**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **BBG COMMUNICATIONS, INC.** | § | **CIVIL ACTION NO. CV2:03-CV-227** |
| | § | |
| **VS.** | § | |
| | § | |
| **1) NETWORK COMMUNICATIONS** | § | **JUDGE WARD** |
| **INTERNATIONAL CORP.,** | § | |
| **2) WILLIAM POPE,** | § | |
| **3) JAY WALTERS, AND** | § | |
| **4) JEFFERY WALTERS.** | § | |

**NCIC'S COUNTERCLAIM AND CLAIM**
**AGAINST THIRD-PARTY DEFENDANTS**

NOW INTO COURT, through undersigned counsel, comes NETWORK COMMUNICATIONS INTERNATIONAL CORP. ("NCIC"), which hereby asserts its Counterclaim against plaintiff BBG COMMUNICATIONS, INC. ("BBG") and third-party claims against third-party defendants, RONALD PEREZ, RICARDO SINGER, GREGORIO GALICOT, RAFAEL GALICOT, MICHAEL STOMPS, AWI FANG a/k/a SURIYANTO SURIYANTO, GORAN ALEXIEV, MICHEL ALEXIEV, PATRICK MAUCHANT, KEVEN WATT, BBG HOLDINGS BERMUDA, d/b/a BBG COMMUNICATIONS (BERMUDA) LTD., BBG HOLDINGS LIMITED, and BBG HOLDINGS (BERMUDA) LTD.

**PARTIES**

1.       Third-party defendant **Ronald Perez** is a citizen of the United States of America and a domiciliary of Montgomery County, Texas. Mr. Perez was an employee of NCIC from September 2002 until approximately June 20, 2003. Beginning on a date unknown to NCIC, but

well prior to June 20, 2003, Mr. Perez surreptitiously began actively working for BBG and its affiliates in direct competition with NCIC as set forth more fully herein below. On information and belief, Mr. Perez may be served with process at 19276 Serpenteer Drive, Porter, Texas, 77365.

2.      Third-party defendant **Ricardo Singer** is a citizen of the United States of America and a resident of the state of California. At all times pertinent hereto, Ricardo Singer was, upon information and belief, an employee of BBG and/or its affiliates and was actively engaged in advancing the business of those companies. On information and belief, Mr. Singer may be served with process at BBG Communications, 1658 Gailes Blvd., Suite #B, San Diego, California, 92154.

3.      Third-party defendant **Gregorio L. Galicot** is a citizen of the United States and a resident of the state of California. At all times pertinent hereto, Mr. Galicot was, upon information and belief, an employee of BBG and/or its affiliates and was actively engaged in advancing the business prospects of those companies. On information and belief, Mr. Gregorio Galicot may be served with process at BBG Communications, 1658 Gailes Blvd., Suite #B, San Diego, California, 92154.

4.      Third-party defendant **Rafael Galicot** is a citizen of the United States and a resident of the state of California. At all times pertinent hereto, Mr. Galicot was, upon information and belief, an employee of BBG and/or its affiliates and was actively engaged in advancing the business prospects of those companies. On information and belief, Mr. Rafael Galicot may be served with process at BBG Communications, 1658 Gailes Blvd., Suite #B, San Diego, California, 92154.

**NCIC'S COUNTERCLAIM AND CLAIM**
**AGAINST THIRD-PARTY DEFENDANTS—Page 2**

5.      Third-party defendant **Michael Stomps** is a citizen of the Netherlands and a resident of the Cayman Islands. Mr. Stomps was associated with NCIC as a sales agent and joint venturer from May 2001 until June 2003 in connection with sales of NCIC telecommunication services in the Caribbean, Europe, North America and Asia. At some time prior to June 2003, and without the knowledge of NCIC, Mr. Stomps surreptitiously began actively promoting the business of BBG and its affiliate entities. On information and belief, Mr. Stomps may be served with process at P. O. Box 30542SMB, John Greer Blvd G T, Grand Cayman, BWI, KY.

6.      Third-party defendant **Awi Fang a/k/a Suriyanto Suriyanto** is a citizen of Indonesia, residing in Australia. Mr. Fang was a sales agent and joint venturer of NCIC and its affiliate in Australia from the time period from September 2002 to June 2003. At some time, prior to June 2003, and without the knowledge of NCIC or its affiliates, Mr. Fang actively, but surreptitiously, began supporting the business of BBG and its affiliates. On information and belief, Mr. Fang may be served with process at 241 Woronga Road, Engadine NSW, 2233, Australia or Unit 173 398-408 Pitt Street Sydney NSW 2000.

7.      Third-party defendants **Goran Alexiev** and **Michel Alexiev** are citizens of the Netherlands, residents of the Czech Republic, joint venturers with NCIC and European Sales Managers for the NCIC affiliate, NCICEurope from March 2002 to June 2002. At some point prior to June 2002, and without the knowledge of NCIC or its affiliates, Messrs. Alexiev began actively, but surreptitiously, promoting the business of BBG and its affiliates. On information and belief, Messrs. Goran and Michel Alexiev may be served with process at Zvonarova 3, 130 00 Prague 3, Czech Republic.

8.     Third-party defendant **Patrick Mauchant** is a citizen of the United Kingdom, residing in Singapore.   Mr. Mauchant was an agent and joint venturer with NCIC from September, 2002 to June, 2003.  At some point no later than June, 2003, Mr. Mauchant began actively promoting the business of BBG and its affiliates.   On information and belief, Mr. Mauchant may be served with process at 10 Anson Road #03-09, International Plaza, Singapore 079903.

9.     Third-party defendant **Keven Watt** is a citizen of Canada, residing in Canada. Mr. Watt was an agent and joint venturer with NCIC from March, 2003 to June, 2003.  At some point no later than June, 2003, Mr. Watt began actively promoting the business of BBG and its affiliates.  On information and belief, Mr. Watt may be served with process at 2637 Perth Place, Kamloops V2B-4TP, BC Canada.

10.     Third-party defendant **BBG Holdings Bermuda**, d/b/a BBG Communications (Bermuda) Ltd., BBG Holdings Limited and BBG Holdings (Bermuda) Ltd., is a corporation organized under the laws of the country of Bermuda.  BBG Holdings Bermuda is an affiliate of BBG and competes with NCIC for business on the island of Bermuda and in various countries around the world.   On information and belief, BBG Holdings Bermuda may be served with process at1658 Gailes Blvd., Suite #B, San Diego, California, 92154 .

## JURISDICTION AND VENUE

11.     This suit alleges violations of the Lanham Trademark Act, 15 U.S.C. Sec. 1051, et. seq. The Court has subject matter jurisdiction over all third-party defendants pursuant to 28 U.S.C. Sec. 1331, 1338, and 1367.

12.     This court has personal jurisdiction over all third-party defendants because they committed intentional torts aimed at NCIC, a Texas corporation, causing foreseeable harm to NCIC in Texas.

13.     Venue is proper in this district because NCIC has its principal place of business in this district and a substantial part of the property at issue is situated in this district.

## FACTUAL ALLEGATIONS

14.     NCIC was incorporated under the laws of the State of Texas in August, 1996.  As set forth more fully in Exhibits NCIC Nos. 1 and 2, respectively, NCIC filed its trademarks with the United States Patent and Trademark office on or about December 27, 2000 under registration number 2671142.  NCIC registered the "NCIC.com" domain name on January 28, 1997.  The mark, name and domain name have been continuously used in commerce throughout the world since registration.

15.     NCIC has used its distinctive "NCIC" name and its distinctive mark in commerce in the United States and International telecommunications markets, and has earned considerable goodwill with its customers and clients as a reliable, high quality, and responsive source of telecommunications services throughout the world.

