# Exhibit
# F

# CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | |
|---|---|
| BBG COMMUNICATIONS, INC. | ) |
| | ) |
| | ) |
| | ) |
| vs. | ) Case No. 2:03-CV-227 |
| | ) (WARD) |
| | ) |
| NETWORK COMMUNICATIONS INTERNATIONAL | ) |
| CORPORATION, WILLIAM POPE, JAY | ) |
| WALTERS, and JEFFREY WALTERS. | ) |
| | ) |
| | ) |

DEPOSITION OF GREGORIO GALICOT

SAN DIEGO, CALIFORNIA

MAY 24, 2004

REPORTED BY LAURA J. BOLLSCHWEILER, RPR, CSR NO. 10500



PETERSON
& ASSOCIATES
COURT REPORTING & VIDEO SERVICES



530 "B" Street, Suite 350 • San Diego, CA 92101 • www.bookadepo.com • www.petersoncsr.com
Telephone: 619-260-1069 • Toll Free: 800-649-6353 • Fax: 619-688-1733
Los Angeles • Orange County • Riverside County • San Bernardino • San Francisco

1          A.     Out ⌐ the top of my head, righ now, this

2     instance, no.  But if I had more time, I could probably

3     think of an instance.                                    12:4

4          Q.     Do you remember any instance where NCIC has

5     taken business away from BBG?

6          A.     Yes.  Yes.

7          Q.     Where?

8          A.     Basically, the truth of the matter is that I

9     don't know if it's NCIC directly or not NCIC.  So I don't

10    want to characterize something which I am not 100 percent  12:4

11    sure.

12         Q.     So you can't tell me with any degree of

13    confidence of any instance where NCIC has taken business

14    away from BBG?

15         A.     Well, I believe that NCIC has taken business

16    from BBG in Mexico with paying off operators from exclusive

17    contracts from BBG.  I believe that.                      12:4

18         Q.     Any other instances where NCIC has taken

19    traffic from BBG?

20         A.     I believe that NCIC has taken traffic routing

21    stickers in Italy from BBG, without having a contract while

22    BBG having an exclusive agreement.

23         Q.     Any other instances that you think NCIC has    12:4

24    obtained traffic on its own behalf which has resulted in

25    traffic being diverted from BBG?

1   Atlantis, and I k  w I got a complaint from  e Atlantis

2   that a customer called and said that NCIC -- that a guest

3   complained about a charge that was sent to NCIC and I also

4   know that NCIC had no business in the Atlantis.  There is

5   no other explanation to me why this lady would call                    12:5

6   using -- contacting the operator in the hotel and the call

7   being billed by NCIC.

8   BY MR. HARPER:

9        Q.   What NCIC officer, director, or employee or

10  authorized representative is placing stickers on phones?

11       A.   I don't know who are the directors, employees,

12  et cetera, et cetera, et cetera that are from NCIC.  I know   12:5

13  that NCIC has agents and I know that NCIC knows about the

14  sticker business and I know that I've advised NCIC to

15  please stop stickering and I know that the issue continues

16  to be an issue.  That's what I know.  I personally sent

17  e-mails to Bill Pope to please stop stickering from numbers

18  that are known numbers billed by NCIC, and activity hasn't

19  stopped.

20       Q.   You've given Mr. Pope the names of all the        12:5

21  NCIC representatives that you claim are stickering?

22       A.   I don't need to give them because he knows who

23  he receives the traffic from.  I've sent him the phone

24  bills.  He can check the billed to numbers.  He can know

25  exactly who handled that traffic and he can shut it down if

1   he really wanted   .

2        Q.    Can you give me any specifics about any NCIC

3   representative stickering?

4             MS. WOJCIECHOWSKI:  Objection as to form.

5             THE WITNESS:  I don't know who would be

6   considered legally an NCIC representative or not.                    12:5

7   BY MR. HARPER:

8        Q.    Who do you think is stickering from NCIC?

9        A.    I know that Michael Stomps put stickers, for

10  example.

11       Q.    Yes, sir.  Michael Stomps is no longer with

12  NCIC.

13       A.    While he was sending his traffic to NCIC, I

14  know that Michael Stomps put stickers.  Illegal stickers.

15       Q.    Did you consider him to be an authorized

16  representative of NCIC?                                              12:5

17            MS. WOJCIECHOWSKI:  Object as to form.

18            ·THE WITNESS:  I always considered him to have

19  his own company.

20  BY MR. HARPER:

21       Q.    That's what I was going to ask.  Was Mr.

22  Stomps working for NCIC when he was stickering?

23       A.    He was sending his traffic to NCIC.  I don't

24  know how NCIC -- I know that NCIC knew about it, but I

25  don't know if he was considered -- my understanding of Mr.

1    Stomps, he has hi   :ompany.  He sends his tr.  ic to NCIC.

2         Q.    When Mr. Stomps was out stickering, as you say          12:5

3    he was, was he working for NCIC or was he working for his

4    company?

5              MS. WOJCIECHOWSKI:  Object as to form.

6              THE WITNESS:  What company is that?

7    BY MR. HARPER:

8         Q.    You're familiar with it.  I've got the same

9    question.  I don't know what company Mr. Stomps works for,

10   but you apparently have satisfied yourself he has a

11   company.

12        A.    Yes, he does.  He has a company, to my

13   understanding.

14        Q.    Was he working for that company or was he          12:5

15   working for NCIC when he was stickering?

16             MS. WOJCIECHOWSKI:  Object as to form.

17             THE WITNESS:  He was sending traffic to NCIC

18   at that moment.

19   BY MR. HARPER:

20        Q.    Are you saying he was working for NCIC when he

21   was stickering?

22        A.    No.  I'm saying he was sending his traffic to

23   NCIC.

24        Q.    What person working for NCIC has engaged in

25   stickering that you complain about in this lawsuit?  Can

110

1    you name a single  ne?

2         A.    I don't know everybody that works for NCIC.   I

3    could name people, but it would be -- it would be                    12:5

4    inappropriate for me to be naming people without having all

5    the knowledge of what is their status with NCIC.   But I do

6    know that I informed Mr. Pope that I was getting stickers.

7    The stickers were billed by NCIC.   He knew about it and he

8    did not do anything about it.

9         Q.    Is BBG applying these stickers that it's

10   complaining about?

11        A.    Is BBG applying what stickers?

12        Q.    The stickers that you've been writing Mr. Pope

13   about, are you applying those stickers yourself?

14        A.    What does that mean?                                        12:5

15        Q.    I'm asking you if your company is applying the

16   stickers that you're complaining about?

17        A.    I don't understand your question.

18        Q.    Yes, sir.  Just listen.  Is BBG applying

19   stickers to phones, taking pictures of them, and then

20   complaining to Mr. Pope?

21        A.    One more time because I honestly don't know

22   what you're saying.

23        Q.    Okay.

24        A.    Can you be specific?

25        Q.    Sure.

1      A.    Than  you.

2      Q.    I can be specific.

3      A.    I'll be very specific also, the best that I

4    can.

5      Q.    Is BBG applying stickers to telephones and

6    taking photographs of them and complaining that NCIC in          12:5

7    fact is responsible for applying those stickers to the

8    phones?

9      A.    Which stickers are you referring to?

10      Q.    The ones that you're referring to in the

11    e-mails.

12      A.    The illegal stickers being placed by NCIC?  Is

13    that what you're referring to?

14      Q.    The ones that you claim are from NCIC, yes,

15    sir.

16      A.    BBG has an authorized account with Telecom

17    Italia exclusive for having our advertisement in the

18    Telecom Italia pay phones and for many years, NCIC has

19    redirected traffic from Telecom Italia pay phones to NCIC          12:5

20    operator centers.  There is a known fact and we have for a

21    long time of this activity happening.

22      Q.    Who's doing this?

23      A.    I know of a few people, but I think NCIC would

24    know better than me.

25      Q.    Will you tell us what you know?  Who from NCIC

1   is engaged in thi  improper activity of redi  ting calls?

2       A.   I don't want to characterize as to the                    12:5

3   particular people because I don't know what is the

4   relationship between that people and NCIC.