16.     NCIC is in the business of offering telecommunication services whereby it charges end users for the placement of credit card calls, calling card calls, collect calls and third-party calls originating from hotels, pay phones, and public facilities (including, but not limited to airports and ports of call) originating from outside the United States terminating into the United States.  BBG, which has its principal place of business in San Diego, California, and its affiliates directly compete with NCIC in offering such telecommunications services.

NCIC'S COUNTERCLAIM AND CLAIM
AGAINST THIRD-PARTY DEFENDANTS—Page 5

17.     In the normal course of its business activities, NCIC (and its affiliates) associate themselves with sales agents and joint venturers to assist NCIC in offering its telecommunications services in specific countries.  NCIC also utilizes the services of Blue Phones, Ltd. ("BPL"), a company organized under the laws of the Country of The British Virgin Islands, which exclusively promotes NCIC business throughout the world, except for the United States, Canada and certain accounts in Europe and Mexico.

18.     Pursuant to law applicable in certain foreign countries, in order to offer such services, NCIC enters into agreements with resident sales agents and joint venturers who form business entities under the foreign laws of that country.  Such agents and joint venturers often hold a majority of stock ownership in such foreign business entities for purposes of procuring a foreign telecommunications license therein for the mutual benefit of the joint venturers.  BPL, a company organized under the laws of the Country of the British Virgin Islands, which exclusively promotes NCIC business in the British Virgin Islands and throughout the world, except for the United States, Canada and certain accounts in Europe and Mexico.

19.     NCIC engages such sales agents on a joint venture basis whereby such agents agree to act solely on behalf of NCIC in connection with its telecommunications business in certain countries, and to hold controlling interests in local telecommunications affiliates of NCIC solely for purposes of furthering that joint venture in exchange for the payment by NCIC of sales commissions based upon the volume of calls placed through those foreign NCIC affiliates. NCIC pays all start-up costs and licensing fees for the establishment of the foreign affiliate and all costs associated with purchasing and installing equipment for servicing that foreign country's needs and provides the use of NCIC trade names, trade marks and promotion materials in

**NCIC'S COUNTERCLAIM AND CLAIM**
**AGAINST THIRD-PARTY DEFENDANTS—Page 6**

connection with the promotion of its services.  The relationship thus established between NCIC, its foreign sales agents, and other joint venturers is fiduciary in nature.

20.     Beginning no later than the spring of 2003, BBG began a concerted effort to destroy or substantially damage NCIC as a competitor for business in the international markets, acting through its officers, employees, agents and affiliates.

21.     In the Spring of 2003, BBG began to target the entire NCIC distribution system of agents or joint venturers, as well as Blue Phone agents in an effort to destroy NCIC as a competitor throughout world telecommunications markets, by raiding the NCIC and BPL sales agents and joint venturers, offering substantial cash payments to them to (i) cease efforts on behalf of NCIC; (ii) begin promoting BBG services; (iii) to disclose confidential information with respect to NCIC business, prospects, contracts and negotiations, including, but not limited to call volume reports, pricing data, contractual and negotiating data, and marketing strategies; (iv) to damage NCIC business by causing customers to renegotiate, abandon or improperly terminate contracts with NCIC and its affiliates; (v) to destroy or disassemble NCIC and BPL equipment; (vi) to surreptitiously reroute  NCIC equipment and phone traffic to BBG and its affiliates; and/or (vii) to communicate false and defamatory information about NCIC, its business, prospects and relationship to BBG.

22.     Thus, beginning no later than the spring of 2003, BBG, acting through its officers, employees, agents and affiliates began to target NCIC agents and joint venturers and recruit them for their assistance in damaging the business of NCIC and its affiliates by diverting business and business opportunities to BBG and its affiliates.  In the course of such activities, Ronald Perez,

Michael Stomps, Awi Fang a/k/a Suriyanto Suriyanto, Goran Alexiev, Michel Alexiev, Keven

Watt and Patrick Mauchant (collectively representing in excess of seventy-five percent (75%) of

NCIC's international sales) ceased business activities on behalf of NCIC and began to direct

their attention to damaging NCIC and promoting the business and prospects of BBG and its

affiliates.   Such activities, as set forth more fully hereinbelow, in several instances were

commenced by such former NCIC sales agents and joint venturers without the knowledge of

NCIC and occurred during the period of time when NCIC believed such persons were still

actively engaged in promoting the business of NCIC and its affiliates through a relationship of

trust which had been established between such parties.

23.    In addition, longtime BBG employees and agents continued unlawful and unfair

activities in the marketplace directed at NCIC commenced no later than 2000 calculated to

destroy the business, prospects and reputation of NCIC and its affiliates and to misappropriate

business and prospects from NCIC customers and potential customers, all as set forth more fully

herein below.

24.    Counter-Defendant BBG, acting through its officers, employees, agents, affiliates

and Third-Party Defendants, acting in concert with one another and aiding abetting one another,

have damaged NCIC and its affiliates in connection with the following acts and omissions:

(a)    Beginning at least as early as March 9, 2000 and continuing into 2003, Ricardo

Singer has attempted to further the business of BBG and its affiliates by telling potential

customers and NCIC affiliates that NCIC was so poorly operated that it had been on the verge of

bankruptcy and that BBG (or Mr. Singer) purchased and owns 25% of NCIC in an effort to save

that company.  Neither Mr. Singer nor BBG has ever owned an interest of NCIC, and the company has never been on the verge of bankruptcy.  Such representations are made with the intent and expectation of discouraging potential customers and potential business associates from doing business with NCIC and its foreign affiliates.

(b)      In November, 2002, NCIC discovered that Ricardo Singer created false e-mail traffic purporting to originate from "Rgonzales@NCIC.com" which purported to make insulting comments about French speaking people in the Caribbean.  Mr. Singer utilized this e-mail by forwarding it to French speaking people of Martinique who were customers or potential customers of NCIC and its affiliates in the Caribbean in a effort to depict NCIC in a false and defamatory light.

(c)      In 2000, NCIC sales representatives Wesley Walters and Ricardo Gonzales obtained contracts with various customers for the sale of telecommunication services on the island St. Maarten in the Caribbean.  BBG, through its local affiliate BBG Communications, NV, Global One and Ricardo Singer offered customers $1,000.00 per location to breach their contracts with NCIC and BPL Blue Phone, Ltd. and enter into contracts to place such calls through BBG Communications, NV.  On May 18, 2000, Ricardo Singer circulated a letter "to all of our associates and customers, offering to "take full financial responsibility on any cost incurred by any legal action taken by BPL Bluephone, Ltd." in connection with such customer's breach of contract with NCIC, Blue Phone and their affiliates.

(d)      In 2002, both NCIC and BBG were placing calls for KPN, the Dutch Telecommunications company, in Amsterdam, the Netherlands.  NCIC learned BBG was

charging rates higher than allowed by contract and contacted an independent Notary Public to perform test calls. KPN inquired of Gregorio Galicot about unusually high rates being charges for call being placed through BBG. KPN, the customer, traced such calls to "International Calling Services" or "ICS", which in this instance is a "fictitious name" registered by BBG with the Assessor, Recorder and County Clerk of San Diego County, California on November 29, 1999, which is located in the same building as BBG in San Diego, California. Mr. Gregorio Galicot informed the customer that "ICS" was owned by a company in Longview, Texas controlled by NCIC. NCIC or its shareholders own a controlling interest in "International Calling Services, Inc." or "ICS", a Texas corporation engaged in network operating services. International Calling Services commenced using its name, as well as the abbreviated "ICS" in commerce in August 1997. As Mr. Gregorio Galicot was well aware, such calls were in fact being charged by BBG d/b/a "ICS" or "International Calling Services" and not an NCIC affiliate, International Calling Services, Corp. Mr. Gregorio Galicot thus deceived the customer to believe that NCIC was not following the contract rates when it was BBG that handled the call, not NCIC's affiliate. BBG continues to use the fictitious name "ICS" or "International Calling Services" to confuse the public as to the source of its charges and services, which damages the reputation of NCIC.