5       Q.   If you think they have a relationship with

6   NCIC, tell us who they are.  I just want to know who the

7   people are engaged in this improper activity.

8       A.   I know they have a relationship with NCIC.

9       Q.   Who are they?

10      A.   Because NCIC billed the calls.  I informed

11  Bill Pope of this activity, and there was no action taken.

12  I know they are profiting from this illegal activity.

13      Q.   Okay, Mr. Galicot.  I know you want to stop

14  this activity, so just tell us who it is so we can look    12:5

15  into this.

16      A.   Many people.

17      Q.   Tell us who they are.

18      A.   I know that Mission Communications has been in

19  the sticker business.  I know Vicencio Cuomo, which I

20  believe he's an employee or very much close to NCIC also is

21  another sticker person.  And I know NCIC has been putting

22  stickers for a long time.

23      Q.   Okay.  You've told me about Mission            12:5

24  Communications and Mr. Cuomo.  Anybody else?

25      A.   I cannot name more because I don't remember at

113

1      A.     I on   know Geraldo Rivera.   Th   s it.

2      Q.     Has BBG ever engaged in unlawful stickering?

3             MS. WOJCIECHOWSKI:   Objection as to form.

4             THE WITNESS:   We have engaged in lawful, legal

5      stickering.  BBG does not engage in illegal stickering.

6      BY MR. HARPER:

7      Q.     Yes, sir.  The question was has BBG ever          13:0

8      engaged in unlawful stickering?

9             MS. WOJCIECHOWSKI:   Objection as to form.

10            THE WITNESS:   To the best of my knowledge, no.

11     BY MR. HARPER:

12     Q.     Has BBG ever paid off operators?

13     A.     When you say "paid off," what do you mean?

14     Q.     I mean engaged in the system of offering

15     operators money to circumvent existing contracts and direct

16     traffic to BBG.

17     A.     No.

18     Q.     Has BBG ever paid Telco employees to direct

19     business to BBG?

20     A.     Telco employees to direct business to BBG?       13:0

21     Q.     Yes, sir.

22     A.     No.

23     Q.     Has BBG made any payments to any

24     representative of the Italian telephone company?

25     A.     No.

123

1    any other compani    that provide services fr.   San Diego.

2    I'm not sure.

3         Q.    Have you checked to see if AT&T has a Better

4    Business Bureau report in San Diego?

5         A.    I've check some competitors' Better Business

6    Bureaus.  I don't think I've checked AT&T's because they

7    have local AT&T offices all over the country so it's kind

8    of difficult to know where complaints would go with regards          14:2

9    to international services.  They have so many offices

10   everywhere that maybe they're diluted throughout the

11   country.

12        Q.    Before the break, I was asking you questions

13   about the appearance of all these stickers suddenly in

14   Italy and other places that you brought to Mr. Pope's

15   attention.  And maybe I'm wrong, but I got the impression

16   that this is a new development.  Is this a new development?

17        A.    Absolutely not.

18        Q.    This is something that's been going on by your          14:2

19   competitors for years and years?

20        A.    Many years.

21        Q.    Has NCIC been engaged in this type of

22   nefarious activity over the years?

23        A.    Yes.

24        Q.    What have you done about it in the past before

25   you had the lawsuit pending?

172

1          A.      Basically, the lawsuit is one action we're

2    taking.   The other thing we've hired -- we are not a

3    litigious company and we've always tried to not do

4    litigation.  I don't know exactly from when NCIC began to          14:2

5    specifically start this sticker activity.  We are

6    investigating that.  So I was not sure that NCIC was the

7    company that was the one from the very beginning that was

8    doing this.  But I do know they have agents from before

9    this lawsuit that were working for NCIC and putting

10   stickers on top of our authorized publicity in Telecom          14:2

11   Italia.

12          Q.      Those would be your agents?

13          A.      Vicencio Cuomo, for example, he's an agent of

14   NCIC or an agent, I don't know his exact position in the

15   company.  But I know that from before this litigation, that

16   gentleman has been placing stickers on top of our phones in

17   order to redirect the traffic to NCIC.  I don't know when

18   the activities began.

19          Q.      So let me understand your testimony.  Are you

20   saying that NCIC has been engaged in unlawful stickering

21   for years?  Is that your testimony?          14:2

22          A.      I don't know from which date.  I cannot

23   testify toward that.  I know that Vicencio Cuomo prior to

24   this litigation has been doing illegal stickering.

25          Q.      When is the first time you wrote Mr. Pope

173

1    about alleged ill_al stickering by NCIC?

2         A.    What we tried to do, we took -- the first time

3    I wrote Mr. Pope -- I don't recall if I ever wrote Mr. Pope

4    prior to communications within the last six months.                14:2

5         Q.    That's my question.  When was the first time

6    you wrote Mr. Pope?

7         A.    I don't recall.  I don't recall when was the

8    first time.

9         Q.    How many times have you written him in the

10   past year?

11        A.    Well, in the past year, I have not written him

12   too much because we've been in pending litigation and I

13   haven't felt comfortable to write to him.  But I decided

14   that -- to start writing him because even though he knows

15   what's going on, he seems not to care.                             14:2

16        Q.    Mr. Pope knows about illegal stickering?

17        A.    Yes.

18        Q.    And how do you conclude that he knows about

19   illegal stickering?

20        A.    Because I told him.  That's one of the

21   reasons.  I told him directly.  And also -- and also

22   Mission Communications -- I know that Michael Stomps

23   engaged in illegal stickering, for example, and was sending  14:2

24   the traffic to NCIC and I believe Mr. Pope was aware of

25   that.

                                                                      174

1      Q.    That Michael Stomps had been doing that?

2      A.    Yes.

3      Q.    And so that's not the kind of agent that you

4  would want associated with your business, right?

5            MS. WOJCIECHOWSKI:  Object as to form.

6            THE WITNESS:  I was not aware that he was

7  doing that prior to this litigation and Michael does not

8  engage in that since he's been an exclusive agent for BBG.

9  BY MR. HARPER:

10     Q.    How did you address that with Michael?          14:3

11     A.    We didn't address it directly -- actually, we

12  have addressed it.  I've told him that we don't want to

13  engage --

14            (Interruption in proceedings.)

15            MS. WOJCIECHOWSKI:  Off the record for a

16  moment.

17            THE VIDEOGRAPHER:  Off the record.  The time

18  is now 2:30 p.m.

19            (Recess.)

20            THE VIDEOGRAPHER:  On the record.  The time is   14:3

21  now 2:32 p.m.

22            Counsel?

23  BY MR. HARPER:

24     Q.    What unlawful stickering did Bill Pope know

25  about and approve of?

1        A.    Mich 1 Stomps told me that he  ew about the

2   stickering.

3        Q.    What stickering?

4        A.    The stickering that he did.

5        Q.    Setting that aside for just a moment, what

6   unlawful stickering that you complain of in this lawsuit

7   did Bill Pope know about and approve it?                          14:3

8        A.    I sent him an e-mail.  I sent him a few

9   e-mails, actually.  And we did test calls from Italy from

10  stickers that were placed on top of our approved,

11  authorized, legal stickers from Telecom Italia on our

12  exclusive contract.  And we took pictures of these illegal

13  stickers.  We reported them to Mr. Pope to see if he would

14  take some action.  He did not.

15       Q.    How do you know?

16       A.    Because the numbers were still working.             14:3

17       Q.    How do you know?

18       A.    Because the numbers were -- I don't know until

19  today.  I haven't received a report today.

20       Q.    How do you know Mr. Pope didn't go to law

21  enforcement officials in Italy and report this?

22             MS. WOJCIECHOWSKI:  Objection as to form.

23             THE WITNESS:  Maybe he did.  But I don't think

24  this has gone to Italy for anything.  It's very clear that

25  I sent him an e-mail and pictures.

1    BY MR. HARPER:

2         Q.    This is not responsive to any question.   I'm

3    not here to argue with you, sir.   I'm just here to ask you          14:3

4    questions.

5         A.    How do I know he did not go to law enforcement

6    officials in Italy?   I think it would be ridiculous that he

7    might have.

8         Q.    Why would it be ridiculous?   Isn't this a

9    serious matter?