(e)     In June 2003, Ronald Perez, while still an employee of NCIC, rerouted existing "800" call traffic which had theretofore been contracted for the benefit of NCIC at the Santiago, Chile International Airport, to BBG.

(f)     On or about Friday, March 14, 2003, Ricardo Singer forwarded a communication to Windam Aruba Beach Hotel, Aruba, making knowingly false claims that taxes charged on NCIC calls made from that hotel and through NCIC services were fraudulently billed by NCIC and that such alleged taxes were, in fact, actually additional surreptitious profits taken by NCIC. Such statements were false and defamatory, thereby causing damage to NCIC and BPL. NCIC's relationship with this customer was affected and damaged.

(g)     NCIC and BPL paid Awi Fang a/k/a Suriyanto Suriyanto commissions, the majority of which were owed to TriTel, located in Sydney, Australia, to provide operator services pursuant to a contract valid through August 31, 2003. Mr. Fang converted said commissions to his own use, thereby failing to pay NCIC's client and referred that client to BBG for future services. This client no longer does business with NCIC and is currently doing business with BBG.

(h)     On or about March 19, 2003, NCIC received approval to operate telephones in the Cebu Airport in the Philippines. NCIC installed fifteen (15) telephones at this location in March, 2003. When the traffic from these telephone calls precipitously dropped, Patrick Mauchant, NCIC's agent for Singapore and Asia, failed to answer inquiries from NCIC. NCIC alleges, on information and belief, that such telephones have been reprogrammed to forward calls to the benefit of BBG with the knowledge and approval of Patrick Mauchant. Mr. Mauchant remains in possession of NCIC's telephone equipment from this location.          .

(i)     Keven Watt registered domain names and e-mail addresses "nciccanada.com" and "ncicglobal.com" on March 29, 2003 while an agent for NCIC. Mr. Watt has disassociated

himself from NCIC and admits that he now works for BBG, reporting to Gregorio Galicot. Notwithstanding demands by NCIC, he has failed and refused to surrender the domain names, containing NCIC's trademark and tradenames, through the date of this complaint.

(j)      In May, 2003, NCIC purchased fifty (50) telephones from Telconet, a company owned by Ronald Perez at a purchase price of $10,000.00.  Such telephones were purchased by NCIC to be shipped to the Dominican Republic to be installed by Mr. Perez, however, Mr. Perez has failed to install the telephones as agreed upon and continues to remain in possession of the equipment, notwithstanding NCIC's demands that he surrender the equipment at an appropriate location.  Additionally, Mr. Perez remains in the possession of ten (10) telephones in El Salvador and their glass enclosures which were purchased by NCIC, and fails and refuses to return this equipment to NCIC.

(k)      In June, 2003, Awi Fang a/k/a Suriyanto Suriyanto caused the PBXs owned by The Victoria, The Four Seasons Menzies, and the La Meridian Hotels located in Australia to be redirected and directed these calls to BBG in violation of contracts with NCIC for those locations.  Mr. Fang caused this telephone traffic to be switched to BBG prior to NCIC being notified of Mr. Fang's resignation and the resignation of Mr. Stomps, who directly supervised Mr. Fang.

(l)      By letter dated June 13, 2003, Awi Fang a/k/a Suriyanto Suriyanto forwarded communications to Intercontinental Hotel, Sydney, an NCIC customer that NCIC Australia Pty, Ltd. had been acquired by BBG effective May 25, 2003.  Such letter also stated that the contract between Intercontinental Hotel Sydney and NCIC Australia Pty, Ltd. was void.  Both of these

statements were untrue and were made at a time when Mr. Fang held himself out as being a representative of NCIC and its affiliates, utilizing NCIC Operator Services, Longview, Texas, stationery, although he had commenced working for BBG and its affiliates at that time. Neither NCIC, nor any of its officers, directors or affiliates had knowledge of or approved of such communications.

(m)     NCIC was a party to a contract with Starhub, a telephone company from Singapore, for telephones in the Singapore Airport. Michael Stomps sent a letter to Starhub in June, 2003, allegedly acting on behalf of NCIC, purporting to terminate that contract. Such actions caused the business theretofore serviced by NCIC with Starhub to be directed to BBG's affiliate VozBBG.

(n)     On or about September, 2002, Ronald Perez, as employee for NCIC, procured a permit from El Salvador Airport through Jose Nelson Mejia, Airport Director, to install pay phones therein. On or about June 20, 2003, Ronald Perez removed eight (8) of ten (10) NCIC public pay phones from the El Salvador Airport. Mr. Perez also attempted to alter the ownership name of the permit obtained for NCIC. All of the foregoing acts occurred prior to Mr. Perez's resignation as an employee of NCIC on or about June 28, 2003.

(o)     NCIC was a party to an exclusive agreement with Vishwagram Info Marketing Services PVT, Ltd., a telecommunications service located in India. Goran Alexiev and Michel Alexiev have caused the exclusive contract between NCIC and Vishwagram to be cancelled on June 23, 2003 and subsequently obtained that contract on behalf of BBG. Vishwagram kept all

monetary deposits paid by NCIC. Goran and Michel Alexiev also caused a termination of NCIC's negotiations with Austria Telecom in June, 2003 and Deutch Telecom in May, 2003.

(p)     After their announced resignations from NCIC and its affiliates, Goran and Michel Alexiev continued to use the domain names "nciceurope.com" and "ncicasia.com" to send and receive e-mail to the detriment of NCIC and its affiliates and with a result that public consumers and business associates of NCIC and its affiliates have been deceived and confused.

(q)     Michael Stomps, and upon information and belief, Goran Alexiev and Michel Alexiev, Ronald Perez, Keven Watt, Awi Fang a/k/a Suriyanto Suriyanto, and Patrick Mauchant, have violated their fiduciary duties to NCIC and its affiliates by providing information to BBG and its affiliates which was deemed confidential by NCIC and its affiliates, was imparted to such persons in confidence and under the circumstances where such defendants knew that the information was confidential and provided such information to BBG and its affiliates. Such information includes customer call volumes, locations, and customer names.

(r)     In June, 2003, Michael Stomps requested from an NCIC Bahamas employee and obtained a list of all (working and non-working) NCIC's telephones in Bahamas for disclosure to and use by BBG and its affiliates.

(s)     Pursuant to their exclusive agent contracts with NCIC, Goran and Michel Alexiev obtained contracts for telecommunication services for NCIC with the Czech Airport in Prague, Katerinska Hotel in Prague, Czech Republic, and Aliatel Telecommunications, Intercontinental Hotel in Prague, Czech Republic and secured approval from Ceski Telecom to post marketing literature on their phones nationwide. NCIC is informed and believes that Goran Alexiev and

**NCIC'S COUNTERCLAIM AND CLAIM**
<u>**AGAINST THIRD-PARTY DEFENDANTS**</u>—**Page 14**

Michel Alexiev caused such parties to breach and terminate their contracts with NCIC and its affiliates and obtained contracts with such entities for BBG in June and July, 2003.

(t)     On or about July 25, 2003, Patrick Mauchant communicated to the front office manager of Swissotel/Raffles Hotel Group, in Singapore, that NCIC Asia Pte, Ltd. had been acquired by BBG and "operates under BBG Communications effective immediately".  As a result of these communications, Swissotel and Raffles terminated service with NCIC.

(u)     In August, 2003, Rafael Galicot offered $400,000.00 to Berlin Key, a joint venturer with NCIC for NCIC Bahamas in exchange for Mr. Key causing NCIC to cease its activities in the Bahamas.  Additionally, Rafael Galicot offered a substantial but yet unknown sum of money to Charles Lightbourne, also a joint venturer with NCIC Bahamas, who subsequently closed the business operations of NCIC Bahamas without notice to NCIC.  NCIC phones in the Bahamas have now been reprogrammed to BBG without any compensation or notice to NCIC.