10        A.    If he knows what's going on, he's not going to

11   report himself, is he?

12        Q.    You would think not, would you?

13        A.    I don't think that would make sense.

14        Q.    Wouldn't it make sense that somebody ought to

15   report this to law enforcement?

16             MS. WOJCIECHOWSKI:   Object as to form.

17             THE WITNESS:   I'm not here to say what law

18   enforcement is interested in addressing.   We have reported          14:3

19   incidents to law enforcement.

20   BY MR. HARPER:

21        Q.    Have you reported this illegal stickering to

22   law enforcement?

23        A.    We have reported the illegal stickering to law

24   enforcement?   I'm not sure.   Probably.

25        Q.    Who would do that?   Who would have done that?

177

1          A.    Prob_ly our local agents in It_.y.

2          Q.    Who makes arrangements for your company to

3    have printers print stickers for phones?

4                MS. WOJCIECHOWSKI:   Object as to form.

5                THE WITNESS:   One more time?

6    BY MR. HARPER:

7          Q.    How is the process of having stickers printed          14:3

8    handled by your firm?

9          A.    Depends.   Some people produce the -- when

10   you're talking about the stickers, you are talking about

11   the authorized stickers that we present for Telecom Italia,

12   for example, where do we print them?

13         Q.    Yes, sir.

14         A.    I'm not sure.

15         Q.    Are they printed locally in Italy?

16         A.    I'm not sure if we print them locally or if we

17   print them in our in-house marketing department.                    14:3

18         Q.    Who is in your in-house marketing department?

19         A.    It's a group of people that print things.

20         Q.    Who are they?

21         A.    It's actually a company that -- I don't know

22   the name of the company.   It's a third-party company.

23         Q.    Who supervises that area?

24         A.    David Franco.

25         Q.    Would Mr. Franco be familiar with the stickers

                                                                         178

1    that have been au—orized and printed by you_ company in          14:3

2    the last six months?

3         A.    Maybe if they were printed in our office, he

4    might have.

5         Q.    Who would be knowledgeable about stickers

6    printed at your request for use in Italy?

7         A.    In Italy?  I don't think we printed any

8    stickers for Italy because we printed a batch of like

9    100,000 or something like that.  I'm not the correct person

10   to answer the specific of how many stickers and where we

11   printed them.

12        Q.    Have you seen -- Eric, for the record, I'm        14:3

13   unfolding a map that's not produced here, but have you seen

14   maps such as the map that I'm holding up for you here?

15        A.    It's too far for me to see.  If you share.

16        Q.    I'll share.  With advertisements such as up

17   here in the corner for 800 numbers international calls?      14:3

18        A.    What's your question?

19        Q.    Have you seen these types of maps used?

20        A.    This particular one, no.

21        Q.    Have you seen maps using this particular form

22   of advertising, tourist maps?

23        A.    I believe I have.

24        Q.    Do you happen to know the costs associated

25   with having something like that published and distributed?

                                                                  179

1         A.    No.

2         Q.    Does it make sense to you that someone would

3    go to the expense of having these types of maps printed and          14:3

4    then putting stickers on phones to have the phone taken out

5    of business or risk that phone being taken out of business?

6              MS. WOJCIECHOWSKI:   Objection as to form.

7              THE WITNESS:   What's your question?

8    BY MR. HARPER:

9         Q.    The question is does it make sense to you that

10   somebody would go to the expense of having this type of

11   advertising done and then engage in unlawful stickering and

12   run the risk of having the phones being disconnected?

13             MS. WOJCIECHOWSKI:   Object as to form.                    14:3

14             THE WITNESS:   I don't understand your

15   question.   Can you repeat for me one more time?

16   BY MR. HARPER:

17        Q.    Is -- engaging in unlawful stickering, you can

18   have your phone number disconnected and inactivated,

19   correct?

20        A.    In Italy, very seldom.   They're very -- they

21   didn't disconnect too many numbers in Italy, in particular.

22        Q.    Do reputable phone companies disconnect

23   numbers that are engaged in unlawful stickering?

24        A.    I consider Telecom Italia very reputable and          14:3

25   they're very concerned about disconnecting numbers.   Most

180

1    other European companies, they do disconnect the numbers.

2    But in Italy, they seldom disconnect the numbers.

3              Q.    Who in Italy first noticed these unlawful

4    stickers?

5              MS. WOJCIECHOWSKI:  Object to form.

6              THE WITNESS:  I don't understand your

7    question.

8    BY MR. HARPER:

9              Q.    How did this stickering come to your attention

10   in Italy?

11             A.    When, how, what?  I don't understand your          14:3

12   question.

13             Q.    From what person did this stickering -- what

14   person brought this stickering to your attention in Italy?

15             A.    It has been known stickering had been placed

16   in our phones.  That's why we hired a big staff of people

17   just to maintain and clean the phones.

18             Q.    How and when did a complaint come to your

19   attention that caused you to believe that NCIC was engaged     14:3

20   in stickering in Italy?

21             A.    We've been doing test calls for the last year.

22             Q.    This has been going on for a year?

23             A.    Probably.  Probably more.  And we have tried

24   to stop it by hiring people, cleaning phones.  Because like

25   I said, we're not a very litigious company but it has come

181

1    to a point where we have no other choice.

2         Q.    Who is the person with BBG who is most

3    knowledgeable about this so-called illegal stickering in            14:3

4    Italy?

5         A.    Probably me.

6         Q.    Have you been over there to see any of this?

7         A.    I've been in Italy, yes.

8         Q.    When is the last time you went over there?

9         A.    Probably last year.

10        Q.    When?

11        A.    I don't remember the dates.  I can check.

12        Q.    What month?

13        A.    I don't remember the month.

14        Q.    What season?

15        A.    Huh?

16        Q.    What season?

17        A.    What season?                                             14:3

18        Q.    Yes.  You know, fall, winter, summer, autumn.

19        A.    I don't remember the exact time.  I don't know

20   the exact date or exact time.  I know it was last year for

21   sure.

22        Q.    Beginning of the year, end of the year?

23        A.    Not sure.

24        Q.    What sort of services does BBG perform for

25   Telecom Italia?

1    calling card call from pay phones in Greece  locations

2    outside Greece from the pay phones.

3         Q.    Did BBG have traffic in Italy prior to the

4    contract with Telecom Italia?

5         A.    I believe so.

6         Q.    And to whom was that contract with?

7         A.    We've always been doing business with hotels.      14:4

8         Q.    What about with Betel, did you have a contract

9    with Betel?

10        A.    I don't know.

11        Q.    What about GCL?

12        A.    GCL and Betel were formed to get maintenance

13   crews of cleaning, specifically because of what you

14   mentioned of cutting of the numbers.  Since Telecom Italia

15   is not too happy about cutting numbers, we've had to invest

16   significant amount of money in cleaning crews in order to

17   take off stickers from pay phones that are unauthorized       14:4

18   placed in telephones where BBG has exclusive contracts.

19        Q.    Do you also have them place your own signage

20   on those phones?

21        A.    I'm not sure if Telecom Italia -- I think we

22   replaced some of the signage, but I think Telecom Italia --

23   I'm not too sure.

24        Q.    Are those crews, those people that keep the

25   phones clean and keep the signage up, are they paid on a     14:4

185

1    out of anger, a list of issues maligning BBG.  And I know

2    that he obtained or I believe that he obtained that e-mail

3    of that gentleman through -- through the bbgcom.com                17:3

4    information.  That caused that that gentleman did not have

5    a good perception of BBG and did not want to work with BBG

6    leading to BBG not obtaining the agreement with Starwood.

7             There are many others such as the interference

8    on agreements such as the Wyndham in Aruba.  And there's a        17:3

9    lot of instances, for example, in the Atlantis, after NCIC

10   was unsuccessful of obtaining the business with Atlantis

11   Paradise Island in Bahamas, they began a campaign of

12   stealing our traffic from our operators.  There are many          17:3

13   ongoing investigations into the operator situation which

14   since I don't have all the information currently, I would

15   not like to talk about them at the moment.