(v)     No later than July, 2003, Keven Watt began actively promoting the business of BBG in the British Virgin Islands.  Mr. Watt acknowledges that his work was directly assigned from BBG representatives in San Diego, California to "go hard after" NCIC contracts and equipment.  Mr. Watt acknowledges that despite personal reservations about the propriety of his actions he physically removed telephones owned by NCIC and BPL in Tortola, British Virgin Islands, as instructed by BBG.  At least as early as late July, 2003, Mr. Watt obtained executed contracts on behalf of BBG with at least 6 customers who had pre-existing contracts with NCIC or BPL.  These customers were told by Mr. Watt that NCIC was "going out of business." The

contracts with NCIC and/or BPL were prematurely terminated, some of which had three years left on their initial term. Mr. Watt was instructed by BBG to refrain from communications with anyone associated with NCIC or BPL.

(w)    On or about June 12, 2003, Ronald Perez along with Jorge Macari Lopez, an employee of BBG, informed Andy Boulogne, an NCIC local representative in St. Lucia, that NCIC and BBG had formed a joint partnership in St. Lucia. Ronald Perez then sent Andy Boulogne DIDs (access numbers) belonging to BBG to be installed and programmed into the NCIC equipment at the NCIC contract location. BBG employee Manuel Alvarez assisted Andy Boulogne to install the telephones at the NCIC locations under the NCIC St. Lucia license that was obtained by Ronald Perez on behalf of NCIC in Texas. NCIC /BPL paid for the licensing fee, company setup, equipment, shipping costs, installation cost in St. Lucia and Mr. Perez's travel costs and salary. In July 2003, Jeffrey Walters contacted Andy Boulogne to inform him that Ronald Perez was no longer an employee of NCIC and Andy Boulogne agreed to continue to work with NCIC upon realization that Mr. Perez was falsely representing his current association with NCIC. When Mr. Perez and Jorge Macari Lopez found out that Andy Boulogne was continuing to work with NCIC, they offered $30,000.00 to Andy Boulogne not to work with NCIC and cease activities in that market. On September 4th, 2003, Jeremy Walters, an agent for NCIC, placed a test call from an NCIC telephone which was programmed to BBG. The phone was located at an NCIC Contract location Bay Garden Inn and the call was made to Jeffrey Walters in Longview, Texas. Jeffrey Walters was billed $44.92 for a 30 second phone call by Int. Satellite Comm. the assumed billing name of BBG Communications. The rates charged at

NCIC's phones by BBG caused harm to NCIC's name, will result in reduced future usage of our phones and may possibly result in regulatory problems or rate regulations.

## COUNT ONE

### Civil Conspiracy

25.   Plaintiff repeats and incorporates paragraphs 1 through 24 and paragraphs 29 through 112 as if fully set forth herein.

26.   BBG and Third-Party Defendants shared the objective of committing unlawful acts and/or causing injury to NCIC and gaining business advantage through unlawful conduct harmful to NCIC's interests. Specifically, BBG and Third-Party Defendants conspired to engage in conduct constituting one or more of the following illegal acts:  misappropriation of trade secrets and/or confidential information; trademark infringement; defamation; commercial disparagement; tortuous interference with existing contractual relationships; tortuous interference with prospective contractual relationships; breach of fiduciary duty; breach of contract; conversion; intentional destruction of property; commercial bribery and/or unfair competition.

27.   To achieve their objective, BBG and Third-Party Defendants took overt, illegal acts harming NCIC.

28.   As a proximate result of the wrongful actions of BBG and Third-Party Defendants, NCIC has suffered damages, plus lost interest, attorneys' fees, and costs, which it is entitled to recover from BBG and Third-Party Defendants, jointly and severally.

## COUNT ONE

### Misappropriation of Trade Secrets
### and Confidential Information

29.    Plaintiff repeats and incorporates paragraphs 1 through 28 as if fully set forth herein.

30.    Third-Party Defendants Ronald Perez, Michael Stomps, Awi Fang, a/k/a Suriyanto Suriyanto, Goran Alexiev, Michel Alexiev, Patrick Mauchant, and Keven Watt each had a confidential relationship with NCIC.   Through their confidential relationships, these defendants acquired knowledge of, and had access to, confidential information and trade secrets belonging to NCIC, including customer names and contacts, phone locations and call volumes.

31.    Beginning no later than the spring of 2003, BBG targeted, recruited, and induced NCIC agents and/or joint venturers to reveal confidential information and trade secrets belonging to NCIC.

32.    Ronald Perez, Michael Stomps, Awi Fang, a/k/a Suriyanto Suriyanto, Goran Alexiev, Michel Alexiev, Patrick Mauchant, and Keven Watt disclosed and/or used NCIC's confidential information and trade secrets for their own benefit and to NCIC's detriment.   NCIC did not authorize such disclosure and use of its confidential information and trade secrets.

33.    In making the disclosures and using the information, Third-Party defendants Perez, Stomps, Fang, Goran Alexiev, Michel Alexiev, Mauchant, and Watt abused the trust reposed in them incident to their confidential relationship with NCIC, while BBG and the remaining Third-Party Defendants knowingly solicited and took advantage of their wrongful disclosures.

34.     BBG and/or Third-Party Defendants continue to engage in known and unknown acts of use, disclosure and/or misappropriation of trade secrets, confidential information, or proprietary business information such that NCIC will suffer immediate, irreparable harm unless BBG and Third-Party Defendants are immediately restrained by this Court. Accordingly, NCIC is entitled to immediate injunctive relief in the form of a preliminary injunction and, upon trial of this matter, a permanent injunction restraining BBG and Third-Party Defendants from misappropriating, using and disclosing trade secrets, confidential information and/or proprietary business information belonging to NCIC.

35.     NCIC suffered damages as a proximate result of BBG's and Third-party Defendants' misappropriation of its trade secrets and confidential information. NCIC is entitled to recover damages, plus attorneys' fees, interest and costs, from BBG and all Third-Party Defendants jointly and severally as a result of this wrongful conduct. Furthermore, given that BBG's and Third-Party Defendants' conduct was committed intentionally, knowingly, and with callous disregard for NCIC's rights, NCIC is entitled to and seeks exemplary damages in an amount not less than the maximum amount permitted by applicable law based on the allegation of actual damages stated above.

## COUNT TWO

### Trademark Infringement (Texas Law)

36.     Plaintiff repeats and incorporates paragraphs 1 through 35 as if fully set forth herein.

**NCIC'S COUNTERCLAIM AND CLAIM**
**AGAINST THIRD-PARTY DEFENDANTS—Page 19**

37.     NCIC's marks are nationally and internationally recognized as being used by a single source, NCIC, in rendering quality telecommunications services.

38.     The registrations embodying the NCIC marks are in full force and effect.

39.     BBG and Third-Party Defendants have used NCIC marks.  BBG's and Third-Party Defendants' use of NCIC marks constitutes trademark infringement, trademark dilution, and engenders a belief by the public that the services offered are from NCIC.

40.     BBG's and Third-Party Defendants' acts of trademark infringement include but are not necessarily limited to the following:

(a)     BBG uses and/or has used the name "International Calling Services," which is deceptively similar to NCIC's registered name, "International Calling Services, Corp."

(b)     Defendant Watt registered and, on information and belief, used the domain name "nciccandada.com" and "ncicglobal.com" without authorization from NCIC.

(c)     Defendants Goran and Michel Alexiev continued to use domain names "nciceurope.com" and "ncicasia.com" after resigning from NCIC.