16             Also, NCIC has ignored while hiding knowledge

17   of illegal stickering into exclusive contracts of BBG and

18   causing us a great deal of financial damage by stealing our       17:3

19   traffic as well as causing us huge maintenance costs.  I

20   mean, that -- there are many more, but that's all I have

21   from the top of my head.

22        Q.    All right.  First one, Austria Telekom.  This

23   is a contract that BBG in fact secured?

24        A.    Yes, sir.

25        Q.    At the time of the alleged interference, BBG          17:3

272

# Exhibit
# G

**From:**     Harper <harper@mmw-law.com>
**To:**       <TWojciechowski@sheppardmullin.com>
**Date:**     7/6/04 8:23AM
**Subject:**  Re: IMMEDIATE RESPONSE REQUESTED

If you claim to have any such new information, you need to supplement you discovery response to tell us about it. Moreover, Gregorio's e-mails to Bill about alleged unlawful stickering do not contstitute any such disclosure. I have assumed that if there were any truth to his e-mail claims, we would be receiving information in discovery about them. I trust that Gregorio is unwilling to provide such claims under oath or he would have done so. If you felt that such stickering was really going on and that we could help prevent it, meaningful disclosure of it through discovery would be a start. Or would that suit your objectives?

>>> Tawnya Wojciechowski <TWojciechowski@sheppardmullin.com> 07/05/04 10:52AM >>>
Dear Jerry and Sharon,

We have asked you to receive a copy of the master account list since the deposition of Luisa Cardenas in March. We need this listing for our deposition this Friday, and demand that it be turned over immediately. I have also asked you for convenient dates for the individuals we have been noticing for depositions, which we had agreed at the hearing could take place July 21-23 and 28-30. We have been attempting to both obtain necessary documents and set depositions at convenient times, without the necessity of going to the Court, over, and over, and over.

Where are the documents you promised to provide us that were laid out in my chart discussed with Ms. Small at the hearing? To date, nothing has been produced, and from your email below, not believed to be promptly forthcoming. Please provide the documents we have requested of you and that you have agreed to provide, posthaste. We need these documents in order to schedule the depositions that we have had to reschedule several times as a result of your client's refusal to turn over such documents.

Further, my message this weekend requesting an immediate response was not related to depositions, but rather is the result of newly discovered information this week concerning your client's blatant infringement of our client's trademark on counterfeit stickers found placed on Telcom Italia (TI) payphones. Unlike yourself, we are giving you an opportunity to conduct an immediate investigation prior to filing a motion for a temporary restraining order and OSC re: preliminary injunction to immediately restrain such illegal activities. Our investigation has determined that your client continues to engage in its complicity to carry illegal sticker traffic from public payphones in Italy, as we have discovered in this litigation it has done for the past several years.

Now, we have found not only is your client and it agents continuing to sticker over BBG's contracted telephones with TI despite its direct knowledge of BBG's exclusive contractual relationship with TI, and TI's specific demand that NCIC not engage in illegal stickering of its phones, but it is using counterfeit stickers bearing BBG's logo, and TI's authorization statement, to carry such traffic. We demand your immediate response to our questions concerning such illegal activities. Absent an immediate and meaningful response to our inquiry, we shall move the court for an injunction.

Tawnya

TRANSMITTED VIA EMAIL AND FAX

This message is sent by a law firm and may contain information that is privileged or confidential.
If you received this transmission in error, please notify the sender by reply e-mail and delete the message
and any attachments.
Sheppard, Mullin, Richter & Hampton LLP
Please visit our website at   www.sheppardmullin.com

# Exhibit
# H

**From:**      Harper <harper@mmw-law.com>
**To:**        <tawnya@sheppardmullin.com>
**Date:**      7/12/04 10:21AM
**Subject:**   Re: Stickering

Tawnya, you recerntly suggested that you have "new evidence" on stickering which necessitated IMMEDIATE supplemntal responses form us. I pointed out tthat (1) Such new evidence, if any, was required to be disclosed to us in prior discovery responses and (2) Gregorio's e-mail messages to Bill over the last several months should be presented to us in such discovery responses as well, under oath, if those reports have a good faith basis. I need to hear your response to this request, please. Thanks.


**CC:**        <eric@albrittonlawfirm.com>, <bwslawfirm.com.sstevens@eric>, <internet>

# Exhibit
# I

# Jerald R. Harper, PLC

A Professional Law Corporation
504 Texas Street, Suite 405
Shreveport, LA 71101
(318) 221-1004
(318) 221-0008 Fax
harper@mmw-law.com

July 21, 2004

Mr. Gregory P. Love                    **Via Facsimile No. 903-657-6108**

    Re:   *NCIC VS. BBG, ET AL*

Dear Greg:

    Please allow me to give you an outline of the outstanding discovery items which need attention, from NCIC's point of view. I would like to provide this to you in connection with our telephone conference scheduled this afternoon.

    As you will note, the first three items represent issues which have been raised by NCIC since the inception of the litigation and which have never been resolved. We view these first three items (as well as the damages issue referred to in yesterday's e-mail) as being matters which we <u>must</u> either between counsel or, upon application to the court. There is simply no way for us to properly prepare for the trial of this case without addressing these issues. This is not to under emphasize the importance of any other matters, but rather, to emphasize that we have been trying for almost a year to take discovery on these fundamental issues without success.

    1.    Depositions of BBG's exclusive, independent agents.

        As you know, BBG has insisted that we make NCIC's and Blue Phones' non-exclusive agents, as well as members of the Walters family available for deposition without compulsory process. We have done so in an effort to cooperate and to reduce the unnecessary effort and expense on behalf of all parties. We must insist that BBG do the same. We are well aware that BBG can make the Alexievs available for depositions and request, once again, that they do so. We are willing to take these depositions in Prague, if necessary. Please note that not only are the Alexievs exclusive independent agents of BBG, for whom BBG will be providing a defense, but the Alexievs have in the past waived service of process, upon virtually no notice, upon the request of BBG. We have been attempting to serve the Alexievs at great expense under the Hague Convention for twelve months. It is now time for BBG to ask these agents to present themselves for depositions either in their home country or in the State of Texas. Incidently, we have produced documents whereby the

Mr. Gregory P. Love
July 21, 2004
Page 2

Alexievs have agreed to jurisdiction in the State of Texas for purposes of any
controversy with NCIC, so no objection on that basis is appropriate. We ask that you
give us your full cooperation in making these witnesses available or to promptly tell
us that you will not do so that we may seek the court's assistance.

2.    Depositions with respect to the events of May 15 and May 16.

As you are no doubt aware, the law firm of Sheppard, Mullin was involved in the
process of the hiring of our agents, the receipt of confidential NCIC documentation
and information, and, decisions on when and how to make my clients aware that their
agents/fiduciaries were working in direct competition with them. Mr. Gumpel and
other unknown attorneys at that law firm were involved in this process, none of the
facts which are protected by any privilege of which I am aware. Moreover, I am
unaware of any legal authority that grants immunity to lawyers participating in such
activities where the effort is to render knowing assistance to a business tort.

We have attempted to learn the specifics of the events of May 15 and May 16 from
both Gregorio Galicot and Rafael Galicot, but despite numerous questions, Messrs.
Galicot cannot recall significant aspects of these events. Indeed, they cannot even
recall all of the participants, times and places of meetings, nor even the names of the
Sheppard, Mullin lawyers who were present, much less the substance of
communications occurring thereafter. Also, significantly, no one has been able to
testify with any precision the date(s) when Rafael Galicot was made aware of an
alleged interception of BBG e-mails or the date on which counsel was first sought
with respect to these matters. As all litigants are aware, the timing of these issues
is of critical importance in any good faith claim of work product privilege by BBG.
Unquestionably, BBG has benefitted by the ambiguity involved in this issue by
attempting to impose a work product privilege on all matters since May 15. Equally
obvious, is that the work product privilege is unavailable and unavailing to BBG until
some date three to four weeks, at a minimum, thereafter. We have repeatedly asked
Sheppard, Mullin to give us a proposed stipulation of the events occurring on May
15 and May 16 to which we have never had a response. In view of (i) the Galicots
inability to testify about these matters; (ii) the inability to take the depositions of the
Alexievs who were present for such meetings, we apparently have had no recourse
except to insist upon either obtaining a stipulation from the other witnesses
(Sheppard, Mullin) or to take depositions of the Sheppard, Mullin attorneys who
were involved in this process. Obviously, we do not want to resort to the latter unless
it is absolutely necessary. Please help us resolve this matter. We also note that the
depositions of the Alexievs could possibility help alleviate this problem.