(d)     Defendant Mauchant used the name "NCIC Asia PTE Ltd.," representing that BBG owned the name instead of NCIC.

(e)     Defendant Fang used NCIC stationary bearing NCIC marks after leaving NCIC.

41.     BBG's and Third-Party Defendants' activities have caused, and are likely to continue causing, confusion, mistake or deception that is harmful to NCIC, and are likely to injure NCIC's business reputation or to dilute the distinctive quality of a registered trademark.

42.     On information and belief, BBG's and Third-Party Defendants' actions are deliberate and are intentionally calculated to harm NCIC's business, goodwill and reputation.

43.     BBG's and Third-Party Defendants' conduct constitutes trademark infringement under Texas common law and violates Chapter 16 of the Texas Business and Commerce Code.

44.     BBG and/or Third-Party Defendants continue to engage in known and/or unknown acts of trademark infringement such that NCIC will suffer immediate, irreparable harm unless BBG and Third-Party Defendants are immediately restrained by this Court. Accordingly, NCIC is entitled to immediate injunctive relief in the form of a preliminary injunction and, upon trial of this matter, a permanent injunction restraining BBG and Third-Party Defendants from infringing marks belonging to NCIC.

45.     NCIC suffered damages as a proximate result of BBG's and Third-party Defendants' trademark infringement. NCIC is entitled to recover damages, plus attorneys' fees, interest and costs, from BBG and all Third-Party Defendants jointly and severally as a result of this wrongful conduct. Furthermore, given that BBG's and Third-party Defendants' conduct was committed intentionally, knowingly, and with callous disregard for NCIC's rights, NCIC is entitled to and seeks exemplary damages in an amount not less than the maximum amount permitted by applicable law based on the allegation of actual damages stated above.

## COUNT THREE

### Trademark Infringement (Federal Law)

46.    Plaintiff repeats and incorporates paragraphs 1 through 45 as if fully set forth herein.

47.    NCIC's marks are "famous" within the meaning of the Lanham Act, Sec. 43(c), 15 U.S.C. Sec. 1125(c).

48.    BBG's and Third-Party Defendants' conduct violates 15 U.S.C. Sec. 1114, et. seq. and constitutes trademark infringement.

49.    BBG's and Third-Party Defendants' conduct violates 15 U.S.C. Sec. 1125(c) and constitutes trademark dilution.

50.    BBG's and Third-Party Defendants' conduct violates 15 U.S.C. Sec. 1125(d) and constitutes cybersquatting.

51.    BBG and/or Third-Party Defendants continue to engage in known and/or unknown acts of trademark infringement such that NCIC will suffer immediate, irreparable harm unless BBG and Third-Party Defendants are immediately restrained by this Court. Accordingly, NCIC is entitled to immediate injunctive relief in the form of a preliminary injunction and, upon trial of this matter, a permanent injunction restraining BBG and Third-Party Defendants from infringing marks belonging to NCIC.

52.    NCIC suffered damages as a proximate result of BBG's and Third-party Defendants' trademark infringement.  NCIC is entitled to recover damages, plus attorneys' fees, interest and costs, from BBG and all Third-Party Defendants jointly and severally as a result of

this wrongful conduct. Furthermore, given that BBG's and Third-Party Defendants' conduct was committed intentionally, knowingly, and with callous disregard for NCIC's rights, NCIC is entitled to and seeks exemplary damages in an amount not less than the maximum amount permitted by applicable law based on the allegation of actual damages stated above.

### COUNT FOUR

#### Defamation

53.    Plaintiff repeats and incorporates paragraphs 1 through 52 as if fully set forth herein.

54.    Beginning no later than the spring of 2003, BBG and Third-Party Defendants made and published defamatory statements and representations about NCIC, its agents, affiliates, services or business. These statements include but are not necessarily limited to the following:

(a)    Defendant Singer told customers and affiliates that NCIC was on the verge of bankruptcy and he bought 25% in attempt to save it.

(b)    Defendant Singer represented that NCIC was making insulting comments about French speaking people in the Carribean.

(c)    Defendant Gregario Galicot told KPN that the business entity overcharging it for telephone calls, ICS, was owned by NCIC.

(d)    Defendant Singer told Windam Aruba Beach Hotel that taxes billed by NCIC were surreptitious profits.

(e)    Defendant Fang told a customer that NCIC Australia Pty, Ltd. had been acquired by BBG and NCIC's contract with the customer was void.

(f)     Defendant Mauchant told Swisshotel/Raffles Hotel Group in Singapore that NCIC Asia Pte., Ltd. had been acquired by BBG, resulting in their suspending service with NCIC.

(g)     Defendant Watt told 6 customers NCIC was going out of business, resulting in the premature cancellation of their contracts with NCIC.

55.     The statements and representations made by BBG and Third-party Defendants were false and were recklessly and/or maliciously made.  BBG and Third-Party Defendants had no right, privilege or justification to make the statements.

56.     As noted above, the statements were defaming to NCIC in the conduct of its business.  Furthermore, the statements and representations were so egregious and obviously hurtful as to constitute libel and/or slander per se.

57.     BBG and Third-Party Defendants continue to engage in known and/or unknown acts of defamation such that NCIC will suffer immediate, irreparable harm unless BBG and Third-Party Defendants are immediately restrained by this Court.  Accordingly, NCIC is entitled to immediate injunctive relief in the form of a preliminary injunction and, upon trial of this matter, a permanent injunction restraining BBG and Third-Party Defendants from defaming NCIC.

58.     NCIC has been materially damaged as a direct and proximate result of the defamatory statements and representations by BBG and Third-Party Defendants, and is entitled to recover damages, plus attorneys' fees, interest and costs, from BBG and Third-Party Defendants jointly and severally, as a result of this wrongful conduct.  Furthermore, given that

BBG's and Third-Party Defendants' conduct was committed intentionally, knowingly, and with callous disregard for NCIC's legitimate rights, NCIC is entitled to and seeks exemplary damages in an amount not less than the maximum amount permitted by applicable law based on the allegation of actual damages stated above.

### COUNT FIVE

### Commercial Disparagement

59.     Plaintiff repeats and incorporates paragraphs 1 through 58 as if fully set forth herein.

60.     Beginning no later than the spring of 2003, BBG and Third-Party Defendants made false statements and representations about NCIC, its agents, affiliates, services or business. BBG and Third-Party Defendants published these false statements to one or more third parties.

61.     The statements and representations made by BBG and Third-Party Defendants were false and were recklessly and/or maliciously made.  BBG and Third-Party Defendants had no right, privilege or justification to make the statements.

62.     As noted above, the statements were disparaging to NCIC in the conduct of its business.  Furthermore, the statements and representations were so egregious and obviously hurtful as to constitute disparagement per se.

63.     As a result of the disparagement, NCIC has suffered special damage and injury. Specifically, NICC has lost identifiable contracts and business relationships as a result of the disparagement.

**NCIC'S COUNTERCLAIM AND CLAIM**
**AGAINST THIRD-PARTY DEFENDANTS—Page 25**

64.   BBG and Third-Party Defendants continue to engage in known and unknown acts of disparagement such that NCIC will suffer immediate, irreparable harm unless BBG and Third-Party Defendants are immediately restrained by this Court.  Accordingly, NCIC is entitled to immediate injunctive relief in the form of a preliminary injunction and, upon trial of this matter, a permanent injunction restraining BBG and Third-Party Defendants from falsely disparaging NCIC.

65.   NCIC has been materially damaged as a direct and proximate result of the disparaging statements and representations by BBG and Third-Party Defendants, and is entitled to recover damages, plus attorneys' fees, interest and costs, from BBG and Third-Party Defendants jointly and severally, as a result of this wrongful conduct.  Furthermore, given that BBG's and Third-Party Defendants' conduct was committed intentionally, knowingly, and with callous disregard for NCIC's legitimate rights, NCIC is entitled to and seeks exemplary damages in an amount not less than the maximum amount permitted by applicable law based on the allegation of actual damages stated above.