Mr. Gregory P. Love
July 21, 2004
Page 3

    3.     AEO designations.

As you know, the first ten months of this litigation BBG designated thousands of documents (including NCIC's own e-mails) as "Attorneys Eyes Only" and redacted a number of those documents. Just prior to the hearing on our Motion to Compel, BBG undesignated a substantial number of them but hundreds remain designated, including many contracts which form the basis of BBG's damage claims. If you recall, Judge Ward referred to the fact that these contracts would necessarily form the basis of damage claims and expert opinions and would be required to be produced. We do not understand why BBG has continued to insist on the AEO designation for these documents or, for that matter, the others. We sent you correspondence yesterday undesignating all NCIC production from AEO status. In an effort to show our good faith attempts to move discovery forward, we do so unilaterally. We asked that BBG respond in kind to allow us to prepare this matter for trial with the understanding that a protective order is in place which should adequately protect all parties from any misuse of information exchanged herein, much of which has been improperly overdesignated from the beginning of the case. Please give this matter your serious consideration.

    4.     Damage discovery.

Please see my e-mail correspondence of yesterday and BBG's responses to the damages. If BBG has a damage claim, we need to know the complete factual basis for that claim, as I am sure you can understand.

    5.     We would like to take the depositions of Berlin Key, Cynthia Soto, Keven Watt, Jorge Marcari and BBG's attorney in connection with the Soto matter, as described in the deposition transcript of Rafael and Gregorio Galicot.

    6.     We reached an agreement with counsel for BBG early in this litigation to allow the electronically stored records of both companies to be inspected by a mutually agreeable, independent third-party. After this agreement was reached, BBG inexplicably withdrew its consent to this arrangement. Both parties have asked for complete access to call detail records, and we are agreeable to doing so on this basis. In this manner, BBG can have full access to our call detail records through the independent third-party and NCIC will have the same. Please let me know whether this is agreeable so that both parties may have equal access to one another's detail records.

Mr. Gregory P. Love
July 21, 2004
Page 4

7.  We sent a Request for Production of Documents to Tawyna several weeks ago and she responded by letter stating, in essence, that none of the requests were relevant. Please respond fully to each of these requests, without delay. If there is any good faith issues about the relevance of any of these requests, I will be pleased to take it up with you at your convenience.

8.  If BBG believes it has claims arising out of stickering or alleged bribing of operators, they need to provide supplemental discovery responses at once. As you know, we have had numerous complaints from BBG about alleged misconduct on these matters but no details (and certainly none under oath as requested in my prior e-mails).

Very truly yours,

Jerald R. Harper

JRH:md

cc:  Ms. Tawyna R. Wojciechowski (via Facsimile No. 714/513-5130)
     Ms. Sharon Small (via facsimile - 903-597-2413)
     Mr. Eric Albritton (via facsimile - 903-758-7397)
     Mr. Scott E. Stevens (via facsimile - 903-238-9704)
     Mr. William Pope, Mr. Jay Walters and Mr. Jeff Walters (via facsimile - 903-757-4899)
     Ms. Javan Johnson (via facsimile - 903-238-8276)

# Exhibit
# J



A PROFESSIONAL CORPORATION

Sharon Small

ATTORNEYS AND COUNSELORS AT LAW

Direct dial: 903-510-5273
Email: sharons@rameyflock.com

July 22, 2004

Tawnya Wojciechowski
SHEPPARD, MULLIN, RICHTER
  & HAMPTON, LLP
650 Town Center Dr., 4th Floor
Costa Mesa, CA 92626
**VIA FACSIMILE**

RE:   No. 2:03-CV-227; *BBG Communications, Inc. v. Network
      Communications International Corp., et al*

Dear Tawnya:

On July 6, 2004, you sent Jerry and me an email regarding "newly discovered information" regarding NCIC and its agents' alleged "stickering" of BBG's phones in Italy. Despite our repeated inquiries to you, however, you have failed to provide us with this newly discovered evidence or with supplemental discovery responses as required by the Federal Rules of Civil Procedure (see attached emails from Jerry Harper).

Instead of providing us with supplemental discovery responses, <u>under oath</u>, your client G. Galicot, has been sending emails <u>directly</u> to Bill Pope with allegations regarding "stickering" in Italy. NCIC has conducted a thorough investigation of this matter and has submitted a response to you to the effect that neither NCIC nor it agents are participating in the "stickering" of BBG's phones (see attached letter from Bill Pope).

For, the third and final time, please supplement your clients' responses to discovery requests, with, *inter alia,* the name and address of any witnesses with relevant information and the name and address of the person(s) who took the pictures of the phones that your client sent to Bill Pope.

T. Wojciechowski
July 22, 2004
Page 2

Sincerely,

SHARON O. SMALL

SOS/tlh
#170086

# Exhibit
# K

albinorough

COMPANY AS IMPORTANT AS IT IS BBG.

     Q.   WHO AUTHORIZED HIM TO APPROACH TELECOM ITALIA ON

BEHALF OF BBG?

     A.   RAFAEL GALICOT.

     Q.   SO HE HAS KNOWN RAFAEL GALICOT SINCE AT LEAST

JUNE OF 2000.

     A.   YES.  I MET HIM.  HE WAS EVEN IN ITALY DURING

THIS TIME.

     Q.   OKAY.  WAS BBG ENGAGED IN TELECOMMUNICATIONS

BUSINESS IN ITALY IN JUNE OF 2000?

     A.   NOT THAT I KNOW.

     Q.   DID MR. ALBINO NOT SEE ANY BBG STICKERS IN JUNE
UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

OF 2000?

     A.   NOT PERSONALLY, NO.

     Q.   IS MR. ALBINO UNAWARE OF BBG DOING BUSINESS IN

ITALY BEFORE 2001?

     A.   I KNOW THAT THEY HAD STARTED, BY THIS TIME,

SERVICE WITH HOTELS.

     Q.   OKAY.  DOES MR. ALBINO KNOW OF ANY AUTHORIZATION

THAT BBG HAD TO APPLY STICKERS TO ITALIAN TELECOM PHONE BOOTHS

PRIOR TO JANUARY OF 2001?

     A.   I DON'T KNOW.

     Q.   STATED DIFFERENTLY --

           THE INTERPRETER:  OKAY.

     Q.   (BY MR. HARPER) -- PRIOR TO JANUARY 2001, DOES

MR. ALBINO KNOW OF ANY LEGAL AUTHORIZATION FOR THE APPLICATION

OF BBG STICKERS TO THE ITALIAN TELECOM PHONE BOOTHS?

     A.   I DON'T KNOW.

     Q.   DO ANY OTHER COMPANIES HAVE CONTRACTS WITH
Page 19

albinorough

ITALIAN TELECOM FOR APPLICATION OF THEIR STICKERS TO PAY

PHONES?

     A.   IN THIS MOMENT?

     Q.   AT ANY TIME SINCE NOVEMBER OF 2000.

     A.   FROM NOVEMBER 2001 THE ONLY COMPANY THAT WAS

AUTHORIZED WAS TELECOM ITALIA -- SORRY, BBG COMMUNICATION.

     Q.   DOES MR. ALBINO HAVE A COPY OF THE REPORT THAT HE

CLAIMS WAS GIVEN TO HIM BY TELECOM ITALIA ON ITS INVESTIGATION

OF IMPROPER STICKERING?

     A.   NO.

     Q.   WHERE IS IT?
UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

            MS. WOJCIECHOWSKI:  HEARSAY.

            THE WITNESS:  OF ALL THE CALLS?

     Q.   (BY MR. HARPER) THE WITNESS TESTIFIED THAT A

REPORT WAS RETURNED TO HIM BY TELECOM ITALIA, AND SIX OR SEVEN

OF THE NUMBERS BELONGED TO NCIC.