### COUNT SIX

### Tortious Interference with
### Existing Contractual Relations

66.   Plaintiff repeats and incorporates paragraphs 1 through 65 as if fully set forth herein.

67.   BBG and Third-Party Defendants were fully aware of contractual relationships existing between NCIC and its customers, including the fact that valid and enforceable contracts existed between these parties.

**NCIC'S COUNTERCLAIM AND CLAIM
AGAINST THIRD-PARTY DEFENDANTS—Page 26**

68.    Despite their actual awareness of such contracts, BBG and Third-Party Defendants willfully and intentionally interfered with NCIC's contractual relationships. Their conduct includes but is not necessarily limited to the following:

(a)    BBG Defendant Singer offered St. Maarten customers $1,000 each to breach NCIC contracts. Singer also sent a letter offering to pay legal costs incurred by customers as a result of their breach.

(b)    Defendant Fang re-directed calls from The Victoria, The Four Seasons Menzies, and the La Merdian Hotel in Australia to be re-routed to BBG, causing NCIC contracts to be breached.

(c)    Defendant Fang represented to a customer that NCIC Australia Pty, Ltd. had been acquired by BBG and NCIC's contract with the customer was void, causing the customer to breach its obligations to NCIC.

(d)    Defendant Stomps sent letter to Starhub falsely representing that NCIC was terminating its contract with Starhub. Stomps also re-routed call traffic from Starhub to BBG's affiliate VOzBBG. Stomps' conduct caused the contract between NCIC and Starhub to be breached.

(e)    Goran and Michel Alexiev caused Vishwagram Info Marketing Services in India to cancel contract with NCIC.

(f)    On information and belief, Goran and Michel Alexiev caused Czech Airport in Prague, Katerinsak Hotel in Prague, Aliatel Telelecommunications, Intercontinental Hotel in Prague, and Ceski Telecom to cancel contracts and/or agreements with NCIC.

(g)     Defendant Mauchant told Swisshotel/Raffles Hotel Group in Singapore that NCIC Asia Pte., Ltd. had been acquired by BBG, resulting in their suspending service with NCIC.

(h)     Defendant Watt told 6 customers NCIC was going out of business, resulting in the premature cancellation of their contracts with NCIC.

69.     BBG and Third-Party Defendants have no interest in NCIC's contracts and there is no legitimate justification or excuse for their interference.

70.     BBG and Third-Party Defendants continue to engage in known and/or unknown acts of tortuous interference such that NCIC will suffer immediate, irreparable harm unless BBG and Third-Party Defendants are immediately restrained by this Court.  Accordingly, NCIC is entitled to immediate injunctive relief in the form of a preliminary injunction and, upon trial of this matter, a permanent injunction restraining BBG and Third-Party Defendants from tortiously interfering with NCIC's contractual relationships.

71.     As a result of BBG's and Third-Party Defendants' tortious interference, NCIC has suffered actual and consequential damages in the form of lost profits, lost sales, lost revenues, and lost income. NCIC is entitled to recover its damages, plus attorneys' fees, interest and costs, from BBG and Third-Party Defendants jointly and severally as a result of this wrongful conduct. Furthermore, given that BBG's and Third-Party Defendants' conduct was committed intentionally, knowingly, and with callous disregard for NCIC's legitimate contractual rights, NCIC is entitled to and seeks exemplary damages in an amount not less than the maximum amount permitted by applicable law based on the allegation of actual damages stated above.

## COUNT SEVEN

### Tortious Interference with
### Prospective Contractual Relations

72.     Plaintiff repeats and incorporates paragraphs 1 through 71 as if fully set forth herein.

73.     BBG and Third-Party Defendants were fully aware of a prospective contractual relationship between NCIC and potential customers, including the fact that NCIC sought to acquire a valid and enforceable contract with such parties.

74.     Despite their actual awareness of the relationship, BBG and Third-Party Defendants willfully and intentionally interfered with NCIC's prospective contractual relations. BBG's and Third-Party Defendants' conduct includes but is not necessarily limited to the following:

(a)     Goran and Michel Alexiev caused Austria Telecom to cancel contract negotiations with NCIC.   On information and belief, BBG solicited, induced, and/or participated in this activity.

(b)     Goran and Michel Alexiev caused Deutsch Telecom to cancel contract negotiations with NCIC.   On information and belief, BBG solicited, induced, and/or participated in this activity.

75.     The relationship was such that NCIC would have entered into enforceable and lucrative contracts had it not been for the wrongful interference.

76.     NCIC has suffered damages that were proximately caused by the intentional interference with its prospective contractual relations.  NCIC is entitled to recover damages, plus

attorneys' fees, interest and costs as a result of this wrongful conduct. Furthermore, given that the conduct was committed intentionally, knowingly, and with callous disregard for NCIC's legitimate contractual rights, NCIC is entitled to and seeks exemplary damages in an amount not less than the maximum amount permitted by applicable law based on the allegation of actual damages stated above.

## COUNT EIGHT

### Breach of Fiduciary Duty

77.    Plaintiff repeats and incorporates paragraphs 1 through 76 as if fully set forth herein.

78.    Third-Party Defendants Ronald Perez, Michael Stomps, Awi Fang, a/k/a Suriyanto Suriyanto, Goran Alexiev, Michel Alexiev, Patrick Mauchant, and Keven Watt assumed a special role and confidential relationship with respect to NCIC. In the context of their relationships, NCIC reposed trust and confidence in these Third-Party Defendants, of which Third-Party Defendants were aware.

79.    The relationship between the parties was such as to be recognized as fiduciary in nature under Texas law. As a result, the named Third-Party Defendants owed fiduciary duties to NCIC, including the duties of undivided loyalty, utmost good faith and fair dealing, scrupulous honesty, and the duty to make full disclosure to NCIC concerning matters affecting NCIC's property or business interests. The named Third-Party Defendants also had a duty to refrain from using the relationship to benefit their own interests or the interests of competitors, except with the full knowledge and consent of NCIC.

**NCIC'S COUNTERCLAIM AND CLAIM**
**AGAINST THIRD-PARTY DEFENDANTS—Page 30**

80.    The named Third-Party Defendants knowingly and intentionally breached these fiduciary duties to NCIC.  Wrongful acts committed while these defendants were still associated with NCIC include but are not necessarily limited to the following:

(a)    Defendant Perez re-routed NCIC call traffic from the Santiago, Chili airport to BBG.

(b)    Defendant Watt registered and, on information and belief, used the domain name "nciccandada.com" and "ncicglobal.com."

(c)    Defendant Mauchant took possession of 15 phones operating at Cebu Airport in Philippines and, on information and belief, reprogrammed the phones to BBG.

(d)    Defendant Fang re-directed calls from The Victoria, The Four Seasons Menzies, and the La Merdian Hotel in Australia to be re-routed to BBG, breaching NCIC contracts.

(e)    Defendant Stomps sent a letter to Starhub purporting to terminate NCIC's contract then re-routed Starhub's business to BBG's affiliate VOzBBG.

(f)    Defendant Perez removed 8 of 10 NCIC payphones from El Salvador airport and attempted to alter ownership name of permit obtained for NCIC.

(g)    Defendants Goran and Michel Alexiuv caused Vishwagram Info Marketing Services in India to cancel its contract with NCIC.

(h)    Defendant Perez deceived NCIC operative Andy Boulogne into installing NCIC phones at NCIC's locations in St. Lucia that were programmed with BBG's access codes.