     A.   YES, I HAVE RECEIVED THIS REPORT FROM TELECOM

ITALIA. BUT AT THIS MOMENT I DON'T HAVE IT WITH ME.

     Q.   WHERE IS IT?

            MS. WOJCIECHOWSKI:  CAN I GO TALK TO --

            MR. HARPER:  NO, NOT WHILE A QUESTION IS

PENDING.

            MS. WOJCIECHOWSKI:  I'D LIKE TO FIND

SOMETHING OUT MYSELF.

            MR. HARPER:  ME TOO.

     Q.   (BY MR. HARPER) WHERE IS THE REPORT?

            THE INTERPRETER:  INTERPRETER COMMENT.  THE

LAST QUESTION WAS ...

     Q.   (BY MR. HARPER) WHERE IS THE REPORT?

albinorough

A.   IT SHOULD BE WITH BBG BECAUSE ALL MY
DOCUMENTATION IS AT BBG.

MR. HARPER:   COUNSEL, DO YOU HAVE THIS
REPORT?

MS. WOJCIECHOWSKI:   SOME PAPERS WERE
DELIVERED TO ME, AND I DON'T KNOW YET WHERE THEY ARE SO --

Q.   (BY MR. HARPER) EXCUSE ME.   WHEN WERE THESE
PAPERS DELIVERED TO BBG?

A.   I DON'T REMEMBER PRECISELY, BUT I KNOW THAT THIS
DOCUMENT BELONG ON THE FIRST OF 2002.
UNEDITED, UNPROOFREAD, UNCORRECTED, UNCERTIFIED ROUGH DRAFT

Q.   WHAT MONTH, SEASON OR YEAR WAS THIS DOCUMENT
DELIVERED TO BBG?

A.   I COULDN'T GIVE YOU A PRECISE ANSWER BECAUSE I
DON'T REMEMBER THE DATE.   NOW YOU ASK ME TO BE MORE PRECISE.

Q.   NO.   I'M ASKING HIM TO BE LESS PRECISE.   IF HE
CANNOT GIVE ME A DATE, GIVE ME A MONTH, A SEASON OR A YEAR WHEN
THIS WAS DELIVERED.

A.   WHAT I REMEMBER, IT WAS AT THE BEGINNING OF 2002
OR MAYBE 2001.   I DON'T REMEMBER VERY WELL.   IT COULD BE 2001
OR 2002.

Q.   MR. ALBINO SAID SIX OR SEVEN NUMBERS BELONGED TO
NCIC.   TO WHOM DID THE OTHER NUMBERS BELONG?

A.   YES.   OTHER COMPANIES, BUT I DON'T REMEMBER WHICH
ONE.

Q.   HOW MANY COMPANIES?

A.   I THINK TWO OR THREE SOCIETY MORE OR LESS.

Q.   HOW ABOUT INDIVIDUALS, AGENTS?

A.   MAYBE YOU WANT TO REPHRASE THE QUESTION.

Q.   THANK YOU.   IT WAS A BAD QUESTION.

# Exhibit
# L

Message

## Delma Andrade

| | |
|---|---|
| **From:** | Gregorio Galicot [gregorio@bbgcomm.com] |
| **Sent:** | Friday, May 30, 2003 4:26 PM |
| **To:** | stomps@candw.ky |
| **Cc:** | cynthiao@bbgcomm.com |
| **Subject:** | Re: Side letter for use of NCIC Singapore |

Michael....

That is correct. I was going to wait for the visit of Patrick... but do me a favor and send him the same letter with his name.

Thanks,

Gregorio

----- Original Message -----
**From:** Michael Stomps
**To:** 'Gregorio Galicot'
**Cc:** cynthiao@bbgcomm.com
**Sent:** Friday, May 30, 2003 5:48 PM
**Subject:** RE: Side letter for use of NCIC Singapore

Patrick is 50% shareholder, so he needs to sign as well, correct?

-----Original Message-----
**From:** Gregorio Galicot [mailto:gregorio@bbgcomm.com]
**Sent:** Friday, May 30, 2003 5:48 PM
**To:** Michael Stomps
**Cc:** cynthiao@bbgcomm.com
**Subject:** Side letter for use of NCIC Singapore

Michael,

Here is the letter so we can sign contracts when needed from NCIC Singapore. We will need the original contracts anyways. Send me to sign copies and I will get you one from Mr. Serrano.

Thanks,

Gregorio

-----Original Message-----
**From:** Jeremy Hayden [mailto:jhayden@sheppardmullin.com]
**Sent:** Thursday, May 29, 2003 4:58 PM
**To:** Brian Rhys
**Cc:** Jerry Gumpel
**Subject:** Stomps Side Letter

Brian:

# REDACTED

Thanks,

Jeremy

**CONFIDENTIAL**

# Exhibit
# M

# Ronald Perez

| Sheppard Mullin | | | September 16, 2003 |
|---|---|---|---|
| Jerry J. Gumpel | | | |
| Phone: [858] 720-8900 | Fax: [858] 509-3691 | Pages: 07 | |
| Re: Chile Airport Contracts | | | |

Dear Jerry,

Per Cynthia's request I hereby attach documents with the old Chile Airport contract
and the new Chile Airport contract that needs to be signed and sent back to them for
the formality of the relationship.

As you can see, the new contract shows the name of BBG communications, but it still
shows my address and my name as the person who signs it. I tried to change this, but
they still sent it as is.

Please let me know how you want me to proceed with these documents.

Any question, please let me know.


Best regards,


Ronald Perez

Ronald Perez

19276 Serpenteer Drive ● Porter, Texas 77365
Tel: (281) 354-5024 ● Fax: (281) 354-4094
E Mail: rperez@telconetcorp.com

BBG 07078
CONFIDENTIAL



**PMS**
Publicidad Exterior

Aer-010

Pg. 1  bbg

# CONTRATO DE ARRIENDO

En Santiago de Chile, **PMS S.A.. Rut 77.022.910-3** representada en este acto por el Sr.Francisco Izcue E., con domicilio en El Rosal  5196, Huechuraba  en la ciudad de Santiago y **BBG Communications Rut 888.888.888-E** representada en este acto por Ronald Pérez , domiciliado en 9276  Serpenteer Drive , Porter Texas 77365vhan convenido un *Contrato de Arriendo* de acuerdo con las siguientes cláusulas:

## PRIMERA

**PMS S.A.** arrienda sus elementos publicitarios, ubicados en AEROPUERTO INTERNACIONAL DE SANTIAGO COMODORO ARTURO MERINO BENÍTEZ,  a **BBG Communications** de acuerdo a las ubicaciones que se detallan en la cláusula *TERCERA* del presente contrato  de arriendo.

## SEGUNDA

**BBG Communications** proveerá a PMS S.A. el material gráfico  en un plazo no superior al 01 de Marzo de 2003.

## TERCERA

**BBG Communications** pagará a PMS S.A.. la suma de US$**1,100+18% IVA mensual (no incluye comisión de agencia)** por el resto del período pactado en la cláusula *SEPTIMA* y  30 días de recepcionada la factura. Este valor corresponde al siguiente detalle:

| Tipo | Ubicación | Dimensiones | Nivel | Foto | Valor Neto | Valor con IVA |
|------|-----------|-------------|-------|------|-----------|---------------|
| 4 soportes | Connecting Passenger | 0,20x0,30 | 2 | 7 | US 200 | US 236 |
| 4 soportes | International departures | 0,20x0,30 | 3 | 1 | US 200 | US 236 |
| 3 soportes | International departures | 0,20x0,30 | 3 | 2 | US 150 | US 177 |
| 3 soportes | International departures | 0,20x0,30 | 3 | 3 | US 150 | US 177 |
| 4 soportes | International departures | 0,20x0,30 | 3 | 4 | US 200 | US 236 |
| 2 soportes | International departures | 0,20x0,30 | 3 | 5 | US 100 | US 118 |
| 2 soportes | International departures | 0,20x0,30 | 3 | 6 | US 100 | US 118 |
|  |  |  |  |  | US 1,100 | US 1,298 |

El arriendo mensual se facturará  en   moneda nacional (peso chileno) según el cálculo correspondiente al cambio de moneda USD(US dollar) publicado en el  mes de emisión de cada factura,  a contar del día de inicio de la exhibición de la campaña.