81.    NCIC has suffered damages that were proximately caused by the above-named Third-Party Defendants' breach of fiduciary duty.  NCIC is entitled to recover damages, plus

attorneys' fees, interest and costs as a result of this wrongful conduct. Furthermore, given that

the conduct was committed intentionally, knowingly, and with callous disregard for NCIC's

rights, NCIC is entitled to and seeks exemplary damages in an amount not less than the

maximum amount permitted by applicable law based on the allegation of actual damages stated

above.

**COUNT NINE**

**Knowing Participation In A
Breach of Fiduciary Duty**

82.     Plaintiff repeats and incorporates paragraphs 1 through 81 as if fully set forth

herein.

83.     BBG and Third-Party Defendants BBG Holdings Bermuda, d/b/a/ BBG

Communications (Bermuda) Ltd., BBG Holdings Limited, BBG Holdings (Bermuda) Ltd.,

Ricardo Singer, Gregorio Galicot and Rafael Galicot, with full knowledge of the fiduciary duty

existing between NCIC and the Third-Party Defendants named in paragraph 78, knowingly

assisted and participated with them in breaching their fiduciary duties to NCIC.

84.     Among other things, defendants BBG Communications, Inc., BBG Holdings

Bermuda, d/b/a/ BBG Communications (Bermuda) Ltd., BBG Holdings Limited, BBG Holdings

(Bermuda) Ltd., Ricardo Singer, Gregorio Galicot and Rafael Galicot, solicited, induced, and

offered payment for acts constituting a breach of such fiduciary duty by their fellow defendants.

85.     NCIC suffered actual damages as a result of the breaches of fiduciary duty,

including but not limited to lost revenues and opportunities which properly belonged to NCIC

and which improperly accrued to BBG at the expense of NCIC.   NCIC is entitled to recover

damages, plus attorneys' fees, interest and costs, from BBG and Third-Party Defendants jointly and severally as a result of this wrongful conduct. Furthermore, given the fraudulent and otherwise wrongful nature of BBG's and Third-Party Defendants' conduct, NCIC is entitled to and seeks exemplary damages in an amount not less than the maximum amount permitted by applicable law based on the allegation of actual damages stated above.

## COUNT TEN

### Breach of Contract

86.   Plaintiff repeats and incorporates paragraphs 1 through 85 as if fully set forth herein.

87.   Third-Party Defendants Goran Alexiev and Michel Alexiev signed contracts with NCIC obligating them to exclusively market NCIC services in their respective territories. Third-Party Defendants breached their obligations under these contracts.

88.   NCIC suffered actual damages as a result of BBG's and Third-Party Defendants' contractual breaches. NCIC is entitled to recover damages, plus attorneys' fees, interest and costs, from Third-Party Defendants as a result of this wrongful conduct.

## COUNT ELEVEN

### Unjust Enrichment

89.   Plaintiff repeats and incorporates paragraphs 1 through 88 as if fully set forth herein.

90.   NCIC enters into agreements with resident sales agents and joint venturers who form business entities under the foreign laws of that country and such agents and joint venturers

often hold a majority of stock ownership in such foreign business entities for purposes of procuring a foreign telecommunications license therein.

91.    NCIC engaged Michael Stomps, Awi Fang a/k/a Suriyanto Suriyanto, Patrick Mauchant and Ronald Perez on a joint venture basis whereby they agreed to act solely on behalf of NCIC in connection with its telecommunications business in certain countries, and to hold controlling interests in local telecommunications affiliates of NCIC solely for purposes of furthering the joint venture in exchange for the payment by NCIC of sales commissions based upon the volume of calls placed through those foreign NCIC affiliates.  NCIC paid all start-up costs and licensing fees for the establishment of the foreign affiliate and all costs associated with purchasing and installing equipment for servicing that foreign country's needs and provided the use of NCIC trade names, trade marks and promotion materials in connection with the promotion of its services.

92.    Michael Stomps, Awi Fang a/k/a Suriyanto Suriyanto, Patrick Mauchant and Ronald Perez have assumed dominion and control over the contracts and customer relationships created as a result of the joint ventures, thus diverting profits rightfully belonging to NCIC.  As a result, Michael Stomps, Awi Fang a/k/a Suriyanto Suriyanto, Patrick Mauchant and Ronald Perez have received more than the agreed upon commissions and have been unjustly enriched to the detriment of NCIC.

93.    NCIC is entitled to recover damages, plus attorneys' fees, interest and costs, from Michael Stomps, Awi Fang a/k/a Suriyanto Suriyanto, Patrick Mauchant and Ronald Perez as a result of this unjust enrichment.

**NCIC'S COUNTERCLAIM AND CLAIM**
**AGAINST THIRD-PARTY DEFENDANTS—Page 34**

## COUNT TWELVE

### Conversion

94.     Plaintiff repeats and incorporates paragraphs 1 through 93 as if fully set forth herein.

95.     Third-Party Defendants wrongfully took and deprived NCIC of lawful possession of property, which they converted to their own use or the use of some other individual or entity. NCIC was, at the time of the conversion, the lawful owner of the property. Third-party Defendants, conversely, had absolutely no right or title to, or interest in, the property.  It was converted without NCIC's consent, and Third-Party Defendants wholly failed to compensate NCIC for it.

96.     As of this date, NCIC is award of the following acts of conversion:

(a)     Defendant Perez failed to install and kept possession of 50 phones that were to be installed in Dominican Republic.

(b)     Defendant Perez took 10 phones and their glass enclosures in El Salvador.

(c)     Acting on BBG's instructions, Defendant Watt physically removed and converted NCIC telephones in Tortola, British Islands.

(d)     Defendant Perez converted NCIC phones at NCIC's locations in St. Lucia by reprogramming them with BBG's access codes.

(e)     Defendant Mauchant converted 15 phones operating at Cebu Airport in Philippines by reprogramming them to BBG.

(f)    On information and belief, Ronald Perez and/or other Third-Party Defendants converted documents, including original contracts, belonging to NCIC.

97.    As a proximate result of Third-party Defendants' unlawful conversion, NCIC has suffered damages, plus lost interest, attorneys' fees, and costs, which it is entitled to recover from BBG and Third-Party Defendants, jointly and severally.  Furthermore, given the fraudulent and otherwise wrongful nature of BBG's and Third-Party Defendants' conduct, NCIC is entitled to and seeks exemplary damages in an amount not less than the maximum amount permitted by applicable law based on the allegation of actual damages stated above.

## COUNT THIRTEEN

### Intentional Property Damage

98.    Plaintiff repeats and incorporates paragraphs 1 through 97 as if fully set forth herein.

99.    On information and belief, BBG and/or Third-Party Defendants defaced and/or otherwise intentionally damaged telephone equipment belonging to NCIC.

100.    As a proximate result of such unlawful conduct, NCIC has suffered damages, plus lost interest, attorneys' fees, and costs, for which it seeks recovery.

## COUNT FOURTEEN

### Violation of Texas Penal Code Section 32.43

101.    Plaintiff repeats and incorporates paragraphs 1 through 100 as if fully set forth herein.

102.     BBG and Third-Party Defendants offered money and/or other things of value to individuals working for or with NCIC to cease activities or otherwise act to the detriment of NCIC.   Such conduct is a violation of Texas Penal Code, Section 32.43.   NCIC is currently aware of the following acts:

(a)     Defendant Galicot, on behalf of BBG, offered Berlin Key, a joint venturer with NCIC, the sum of $400,000 to cease activities in the Bahamas.

(b)     Defendant Perez, on behalf of BBG, offered Andy Boulogne, an NCIC local representative in St. Lucia, the sum of $30,000 to cease work for NCIC.

103.     On information and belief, BBG will continue to engage in known and/or unknown acts of commercial bribery such that NCIC will suffer immediate, irreparable harm unless BBG is immediately restrained by this Court. Accordingly, NCIC is entitled to immediate injunctive relief in the form of a preliminary injunction and, upon trial of this matter, a permanent injunction restraining BBG and Third-Party Defendants from engaging in acts of commercial bribery.