El pago de el arriendo mensual debe ser realizado los primeros días de cada mes de exhibición, previa confirmación fotográfica de PMS S.A al inicio de el contrato, de la implemenación e instalación de el circuito publicitario contratado

**BBG 07079**
**CONFIDENTIAL**





PMS
Publicidad Exterior

Aer-010

bbg B2

### CUARTA

La mantención e iluminación serán de cargo de PMS S.A.

### QUINTA

PMS S.A., se reserva el derecho de caducar todo o parte de este *Contrato de Arriendo* si la persona y/o autoridad competente, exigiera el retiro o traslado de la publicidad, sin derecho de la otra parte a reclamar pago o indemnización alguna por este motivo. Asimismo, PMS S.A tendrá el mismo derecho antes señalado en caso de extinción, por cualquier causa, de su derecho a explotar publicidad en el recinto del Aeropuerto. En ese caso, se presentarán otras alternativas de nuevas ubicaciones para trasladar los elementos que reemplacen a las contratadas originalmente, a satisfacción de ambas partes. Si ambas partes no acuerdan en dichos traslados BBG Communications podrá dar por terminado el contrato pagando sólo hasta el día en que se haga efectivo el retiro.

### SEXTA

El no pago o mora de una o más mensualidades correspondientes al arriendo de elementos dará derecho a PMS S.A., a caducar de inmediato todo o parte de este *Contrato de Arriendo*, además de facturar y cobrar el saldo faltante para cumplir con el periodo de arriendo pactado en la cláusula *SEPTIMA* de este Contrato. BBG Communications se reserva el derecho de caducar todo o parte de este contrato de arriendo si PMS S.A. incumple cualquiera de sus obligaciones bajo este contrato de arriendo. En caso de tal cancelación, PMS S.A. remitirá a BBG Communications los montos pagados bajo la cláusula tercera por cualquier periodo en que los soportes no fueron exhibidos o su exhibición no estuvo de acuerdo a lo establecido en este contrato de arriendo debido al incumplimiento.

### SEPTIMA

Este *Contrato de Arriendo* se extenderá por un periodo de 12 meses contados desde el 01 de Marzo de 2003 hasta el 29 de Abril de 2004, plazo que se prorrogará por otros iguales y sucesivos si ninguna de las partes manifiesta lo contrario por escrito con 30 de anticipación a la fecha de término, mediante carta certificada. No obstante, lo anterior PMS S.A podrá poner término anticipado al presente contrato , sin expresión de causa y en cualquier momento, dando a BBG Communications previo aviso por escrito con 15 días de anticipación a la fecha de termino anticipado.

### OCTAVA

Este *Contrato de Arriendo* y sus copias serán válidos al firmarse dentro de los 5 días hábiles siguientes a la fecha de su emisión, quedando cada parte con su correspondiente copia firmada.

BBG 07080
CONFIDENTIAL

BBG   Pg. 3



**PMS**
Publicidad Exterior

Aer-010

### NOVENA

Cualquier dificultad que se produzca acerca de la validez, nulidad, interpretación, aplicación, ejecución, cumplimiento o resolución del presente contrato o con cualquiera otra materia que con él se relacionen, será resuelta breve y sumariamente, sin forma de juicio, por un árbitro arbitrador en contra de cuyas resoluciones no procederá recurso alguno, renunciando las partes a todos ellos incluso al de queja.

Las partes designan árbitro arbitrador a don Miguel Retamal y en caso de ausencia o impedimento de éste, a don Cristián Zúñiga. En caso de ausencia o impedimento de este último, el árbitro arbitrador será designado por la Justicia Ordinaria, debiendo recaer el nombramiento en algún abogado que se haya desempeñado o se desempeñe por más de dos años en el cargo de Abogado Integrante de la Corte de Apelaciones de Santiago o de la Corte Suprema.

| Francisco Izque E/ | Ronald Pérez |
|---|---|
| Rut 77.022.910-3 | A   Rut 555.555.555-5 |
| PMS S.A. | BBG Communications |

BBG 07081
CONFIDENTIAL

Av. El Rosal 5196 • Huechuraba • Santiago • Chile
Teléfono 754 70 00 • Fax 754 70 01

Page 1  NCIC



**PMS**
Publicidad Exterior

Acx-010

# CONTRATO DE ARRIENDO

En Santiago de Chile, PMS S.A.. Rut 77.022.910-3 representada en este acto por el Sr.Francisco Izcue E., con domicilio en El Rosal 5196, Huechuraba en la ciudad de Santiago y NCIC Rut 555.555.555-5 representada en este acto por Ronald Perez , domiciliado en 19276 Serpenteer Drive , Porter Texas 77365vhan convenido un *Contrato de Arriendo* de acuerdo con las siguientes cláusulas:

## *PRIMERA*
PMS S.A. arrienda sus elementos publicitarios ubicados en AEROPUERTO INTERNACIONAL DE SANTIAGO COMODORO ARTURO MERINO BENÍTEZ a NCIC las ubicaciones que se detallan en la cláusula *TERCERA* del presente contrato de arriendo.

## *SEGUNDA*
NCIC proveerá a PMS S.A., el material gráfico en un plazo no superior al 01 de Marzo de 2003.

## *TERCERA*
NCIC pagará a PMS S.A.. la suma de US$1.100+18% tax IVA mensual (no incluye comisión de agencia) por el resto del período pactado en la cláusula *SEPTIMA* y 30 días de recepcionada la factura. Este valor corresponde al siguiente detalle:

| Tipo | Ubicación | Dimensiones | Nivel | Foto | Valor Neto | Valor con IVA |
|------|-----------|-------------|-------|------|------------|---------------|
| 4 soportes | Connecting Passenger | 0,20x0,30 | 2 | 7 | US 200 | US 236 |
| 4 soportes | International departures | 0,20x0,30 | 3 | 1 | US 200 | US 236 |
| 3 soportes | International departures | 0,20x0,30 | 3 | 2 | US 150 | US 177 |
| 3 soportes | International departures | 0,20x0,30 | 3 | 3 | US 150 | US 177 |
| 4 soportes | International departures | 0,20x0,30 | 3 | 4 | US 200 | US 236 |
| 2 soportes | International departures | 0,20x0,30 | 3 | 5 | US 100 | US 118 |
| 2 soportes | International departures | 0,20x0,30 | 3 | 6 | US 100 | US 118 |
| | | | | | US 1.100 | US 1.298 |

El arriendo mensual del letrero se facturará en moneda nacional (peso chileno) según el cálculo correspondiente al cambio de moneda USD(US dollar) publicado en el mes de emisión de cada factura, a contar del día de inicio de la exhibición de la campaña.

El pago de el arriendo mensual debe ser realizado los primeros días de cada mes de exhibición, previa confirmación fotográfica de PMS S.A al inicio de el contrato, de la implementación e instalación de el circuito publicitario contratado

**BBG 07082**
**CONFIDENTIAL**



*Pase 2 NCIC*

Ase-010

### CUARTA

La mantención e iluminación serán de cargo de PMS S.A.

### QUINTA

PMS S.A.. se reserva el derecho de caducar todo o parte de este *Contrato de Arriendo* si la persona y/o autoridad competente, exigiera el retiro o tralado de la publicidad, sin derecho de la otra parte a reclamar pago o indemnización alguna por este motivo. Asimismo, PMS S.A tendrá el mismo derecho antes señalado en caso de extinción, por cualquier causa, de su derecho a explotar publicidad en el recinto del Aeropuerto. En ese caso, se presentarán otras alternativas de nuevas ubicaciones para trasladar los elementos que reemplacen a las contratadas originalmente, a satisfacción de ambas partes. Si ambas partes no acuerdan en dichos traslados NCIC podrá dar por terminado el contrato pagando sólo hasta el día en que se haga efectivo el retiro.