104.     As a proximate result of BBG's and Third-Party Defendants' commercial bribery, NCIC has suffered damages, plus lost interest, attorneys' fees, and costs, which it is entitled to recover from BBG and Third-Party Defendants, jointly and severally.   Furthermore, given the fraudulent and otherwise wrongful nature of BBG's and Third-Party Defendants' conduct, NCIC is entitled to and seeks exemplary damages in an amount not less than the maximum amount permitted by applicable law based on the allegation of actual damages stated above.

## COUNT FIFTEEN

### Unfair Competition

105.    NCIC repeats and incorporates paragraphs 1 through 104 as if fully set forth herein.

106.    BBG and Third-Party Defendants engaged in wrongful acts constituting unfair competition under Texas common law, including misappropriation of trade secrets and/or confidential information; trademark infringement; defamation; business disparagement; tortuous interference with existing contractual relations; tortuous interference with prospective contractual relationships; breach of fiduciary duty; breach of contract; conversion; intentional destruction of property; commercial bribery; and/or a combination of some or all of the above.

107.    As a proximate result of BBG's and Third-Party Defendants' unfair competition, NCIC has suffered damages, plus lost interest, attorneys' fees, and costs, which it is entitled to recover from BBG and Third-Party Defendants, jointly and severally.  Furthermore, given the fraudulent and otherwise wrongful nature of BBG's and Third-Party Defendants' conduct, NCIC is entitled to and seeks exemplary damages in an amount not less than the maximum amount permitted by applicable law based on the allegation of actual damages stated above.

### PUNTIVE DAMAGES

108.    Plaintiff repeats and incorporates paragraphs 1 through 107 as if fully set forth herein.

109.    BBG and Third-Party Defendants acted intentionally and with malice in committing the unlawful acts described herein.

110.   NCIC is entitled to recover punitive damages against BBG and Third-Party Defendants to punish them for their unlawful conduct in an amount to be determined at trial.

### INJUNCTIVE RELIEF

111.   Plaintiff repeats and incorporates paragraphs 1 through 110 as if fully set forth herein.

112.   BBG's and Third-Party Defendants' actions are causing, and will continue to cause, irreparable harm for which NCIC has no adequate remedy at law. NCIC is entitled to preliminary and permanent injunctive relief restraining BBG and Third-Party Defendants from continuing their unlawful conduct and ordering the return and/or restoration of NCIC's property.

### PRAYER

**WHEREFORE, PREMISES CONSIDERED**, NCIC respectfully prays for relief as follows:

a.   That NCIC be awarded a judgment against BBG and Third-Party Defendants, jointly and severally, for actual damages;

b.   That a preliminary injunction, and after trial a permanent injunction, be issued ordering that BBG, Third-Party Defendants, their officers, agents, servants, employees, attorneys, and persons in active concert or participation with them:

> (1)   Immediately cease and desist from re-programming, defacing, damaging or tampering with NCIC phones;

> (2)   Immediately cease and desist from representing to customers that NCIC has charged rates in excess of the legally permitted amount;

(3)     Immediately cease and desist from using or registering e-mail addresses or domain names including the letters "NCIC" the words "blue phone", or any terms deceptively similar to them;

(4)     Immediately cease and desist from offering any compensation, cash or otherwise, to an individual or company who breaches a contractual agreement with NCIC.

(5)     Immediately cease and desist from re-directing telephone traffic from NCIC to BBG;

(6)     Immediately cease and desist from representing that NCIC is having, or has had, financial difficulty and/or is facing bankruptcy;

(7)     Immediately cease and desist from using or disclosing NCIC information on customer names, call volumes, and/or locations;

(8)     Immediately cease and desist from engaging in any conduct that falsely represents that, or is likely to confuse, mislead, or deceive customers, end users and members of the public that the actions of BBG and Third-Party Defendants are sponsored, approved, or connected with NCIC.

And further, that such preliminary injunction, and after trial a permanent injunction, order that:

(9)     BBG and Third-Party Defendants instruct and admonish their agents, employees, and representatives to cease and desist from all conduct herein restrained by this order, and enforce their compliance;

**NCIC'S COUNTERCLAIM AND CLAIM**
**AGAINST THIRD-PARTY DEFENDANTS—Page 40**

(10)   BBG and Third-Party Defendants restore and return any equipment or property in their possession belonging to NCIC;

(11)   BBG and Third-Party Defendants return any and all documents taken from NCIC, and all copies thereof; and

(12)   BBG and Third-Party Defendants provide an accounting of all gains, profits and damages sustained by NCIC as a result of BBG's and Third-Party Defendants' wrongful acts.

c.   That NCIC be awarded punitive damages against BBG and Third-Party Defendants, jointly and severally, in an amount no less than $500,000.

d.   That NCIC be awarded attorneys fees, costs and prejudgment and post-judgment interest against BBG and Third-Party Defendants, jointly and severally; and

e.   That NCIC be granted such other relief that the Court deems appropriate.

Respectfully submitted by:

Jerald R. Harper
Attorney-in-Charge
La. Bar No. 6585
Jerald R. Harper, P.C.
504 Texas Street, Suite 405
P. O. Box 72
Shreveport, Louisiana 71161
Telephone: (318) 221-1004
Facsimile: (318) 221-0008

**NCIC'S COUNTERCLAIM AND CLAIM**
**AGAINST THIRD-PARTY DEFENDANTS—Page 41**

Tom Henson
Texas Bar No. 09494000
Maria B. Sowders
Texas Bar No. 02129080
Ramey & Flock, P.C.
100 East Ferguson, Suite 500
Tyler, Texas 75702
Telephone: (903) 597-3301
Facsimile: (903) 597-2413

ATTORNEYS FOR DEFENDANT AND
COUNTERCLAIM PLAINTIFF NETWORK
COMMUNICATIONS INTERNATIONAL CORP.

OF COUNSEL:

RAMEY & FLOCK, P.C.
100 East Ferguson, Suite 500
Tyler, Texas 75702
Telephone: (903) 597-3301
Facsimile: (903) 597-2413

JERALD R. HARPER, P.C.
504 Texas Street, Suite 405
P. O. Box 72
Shreveport, Louisiana 71161
Telephone: (318) 221-1004
Facsimile: (318) 221-0008

## VERIFICATION

STATE OF TEXAS       )
                       )
COUNTY OF _____  )

      BEFORE ME, the undersigned authority, on this day personally appeared William Pope, who after being duly sworn upon his oath states that he has read NCIC's COUNTERCLAIM AND CLAIM AGAINST THIRD-PARTY DEFENDANTS and the factual averments contained therein have been investigated and are to the best of his knowledge true and correct.

BY: _William 2 Pope_____

      Subscribed and sworn to me by the said William Pope on this the 31st day of October, 2003.

_Randi K. Lasater_____
Notary Public in and for the State of Texas

RANDI K. LASATER
Notary Public
STATE OF TEXAS
My Comm. Exp. 5-13-2006

**NCIC'S COUNTERCLAIM AND CLAIM**
**AGAINST THIRD-PARTY DEFENDANTS—Page 43**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the above and foregoing Counterclaim in Claim against Third-Party Defendants was delivered to all parties on this 31st day of _October_, 2003, via facsimile and depositing same in the U. S. Mail, postage prepaid, addressed to:

Otis W. Carroll
Wesley Hill
Collin Maloney
Ireland, Carroll & Kelley, P.C.
6101 South Broadway
Suite 500
Tyler, TX 75703

Tawnya R. Wojciechowski
Sheppard, Mullin, Richter & Hampton LLP
650 Town Center Drive, 4th Floor
Costa Mesa, CA 92626-1925