### SEXTA

El no pago o mora de una o más mensualidades correspondientes al arriendo de elementos dará derecho a PMS S.A.. a caducar de inmediato todo o parte de este *Contrato de Arriendo*, además de facturar y cobrar el saldo faltante para cumplir con el período de arriendo pactado en la cláusula SEPTIMA de este Contrato. NCIC se reserva el derecho de caducar todo o parte de este contrato de arriendo si PMS S.A.. incumple cualquiera de sus obligaciones bajo este contrato de arriendo. En caso de tal cancelación, PMS S.A.. remitirá a NCIC los montos pagados bajo la cláusula tercera por cualquier periodo en que los soportes no fueron exhibidos o su exhibición no estuvo de acuerdo a lo establecido en este contrato de arriendo debido al incumplimiento.

### SEPTIMA

Este *Contrato de Arriendo* se extenderá por un período de 12 meses contados desde el 01 de Marzo de 2003 hasta el 29 de Abril de 2004, plazo que se prorrogará por otros iguales y sucesivos si ninguna de las partes manifiesta lo contrario por escrito con 30 días de anticipación a la fecha de término, mediante carta certificada. No obstante lo anterior, PMS S.A. podrá poner término anticipado al presente contrato, sin expresión de causa y en cualquier momento, dando a NCIC previo aviso por escrito con 15 días de anticipación a la fecha de término anticipado.

### OCTAVA

Este *Contrato de Arriendo* y sus copias serán válidos al firmarse dentro de los 5 días hábiles siguientes a la fecha de su emisión, quedando cada parte con su correspondiente copia firmada.

BBG 07083
CONFIDENTIAL

Av. El Rosal 5196 • Huechuraba • Santiago • Chile
Teléfono 754 70 00 • Fax 754 70 01



**PMS**
Publicidad Exterior

Pase 3  NCIC

Arr-010

### NOVENA

Cualquier dificultad que se produzca acerca de la validez, nulidad, interpretación, aplicación, ejecución, cumplimiento o resolución del presente contrato o con cualquiera otra materia que con él se relacionen, será resuelta breve y sumariamente, sin forma de juicio, por un árbitro arbitrador en contra de cuyas resoluciones no procederá recurso alguno, renunciando las partes a todos ellos incluso al de queja.

Las partes designan árbitro arbitrador a don Miguel Retamal y en caso de ausencia o impedimento de éste, a don Cristián Zúñiga. En caso de ausencia o impedimento de este último, el árbitro arbitrador será designado por la Justicia Ordinaria, debiendo recaer el nombramiento en algún abogado que se haya desempeñado o se desempeñe por más de dos años en el cargo de Abogado Integrante de la Corte de Apelaciones de Santiago o de la Corte Suprema.

| Francisco Izwé E. | Ronald Pérez |
|---|---|
| Rut: 77.022.910-3 | A  Rut 555.555.555-5 |
| PMS S.A. | NCIC |

**BBG 07084**
**CONFIDENTIAL**

# Exhibit
# N

071403wp

CURRY JOHNSON JULIAN, INC.
903-533-1172                www.tylerreporters.com
800-533-1129

153

1   would like to consult with my counsel for a couple of

2   moments, please.  Break, please.

3                   THE VIDEOGRAPHER:  We're off the record

4   at 3:33 p.m.

5                   (Break.)

6                   THE VIDEOGRAPHER:  We're on the record

7   at 3:47 p.m.

8                   MR. HARPER:  Okay.  Counsel, I just

9   wanted to express my concern after looking at Pope 25,

10  and this is at least the second document in this

11  category of documents that appear to have their

12  inception among the defendants and express our very

13  strong concern about how these documents would have

14  come into the hands of Plaintiffs.  We don't

15  necessarily need to know the answer right now, but we

16  would like for BBG to know that our representatives

17  are often the subject of contracts that have

18  confidentiality provisions in them and they are quite

19  often and in fact in the ordinary course of business

20  are recipients of information which are provided to

21  them in trust.  And we would hope that documents like

22  this are not obtained in violation of the obligations

23  of our representatives and former representatives.

24                  MS. WOJCIECHOWSKI:  I understand,

25  counsel.  But two points, one is I don't believe the

CURRY JOHNSON JULIAN, INC.
903-533-1172                www.tylerreporters.com
800-533-1129

154

1   judge is going to take too kindly to any claim of

Page 136

071403wp

2   confidentiality when your client is discussing the

3   internal business and forwarding E-mails which should

4   have been directed to my client.  And secondly.

5           MR. HARPER:  You're assuming.

6           MS. WOJCIECHOWSKI:  We will agree that

7   these documents are used only for the sole purpose of

8   this litigation and are not to be disseminated to

9   third parties.

10          MR. HARPER:  Well, you can expect

11  counter claims, counsel, and they will deal with the

12  very subjects that I'm raising.  And we'll see how the

13  judge and the jury react to those counter claims and

14  the clients.  And I reiterate my concern about the

15  means at which these documents came into your

16  possession and I would ask that you not treat those

17  concerns too cavalierly, because the reason I raise

18  them is I expect them to be an issue in this

19  litigation.

20          MS. WOJCIECHOWSKI:  Understood.

21    Q    (By Ms. Wojciechowski) Next Exhibit Number

22  26, an E-mail dated April 1, 2003, Jeff Walters to

23  Michael Stomps.  And if you'll look at the initial

24  E-mail again in the same chronology that we've been

25  looking at these before.  Can you tell me what this

                            CURRY JOHNSON JULIAN, INC.
        903-533-1172       www.tylerreporters.com
800-533-1129

                                          155

1   originally concerned, if you know.

2     A    It looks like BBG was having problems with

3   Cable Wireless in Jamaica.  And then I know that

4   Michael Stomps has in the past quite often or on

                   Page 137

anny Bramblett

| From: | Bill Pope [billp@ncic.com] |
|---|---|
| Sent: | Saturday, March 29, 2003 1:51 PM |
| To: | Jeffrey Walters; Jay Walters; Michel Alexiev |
| Cc: | T.Hoogstraaten; Michael Stomps |
| Subject: | RE: Call BT |

The guy won't return Michel's calls....I think I was just lucky...I tried calling him
about 5 days during a 3 hour period and finally caught him about to go into another
meeting.  I really believe that this guy is busy...they are probably cutting budgets big-
time on the payphone division...this guy
probably runs the phones and collect the coins too!!  He said bbg offered
an advance and was the only one that had done that...I think we can get fairycall kicked
out and maybe have to share the market with bbg.  I'll see what we can offer to get an
exclusive.  If nothing else, we can start a bidding war and just cost bbg a bunch more
money.

We don't have contact with C&W Jamaica yet, so how can we use them as a reference?  Maybe
C&W is pissed because they caught bbg using Digicel and bypasssing their
network!!!!!!!!!!!!!!

-----Original Message-----
From: Jeffrey Walters [mailto:jeffrey@3comcr.com]
Sent: Saturday, March 29, 2003 10:08 AM
To: Bill Pope; Jay Walters; Michel Alexiev
Cc: T.Hoogstraaten
Subject: Re: Call BT


Michel,  have you followed up with the pay phone division  BT here lately? How much up-
front commissions has BBG offered.  BBG has been offering all these up-front commissions
but the can not even their phone bills or C&W Jamaica... Bill should we use C&W Jamaica
as a bad reference with BBG...


----- Original Message -----
From: "Bill Pope" <billp@ncic.com>
To: <jeffrey@3comcr.com>; "Jay Walters" <jay@ncic.com>; "Michel Alexiev"
<MichelAlexiev@ncic.com>
Sent: Friday, March 28, 2003 4:51 PM
Subject: RE: Call BT


Michel and Jeff,

This morning I spoke with Andrew, the BT payphone director.  It seems like we might have
our foot back into the door now.  He says he's going to bring in another person to manage
this project and that they are considering allowing us to be a third bidder for this
service.  He said that they might narrow down to only 1 provider if there is "incentive",
but otherwise will go with 2 providers.  I suggested that bbg had probably offered some
type of advance in order to get an exclusive and he said "yes"....so I suggested we would
be interested in a third month advance for an opportunity to get an exclusive agreement
too.

He said he would definitely call me on Monday or Tuesday to discuss and we'll go from
there.

Bill



DEPOSITION
EXHIBIT
25
Pope