IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| BBG COMMUNICATIONS, INC. AND<br>BBG HOLDINGS LIMITED | § §<br>§ | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:03-CV-227 |
| | § | |
| NETWORK COMMUNICATIONS<br>INTERNATIONAL CORP.; BLUE<br>PHONES LIMITED; WILLIAM POPE;<br>JAY WALTERS; AND JEFFREY<br>WALTERS | § § § § § | JUDGE WARD |
| | § | |
| v. | § § | |
| RONALD PEREZ, GREGORIO L.<br>GALICOT, RAFAEL GALICOT,<br>MICHAEL STOMPS, AWI FANG a/k/a<br>SURIYANTO SURIYANTO, GORAN<br>ALEXIEV, MICHEL ALEXIEV,<br>KEVEN WATT, BBG HOLDINGS<br>BERMUDA d/b/a BBG COMMUNI-<br>CATIONS (BERMUDA) | § § § § § § § § § | |

## NCIC'S RESPONSE TO GORAN AND MICHEL ALEXIEV'S MOTIONS TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2)(4) and (5)

### I. Factual Summary

Michel and Goran Alexiev ("The "Alexievs") entered into an agreement with NCIC on June 1, 2002 pursuant to which the Alexievs agreed to promote the sale of telecommunications services provided by NCIC (the "Agreement"). (See Exhibit A). The Agreement provides Texas as the **exclusive** jurisdiction to resolve disputes pertaining thereto. *Id.* In June 2003, BBG filed a complaint against NCIC, Bill Pope, Jay Walters and Jeffrey Walters based upon allegations of intercepted electronic mails associated with the BBGCOM domain name. On or about January 2004,

NCIC filed a counterclaim and third party complaint against BBG and the Alexievs based on allegations of, *inter alia*, breach of fiduciary duty, misappropriation of trade secrets, and tortious interference with contractual relations. (Fourth Amended Counterclaim and Third-Party Complaint.) On July 21, 2003, BBG's attorney issued a subpoena duces tecum to the Alexievs along with a waiver of service (See Exhibit B). The waiver of service was not executed by the Alexievs (see Exhibit C) but they did provide documents responsive to the subpoena. (See Exhibit D). NCIC has been diligently attempting to serve the Alexievs through the Central Authority of the Czech Republic pursuant to the Hague Convention to no avail.[1] NCIC has requested that BBG secure the appearance of the Alexievs based upon their execution of exclusive agreements with BBG. (See Exhibit F.) BBG stated that it had made several requests to the Alexievs to appear for depositions. (See Declaration of Gregorio Galicot attached as Exhibit G.) The Alexievs responded to such requests with marked indifference and disdain. (See Exhibit H.) On September 27, 2004, NCIC attempted service by mail. The Alexievs received a copy of the Summons and Complaint on October 5, 2004. (See Exhibit I.) Once they received the Summons and Complaint, the Alexievs **then requested an extension of time to file an answer.** (See Exhibit J.) On November 1, 2004, the Alexievs filed their answer and a motion to dismiss, challenging the jurisdiction of this Court.

## II.  Argument and Authorities

### A.    Service of Process Under the Hague Convention

The Federal Rules of Civil Procedure allow service upon a foreign defendant "by any

---

[1]NCIC has been diligently attempting to serve the Alexievs via the Central Authority of the Czech Republic pursuant to the Hague Convention at a cost of more than $20,000. The Alexievs apparently moved from the address that NCIC had in its records. After their new address was determined, NCIC had the summons amended on service was again initiated via the Central Authority. As of the date of this filing, no response has been obtained from the Central Authority. (See Affidavit of Patricia Barron attached as Exhibit E).

internationally agreed means reasonably calculated to give notice such as those means authorized by the Hague Convention." Fed. R. Civ. P. 4(f)(1). The Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters is an international treaty to which both the United States and the Czech Republic are signatories. 20 U.S.T. 361 (the "Convention"). The Convention was designed to improve the organization of mutual judicial assistance... by simplifying and expediting the procedure [of service abroad] so as to "ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time." *See* Convention preamble. The principle mechanism for service of process under the Convention is set forth in Articles 2 through 7. Each signatory country is required to establish a Central Authority to receive requests from other countries for service of judicial documents. Convention Art. 2.

NCIC does not dispute that the Convention is implicated. In fact, NCIC has been diligently attempting to serve the Alexievs under the Convention via the Central Authority of the Czech Republic. As of the date of this filing, no response has been obtained from the Central Authority. (See Affidavit of Patricia Barron.) After the lack of response from the Central Authority, NCIC decided to attempt service by mail. Moreover, the Alexievs do not dispute actual notice of this suit or receipt of the Summons and Complaint that were sent via Federal Express. Instead, they have elected to challenge service despite the other obvious indicia of their notice of this lawsuit.

Moreover, while the Convention permits service of process through postal channels,[2] there is a split among the United States federal circuits as to whether such service is permitted under the

---

2 Article 10(a) of the Convention provides:
Provided the State of destination does not object, the present Convention shall not interfere with
(a) the freedom to send judicial documents, by postal channels, directly to persons abroad.

Convention. This dichotomy apparently arises from the meaning of the word "send" in Article 10(a). One line of cases follows *Ackerman v. Levine*, 788 F.2d 830, 838 (2d Cir. 1986) in which the Second Circuit held that service by mail on a German plaintiff was permissible under the Convention because the word "send" in Article 10(a) includes "serve." In a recent decision, the Ninth Circuit Court of Appeals in *Brockmeyer v. May*, 383 F.3d 798 (9th Cir. 2004) joined the Second Circuit in holding that service via postal channels is permitted by the Convention. The Eighth Circuit Court of Appeals, on the other hand, in *Bankston v. Toyota Motor Corp.*, 889 F.2d 172 (8th Cir. 1989), held that service via postal channels is not permitted by the Convention. . The *Bankston* case was criticized by the United States government.[3] In a letter dated March 14, 1991, the State Department's legal advisor stated that "the decision of the Court of Appeals in *Bankston* is incorrect to the extent that it suggests that the Hague Convention does not permit as a method of service the sending of a copy of the Summons and Complaint by registered mail to a defendant in a foreign country." *Id.* The Fifth Circuit, in *Nuovo Pignone v. Stoman Asia M/V*, 310 F.3d 374 (5th Cir. 2002), likewise adopted a strict reading of the Convention in concluding that service by mail was not permissible under the Convention  NCIC acknowledges the Fifth Circuit's position on this issue and recognizes that this Court is bound by such precedent. While not in agreement with such position, NCIC will preserve this issue for later disposition.

(i)     **If Service of Process was Defective, NCIC Should be Given the Opportunity to Cure the Defect Without the Dismissal of the Lawsuit**

Although NCIC contends that its service was proper under the Federal Rules of Civil Procedure and the terms of the Convention, if this Court finds that service was defective, NCIC

---

3 *See* Letter from Alan K. Kreczko, U.S. Department of State, Legal Advisor to Administration Office of the U.S. Courts and National Center for state courts cited in U.S. Dep't of State Op. regarding the Bankston Case, 30 I.L.M. 260 (1991)

should be given an opportunity to serve the Alexievs without dismissal of the lawsuit. Courts that have considered this issue have not dismissed the cases, but rather have quashed service and granted plaintiff leave to serve the defendant in compliance with the Convention. *Jim Fox Enter., Inc. v. Air France,* 664 F.2d 64, 65 (5th Cir. 1981).

**B.     Personal Jurisdiction**

Pursuant to Rule 12(b)(2), a court may dismiss a claim for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). The plaintiff bears the burden of establishing personal jurisdiction, but need only present prima facie evidence thereof. *Kelly v. Syria Shell Petroleum Development & B.V.,* 213 F.3d 841, 854 (5th Cir. 2000). The plaintiff's allegations concerning the basis for personal jurisdiction must generally be accepted as true. *Panda Brandywine Corp. v. Potomac Elec. Power Co.,* 253 F.3d 865, 868-69 (5th Cir. 2001). All factual disputes concerning jurisdiction should be resolved in favor of the plaintiff. *Deluxe Ice Cream Co. v. R.C.H Tool Corp.,* 726 F.2d 1209, 1215 (7th Cir. 1984).

**(i)     This Court Has Personal Jurisdiction Over the Alexievs by Virtue of Their Written Agreement to Such Jurisdiction**

Article 21 of the Agreement provides Texas as the exclusive jurisdiction for adjudicating disputes regarding the Agreement. A forum selection clause in a written contract is *prima facie* valid and unenforceable absent a showing that enforcement would be unreasonable. *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907 (1972); *Kevlin Services, Inc. v. Lexington State Bank,* 46 F.3d 13, 15 (5th Cir. 1995). Thus, absent a showing by the Alexievs that enforcement of this provision would be unreasonable due to fraud or overreaching, jurisdiction in Texas is proper.

**(ii)      This Court Has Personal Jurisdiction Over the Alexievs on the Same Basis Upon Which it Exercised Jurisdiction Over Other Third-Party Defendants**

On July 9, 2004, after oral hearing and reviewing briefs submitted by the parties, this Court exercised personal jurisdiction over several Third-Party Defendants on the basis of their unauthorized access of NCIC's server in Longview, Texas. On May 15, 2003, the Alexievs, through their company, Benchmark Project Management, S.R.O., signed an exclusive agreement with BBG. The Alexievs were present at the BBG offices in San Diego on the May 15 and 16, 2003, when NCIC's server in Longview, Texas was illegally accessed in violation of 18 U.S.C. § 1030(a) *et seq.* (See Excerpts from Michael Stomps Deposition attached as Exhibit K.)   Moreover, NCIC has recently discovered that the Alexievs continued to access their server from the Czech Republic after they had signed the exclusive agreement with BBG. (See Affidavit of Jay Walters).

### Conclusion

The Alexievs are parties to this lawsuit and not mere witnesses. They are fully aware of this lawsuit and have responded to requests by both Sheppard Mullin and Gregorio Galicot regarding this lawsuit. They have provided documents in response to subpoena from Tawnya Wojciechowski. NCIC has been diligently attempting to serve them under the Hague Convention and will continue to do so. NCIC was gracious enough to grant them an extension of time to file an answer in the hope that that would facilitate some cooperation regarding discovery. Given their obvious involvement in this litigation and their unauthorized access to NCIC's server after they signed an exclusive agreement with BBG, this Court should deny their motion to dismiss. Moreover, this Court should grant NCIC an extension in order to effectuate service.

Respectfully submitted by:

**Tom Henson**
**Attorney-in-Charge**
State Bar No. 09494000
**Sharon Small**
State Bar No. 24042773
RAMEY & FLOCK, P.C.
100 E. Ferguson, Ste. 500
Tyler, TX  75702
(903) 597-3301
Fax:  (903) 597-2413

**Jerry Harper**
LA State Bar No. 6585
JERALD R. HARPER, PLC
504 Texas St., Ste. 405
Shreveport, LA  71101
(318) 221-1004
Fax:  (318) 221-0008

ATTORNEYS FOR NCIC, ET AL

## Certificate of Service

I certify that on the 16th day of November, 2004 a copy of this document will be served on the following counsel of record via the Court's ECF system:

Gregory P. Love
WELLBORN, HOUSTON, ADKISON,
 MANN, SADLER & HILL, L.L.P.
300 W. Main St.
Henderson, TX 75652

Tawnya R. Wojciechowski
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
650 Town Center Dr., 4th Fl.
Costa Mesa, CA 92626-1925

James J. Mittermiller
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
501 W. Broadway, 19th Fl.
San Diego, CA 92101

Betty J. Santohigashi
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
12544 High Bluff Dr., Ste. 300
San Diego, CA 92130-3051

Eric M. Albritton
ALBRITTON LAW FIRM
109 W. Tyler St.
Longview, TX 75601

Scott E. Stevens
STEVENS LAW FIRM
P.O. Box 807
Longview, TX 75606

SHARON SMALL

# 175432.1

# Exhibit
# A

AGENCY CONTRACT

This Agency Agreement (hereinafter referred to as the "Agreement") is made this 1st day of
June 2002,

BY AND BETWEEN:

Network Communications International Corporation, a private limited liability NCIC,
incorporated under the laws of Texas, USA, having its place of business is 1809 Judson,
Longview, Texas, USA 75605, (hereinafter called 'NCIC')

and:

Michel Alexiev, a Dutch citizen, passport number N61801604, with his registered address at
Zvonarova 3, 130 00 Prague 3, Czech Republic (hereinafter called the 'Agents', or 'Agents'
when referred to together with Goran Alexiev)

Goran Alexiev, a Dutch citizen, passport number N95398784, with his registered address at
Zvonarova 3, 130 00 Prague 3, Czech Republic (hereinafter called 'the Agents' or 'Agents'
when referred to together with Michel Alexiev)

and adherent to the relevant provisions of all contracts and agreements concluded prior to the
date of this Agreement between NCIC and Blue Phone Limited, a corporation duly
established and registered under the laws of Tortola, British Virgin Islands, having its
principal office at Sabana Sur, 150 Oeste de la Controlaria, Edificio EDICOL 2 Piso, Costa-
Rica (hereinafter called 'BPL')

Jointly called the 'Parties'.

WHEREAS:

NCIC is the largest provider of International Operator Services for public payphones, hotels,
and telecommunication service providers in over 70 countries throughout the world. NCIC
provides underlying carrier operator services with custom branding and billing options on
behalf of the carrier. NCIC also provides a revenue sharing program for service providers
helping to  increase profits from their services and increasing service options to their Clients

BPL has been instrumental in introducing Messrs. Michel and Goran Alexiev to NCIC.

NCIC and Messrs. Michel and Goran Alexiev desire to enter into a relationship whereby
Messrs. Michel and Goran Alexiev will act as Agents of NCIC for the services herein
described, on the terms and conditions herein after set forth.

IT IS AGREED AS FOLLOWS:

## Article 1 – Terminology and interpretation

In this Agreement, the following terms shall be understood to have the meanings assigned to them below:

1.1 **USA Collect**: the Service which makes it possible for callers to a special access number to create a connection with a chosen number within the telecommunication infrastructure in the USA, with the costs being charged to the receiving party;

1.2 **Canada Collect**: the service which makes it possible for callers to a special access number to create a connection with a chosen number within the telecommunication infrastructure in Canada with the costs being charged to the receiving party;

1.3 **Worldwide Credit Card Calling**: the service which makes it possible for callers to a special access number to create a connection with a chosen number within the telecommunication infrastructure in each country in the world, with the costs being charged to the Credit Card Holder.

1.4 **Clients**: A Client in the context of this Agreement is a third party/legal entity, which the Agents have successfully introduced to NCIC. A Client is deemed to been successfully introduced, if a contract is concluded between the NCIC and the Client with intervention of the Agents.

1.5 **Monthly traffic**: The aggregate number of completed calls per calendar month generated from dedicated numbers pertaining to Clients and directed to NCIC's call centre at Longview, Texas, USA, or any other call centre directly or indirectly owned or operated by NCIC for the purpose of allowing the final Clients of Clients to place operator-assisted calls from telephones, services and properties aggregated by Clients or other Parties

1.6 **Completed call**: A call initiated by any final customer, made to NCIC's call centre at Longview, Texas, USA, or any other call centre directly or indirectly owned or operated by NCIC, which is subsequently connected from NCIC's call centre to its final destination, and on which final billing has occurred.

1.7 **Attempt**: A call initiated by any final customer, made to NCIC's call centre at Longview, Texas, USA, or any other call centre directly or indirectly owned or operated by NCIC, which is not subsequently connected from NCIC's call centre, and on which no final billing has occurred;

1.8 **Billing**: Clients shall have the option to submit operator service provider (OSP) Traffic to NCIC using any of the following billing procedures:

1.8.1 Approved telephone company calling cards with which NCIC has a billing and collection agreement;

1.8.2 Major credit cards (American Express, MC, Visa, Discover, or any other major credit card company) as allowed under current agreements between these credit card companies and NCIC);

1.8.3 Collect;

1.8.4   Third party billing
1.8.5   Any other form of billing which may become available in the future


Article 2 – Territory and Services

2.1     NCIC appoints the Agents, who accept, as his commercial Agents to promote the sale
        of the Services listed under Article 1 above (hereinafter called 'the Services') in the
        following Territories (hereinafter called 'Non-exclusive Territories'):
2.1.1   Germany
2.1.2   Spain
2.1.3   Hungary
2.1.4   Hong Kong
2.1.5   Philippines
2.1.6   Thailand
2.1.7   Other countries which may be added during the term of this agreement

2.2     Safe for contracts already concluded between NCIC and BPL on the one hand, and
        other parties on the other hand prior to the date of signing of this Agreement, NCIC
        and BPL grant Agents exclusivity for the following countries (hereinafter called
        'Exclusive Territories'):
2.2.1   Czech Republic
2.2.2   India

        Hereinafter called 'Territory' when referred to the Non-exclusive and Exclusive
        Territories together

2.3     The exclusivity for the Exclusive Territories has been granted starting from the date
        of signing of this Agreement. Exclusivity is contingent of Agents (being or having
        been instrumental in) generating monthly traffic of:

2.3.1   An aggregate number of 100 (in words: hunderd) completed calls per month from the
        Czech Republic starting 1 April 2002;
2.3.2   An aggregate number of 1000 (in words: one thousand) completed calls per month
        from India starting 1 March 2003;

2.4     Aside from the contingency set out in provisions 2.3.1 and 2.3.2 above, exclusivity in
        the Exclusive Territories will cease to exist / have been granted at any time if and
        when:
2.4.1   The aggregate number of completed calls per month from the Czech Republic will
        drop below 50 completed calls per month for a consecutive period of 90 days;
2.4.2   The aggregate number of completed calls per month from India will drop below 500
        completed calls per month for a consecutive period of 90 days;


Article 3 – Sub-Agents

3.1     The Agents shall be allowed to engage sub-Agents by separate agreement between the
        Agents and the sub-Agents. Sub-Agents are accountable to the Agents under separate
        agreement.

3.2    In the event that NCIC and/or BPL engages Agents in the Exclusive Territory other than the Agents under this Agreement, these Agents shall automatically be considered sub-Agents to the Agents under this Agreement.

3.3    In the event that NCIC and/or BPL engages sub-Agents in the Exclusive Territory other than the Agents under this Agreement, NCIC is obliged to notify the Agents of the engagement in writing within 30 days subsequent to the engagement.

3.4    Subsequent to the notification under Article 3.3 above, the Agents shall be entitled for a period of 180 days to conclude Sub-agency Agreements with the sub-Agents originally engaged by NCIC and/or BPL. These newly concluded Sub-agency agreements as set forth under this Article, shall replace the (sub)-agency agreements concluded by NCIC.

3.5    The Agents shall determine commissions to sub-Agents, as such commissions shall be deducted by the Agents from their aggregate commission amount paid out by NCIC and/or BPL.

3.6    The Agents shall pay out commissions to sub-Agents, unless explicitly agreed otherwise by the Parties and the sub-Agents(s) in writing.

3.7    The Agents shall be responsible for the activities of their sub-Agents unless in the event that there is clear evidence to the fact that the Sub-Agents acted with gross negligence and/or wilful misconduct.

Article 4 – Good faith and fair dealing

4.1    In carrying out their obligations under this agreement the Parties will act in accordance with good faith and fair dealing;

4.2    The provisions of this agreement, as well as any statements made by the Parties in connection with this agency relationship, shall be interpreted in good faith.

Article 5 – Agents' functions

5.1.    The Agents agree to use their best endeavours to promote the sale of the Services in the Territory, as well as in any other countries that may be included to the Territory in the future.

5.2.    The Agents shall have the right to solicit orders from outside the Territory provided that the Agents have informed NCIC and that NCIC has permitted the Agents to do so. In the event that the Agents negotiate business that results in contracts of sale with Clients established outside the Territory, the Agents shall be entitled to a commission as set forth under article 15 and 16.

5.3    Unless otherwise agreed, the Agents have no authority to make contracts on behalf of, or in any way to bind, NCIC towards third Parties without the explicit written consent of NCIC. The Agents only solicit orders from Clients for NCIC.

Article 6 – Acceptance and evidence of orders by NCIC

6.1    NCIC will inform the Agents without undue delay of his acceptance or rejection of the orders transmitted by the Agents.

6.2    NCIC may not unreasonably reject the orders transmitted by the Agents. In particular, a repeated refusal of orders contrary to good faith (e.g. if made for the only purpose of hindering the Agents' activity) shall be considered as a breach of contract by NCIC.

6.3    The Agents shall be allowed by NCIC to co-sign contracts between Clients and NCIC, solicited by the Agents or in the conclusion of which the Agents have been instrumental, solely for the purpose of evidence that such contract has indeed been solicited by the Agents and without any other legal effect.


Article 7 – Sales organisation, Marketing, Advertising and Fairs, Travel Expenses, and Technical Support

7.1    The Agents shall provide an adequate organisation for sales and marketing, and, where appropriate, after-sales service, in order to ensure the fulfilment of their obligations throughout the Territory under this Agreement.

7.2    The Parties may agree on the advertising to be jointly made in the Territory. Subject to the Agents' presenting adequate documentation thereof, the cost of advertising carried out in the Territory shall be borne by NCIC and/or BPL, unless agreed otherwise by the Parties on a case-by-case basis.

7.3    The Parties may agree on their participation in fairs or exhibitions within the Territory. Subject to the Agents' presenting adequate documentation thereof, the cost of participation in such fairs and exhibitions shall be borne by NCIC and/or BPL, unless otherwise apportioned between the Parties on a case-by-case basis.

7.4    The Parties may agree on travelling to be done by the Agents in or outside the Territory in connection with business development under this Agreement. Subject to the Agents' presenting adequate documentation thereof, the cost of such travelling done in or outside the Territory shall be borne by NCIC and/or BPL, unless agreed otherwise by the Parties on a case-by-case basis.

7.5    The Parties may agree on necessary technical support, in particular relating to the implementation of so-called 'mini call centres' in order to offset the financial risk arising from a very high number of attempts in certain high-volume Territories, such as, including but not limited to, India. The cost associated with the implementing such mini call centre, either in the form of lease payments, rent, capital expenditure, or otherwise, done shall be borne by NCIC and/or BPL, unless agreed otherwise by the Parties on a case-by-case basis, and will be deducted linearly from the aggregate monthly commission amount due to the Agents, in equal instalments over a period of 24 up to 36 months.

Article 8 – Sales Targets

8.1.    The Parties may agree annually on the sales targets for the forthcoming year.

8.2.    The Parties shall make their best efforts to attain the targets agreed upon, but non-attainment shall not be considered as a breach of the contract by any party under this Agreement.

Article 9 – Information to Principal and liability Agents

9.1.    The Agents shall exercise due diligence to keep NCIC and BPL informed about their activities within the Territory. They shall answer any reasonable request for information made by the NCIC or BPL.

9.2.    The Agents shall make best efforts to keep the NCIC and BPL informed about the laws and regulations that are to apply in the Territory in respect of the Services. However, the Agents shall not be liable towards NCIC for any damage resulting from the contravention of the above regulations by NCIC. NCIC will retain the right to terminate any services that may be in conflict with local laws of a particular country or territory.

9.3.    Unless otherwise provided in this Agreement, the Agents shall not be liable for any direct, indirect, special or consequential damages arising out of the implementation of this Agreements except where the same is caused by gross negligence and/or wilful misconduct by the Agents.

Article 10 – Financial responsibility

10.1    The Agents shall not bear any responsibility in respect of the solvency of Clients whose orders they transmit to NCIC. However, the Agents shall give his best efforts to inform NCIC of Clients of which he knows that they are in a critical financial position.

Article 11 – Principal's trademarks and symbols

11.1    The Agents shall use the NCIC's and/or BPL's trademarks, trade names or any other symbols, for the purpose of identifying and advertising the Services, within the scope of this Agreement and in NCIC's and/or BPL's sole interest.

11:2.    The Agents hereby agree neither to register, nor to have registered, any trademarks, trade names or symbols of NCIC and/or BPL in the Territory or elsewhere, unless required to do so by NCIC.

11.3.    The Agents shall notify NCIC of any infringement of NCIC's and/or BPL's trademarks, trade names or symbols that comes to his notice.

Article 12 -- Complaints by Clients

12.1   The Agents shall immediately inform NCIC and BPL of any observations or complaints received from Clients in respect of the Services. The Parties hereto shall deal promptly and properly with such complaints. The Agents have no authority to engage in any way NCIC, unless after they have received authorisation to such effect.


Article 13 -- Client protection

13.1.   NCIC and BPL shall, during the life of this contract, grant exclusivity ("client protection") to the Agents for each Client, which has been successfully introduced to NCIC by the Agents. A Client is deemed to been successfully introduced, if a contract is concluded between the NCIC and the Client with intervention of the Agents.

13.2.   Subject to the Agents' prior written approval, NCIC and/or BPL is entitled to deal directly, without the Agents' intervention, with Clients referred to in article 13.1 In respect of any sales arising there from, the Agents shall be entitled to the commission provided for in article 15 and 16 of this contract.

13.3.   NCIC and BPL hereby agree to submit to the Agents all necessary information (e.g. about prospective Clients), which could lead to the successful conclusion of sales contracts with Clients in the Territory.


Article 14 -- Agents to be kept informed

14.1.   NCIC and BPL explicitly agree to provide the Agents with all necessary written information relating to the Services (such as connection fees, gross charges per minute, and all surcharged imposed by NCIC) as well as with all the information needed by the Agents for carrying out their obligations under the contract on a Client-by-Client basis.

14.2.   NCIC shall furthermore inform the Agents without undue delay of its acceptance, refusal and/or non-execution of any business transmitted by the Agents. In addition, NCIC and BPL shall inform the Agents without undue delay of any business leads and/or (prospective) Clients that have approached NCIC and/or BPL regarding the purchase/implementation of the Services.

14.3.   NCIC and BPL shall keep the Agents informed of any relevant communication with Clients in the Territory.


Article 15 -- Agents' commission

15.1   The Agents are entitled to a commission as set forth in article 16 on all sales of the Services, which are made during the life of this contract to Clients established in the Territory, for as long as there is an Agreement between NCIC and such Clients for the Services. A Client is deemed to been successfully introduced, if a contract is concluded between the NCIC and the Client with intervention of the Agents.

15.2   The Agents are entitled to a commission as set forth in article 16 on all sales of the Services sold to NCIC through BPL, i.e. in the case that the Agents are instrumental in a contract for the Services being concluded between a Client and BPL, and the contract is subsequently placed by BPL with NCIC.

15.3   The Agents' rights to commission from NCIC will only cease to exist if and when a contract between NCIC and a Client which has succesfully been introduced to NCIC by the Agents is terminated by the Client and/or NCIC, and has not been subsequently renewed by NCIC and that Client.

15.4   Renewal of an Agreement between NCIC and a former Client, which was formerly successfully introduced to NCIC by the Agents, will entitle the Agents to a commission equal to the commission of the Agents which applied before termination between NCIC and the Client with whom a contract has been renewed.

15.5   Termination of this contract by any of the Parties to this Agreement does not affect any accrued rights or liabilities of the Parties hereto.

15.6   If the Agents solicit orders resulting in contracts of sale with Clients established outside the Territory, and if NCIC accepts such orders, the Agents shall also be entitled to receive a commission as set forth in article 16.

15.7   Except for the provisions under Article 7 of this Agreement, the commission covers any expenses incurred by the Agents in connection with the ordinary course of business associated with running an office (such as telephone, e-mail, fax, office rent, telex, office, travel expenses, etc.).


Article 16 – Method of calculating Agents' commission and payment

16.1   On all of NCIC's revenue generated from contracts concluded between NCIC and Clients, or concluded between BPL and Clients and placed by BPL with NCIC, as mentioned in Article 15 above, the Agents are entitled to a commission. Commission shall be calculated (at the option of the Agents) as:

16.1.1  a fixed amount per Completed Call, the amount to be determined on a case-by-case basis;

16.1.2  or as a percentage over the gross calling charges billed by NCIC to Clients which have been successfully introduced to NCIC by the Agents, the percentage to be determined;

16.2   With each concluded contract between NCIC and a Client successfully introduced to NCIC by the Agents, the Agents shall send to NCIC a so-called 'Commission Statement', which NCIC shall sign for acceptance and return to the Agents. The Commission Statements shall contain detailed information on all fees and charges charged by NCIC per individual Client, as well as the Agent's commission structure per individual Client (as percentage of gross calling charges or fixed amount per completed call). These Commission Statements shall be numbered and dated, and attached as Annexes to this Agreement. These Commission Statements shall form an integral part of this agreement.

16.3    The Agents shall acquire the right to commission at the end of each calendar month.

16.4    NCIC shall provide the Agents with, or shall make available on the Internet or otherwise, a statement of the commissions due in respect of each month and shall set out all the business in respect of which such commission is payable. The commission shall be paid not later than 15 days following the end of each calendar month.

16.5    The Parties agree that BPL shall pay out commissions to Agents as set forth under Articles 16.1-4 above.

16.6    The Agents are entitled to all the information, in order to check the amount of the commission due to them. In addition, the Agents have the right to request the Client to set out all the business in respect of which commission is payable.

16.7    Unless otherwise agreed, the commission shall be calculated in the currency of the sales contract in respect of which the commission is due.

16.8    In the event that NCIC should charge the Clients surcharges and/or any other hidden charges (hereinafter 'Surcharges'), NCIC shall notify the Agents of any such Surcharges in writing within 15 days. NCIC explicitly agrees that the Agents shall be entitled to receive commissions over any such Surcharges. The commission over Surcharges shall be calculated in an identical way as the commissions over the contract between NCIC and the Client on which Surcharges have been imposed. Commissions over Surcharges shall be calculated and due from the moment that such Surcharges have been imposed.

16.9    The Agents will not be paid commissions on taxes (local, federal, or Universal Service Fund taxes) or any taxes required by Territory governing/regulatory administration from where calls originate.

Article 17 – Un-concluded business

17.1    No commission shall be due in respect of offers or orders transmitted by the Agents and not accepted by NCIC.

17.2    If a contract made by NCIC as a result of orders transmitted by the Agents is not thereafter put into effect, the Agents shall not be entitled to commission.

Article 18 – Security

16.10    NCIC hereby irrevocably and unconditionally guarantees to pay out promptly to BPL the commission due and payable to the Agents under article 15 and 16 of this agreement.   BPL hereby irrevocably and unconditionally guarantees to pay out promptly to the Agents the commission due and payable to the Agents under article 15 and 16 of this Agreement.

16.11    In the event that BPL will, for what ever reason, be in default with regard to payments of commissions to Agents as mentioned under Articles 16.4 and 16.5 above for a

period of 30 days, the Agents shall have the right to be paid out commissions which pertain to the period subsequent to BPL's default directly by NCIC. Any commissions pertaining to the period prior to BPL's default to pay commissions to the Agents shall not be claimed by Agents from NCIC.

Article 19 – Term of the Contract

19.1.   This contract enters into force on 1 February 2002, and shall remain in force for a period of 2 years, with the understanding that this Agreement be automatically renewed for another period of 2 years if no termination notices are sent by either party at least 30 days prior to termination.

Article 20 – Earlier termination

20.1   Each party may terminate this Agreement with immediate effect, by notice given in writing by means of communication ensuring evidence and date of receipt (e.g. registered mail with return receipt, special courier), in case of a substantial breach by the other party of the obligations arising out of this contract, or in case of exceptional circumstances justifying the earlier termination, if the Party which is in breach fails to remedy such breach within thirty (30) days of receiving written notice of such breach from the first party;

20.2   Any material failure by a party to carry out all or part of his obligations under this Agreement resulting in such detriment to the other party as to substantially deprive that party of what that party is entitled to expect under the Agreement, shall be considered as a substantial breach for the purpose of article 20.1 above. Circumstances in which it would be unreasonable to require the terminating party to continue to be bound by this contract shall be considered as exceptional circumstances for the purpose of article 20.1 above.

20.3   The Parties agree that the following situations shall be considered as exceptional circumstances that justify the earlier termination by the other party: bankruptcy, moratorium, receivership, liquidation or any kind of composition between the debtor and the creditors, makes a general assignment for the benefit of its creditors, suffers or permits the appointment of a receiver over its business or assets, or becomes the subject of any proceedings relating to insolvency or the protection of creditors' rights and fails to have those proceedings struck out within fourteen (14) days.

Article 21 – Dispute resolution - Applicable law  - Arbitration

21.1   Any dispute arising out of or in connection with this Agreement shall be finally settled by the competent court in Longview, Texas, USA.

21.2   This agreement shall be governed by the laws of Texas, USA.

21.3   Any dispute arising out of or in connection with this Agreement, including any questions regarding its existence, validity or termination, shall be referred to and

10

finally resolved by arbitration under the Rules of the London Court of International Arbitration, which rules are deemed to be incorporated by reference into this clause. The place of arbitration shall be London. The language of arbitration shall be English.

## Article 22 – Previous agreement - Modifications - Nullity

22.1    This contract supersedes any other preceding agreement between the Parties on the subject.

22.2    No addition or modification to this contract shall be valid unless made in writing.

22.3    The nullity of a particular clause of this contract shall not entail the nullity of the whole agreement.

## Article 23 - Representations and Warranties

23.1    Each party warrants that it has the full authority to execute this Agreement and bind itself to the terms and provisions hereof.

23.2    It is expressly understood and agreed that neither party is an Agents, employee, nor legal representative of the other and, unless specifically authorized in writing to do so may not incur any obligations on behalf of or in the name of the other.

## Article 24 - Notices and language

24.1    Any notice pursuant to this Agreement shall be in writing signed by the person giving it and may be served by courier, facsimile, prepaid recorded delivery or registered post to the address of the party or such other address as shall have been duly notified in accordance with this clause. The Parties have specifically requested that English be the official language for the Agreement, that all related documents be drawn up in English, and that all communications and dispute resolution take place in English.

## Article 25 – Transfer of rights under this Agreement

25.1    The Parties hereto explicitly agree that the Agents are allowed to transfer their rights and obligations under this Agreement to any existing or to-be-established legal entity (limited liability company, private partnership, etc.) in which the Agents may decide to become Partners in the present or future, safe that such transfer would not in any way prevent the legal entity to which the rights under this Agreement have been transferred to from carrying out all or part of the Agents' obligations under this Agreement.

## Article 26 - Mutual consultation and goodwill

26.1    The Parties confirm their intention to promote the best interests of the Services and to

consult fully on all matters materially affecting the development of the Services. Each party shall act in good faith towards the other Parties in order to promote the success of the Services.

Signed on behalf of NCIC:

Name: William Pope

Title:   President

Signed on behalf of the Agents

Name: Michel Alexiev / Goran Alexiev

Title:   Agents

Signed on behalf of the BPL:

Name: Jeffrey Walters

Title:   Partner

# Exhibit B

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
## UNITED STATES DISTRICT COURT

## RECEIVED

_____ EASTERN _____                   DISTRICT OF _____ TEXAS

AUG 2 0 2003

BBG COMMUNICATIONS, INC.

### SUBPOENA IN A CIVIL CASE

V.

1) NETWORK COMMUNICATION
   INTERNATIONAL CORP:, et al

CASE NUMBER: ¹ 2:03-CV-227
                (WARD)

TO:   MICHEL and GORAN ALEXIEV
      STROSSMAYEROVO NAM.11 17000 PRAGUE 7
      CZECH REPUBLIC

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment A

| PLACE Sheppard, Mullin, Richter & Hampton, LLP<br>650 Town Center Drive 4th Floor<br>Costa Mesa, CA 92626-1925 | DATE AND TIME<br>August 22, 2003<br>10:00 a.m. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>Wesley Hill, Attorney for BBG Communications | DATE<br>7-21-03 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
6101 S. Broadway, Suite 500
Tyler, TX 75703     Tel: (903) 561-1600

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

¹ If action is pending in district other than district of issuance, state district under case number.

ATTACHMENT A

1. <u>DEFINITIONS AND INSTRUCTIONS.</u>

A. <u>Document</u>. As used herein, the term "Document" means any and all documents, tangible things and property, of any kind, and all writings of any kind, including the originals and all non-identical copies, whether different from The originals by reason of any notation made on such copies or otherwise, and including, without limitation, communication, memoranda, notes, diaries, statistics, letters, telegrams, telex, telefax, minutes, contracts, reports, studies, checks, statements, receipts, return summaries, pamphlets, books, inter-office and intra-office communications, notations of any sort of conversations, telephone calls, meetings, or other communications, bulletins, computer printouts, invoices, worksheets, all forms of drafts, notations, workings, alterations, modifications, changes and amendments of a of the foregoing, graphical or aural records or representations of any kind, including, without limitation, photographs, charts, microfiche, microfilm, videotape, records, motion pictures, and electronic, mechanical, or electrical records or representations any kind, including, without limitation, tapes, cassettes, discs, and recordings, computer discs, computer tapes, computer cards, computer programs, computer software, computer-readable media, machine sensible media, electronically stored media, and any other form of stored information.

B. <u>Communications</u>. As used herein, the term "Communications" means any and every exchange of thoughts, message or information by and through any and every medium.

C.  You/Your. As used herein, the terms "You" and "Your" refers to each and every Defendant and any other entity or person acting at their direction or on their behalf.

D.  Possession, Custody, or Control. Each request herein requires production of any and all documents in Your Possession, Custody, or Control. A document is deemed to be in Your "Possession, Custody, or Control" if the document is in Your physical custody or in the physical custody of any other person and You: own the requested document in whole or in part; have right by contract, statute, or otherwise to use, inspect, examine, or copy the requested document on any terms; have an understanding whether express or implied, that You may use, inspect, examine, or copy the requested document on any terms; have, as a practical matter, been able to use, inspect, examine, or copy the requested document when You have sought to do so; or are able to lawfully use, inspect, examine, or copy the requested documents. Documents within Your Possession, Custody, or Control include, but are not limited to, documents that are in the custody of Your attorney or other agents.

E.  Refer, Pertain, or Relate. As used herein, the phrase "Refer, Pertain, or Relate" means mentioning, describing, discussing, memorializing, concerning, consisting of, containing, evidencing, reflecting, depicting, or referring to in any way, directly or indirectly, the subject matter of the request.

F.  And/Or. As used herein, the term "and" includes "or," and the term "or" includes "and."

G.  Singular/Plural. As used herein, the singular shall include the plural, and the plural shall include the singular.

2.    DOCUMENTS AND ITEMS TO BE PRODUCED FOR INSPECTION AND
COPYING.

1.    All Communications (including all emails and attachments)You have created,
used, maintained or received since April 2001 on any email account associated with the
BBGCOM.COM domain name.

2. .    All files maintained on all computers in Your Possession, Custody, or Control
including servers, laptop and desktop and tower computers as well as any personal digital
assistant devices such as Palm Pilots, etc. which Refer, Pertain, or Relate to the registration, use,
creation or maintenance of any email account using any BBG's personnel's names associated
with the BBGCOM.COM domain name.

1.   All files on all computers (including servers) containing electronic data and
Documents which constitute, Refer, Pertain, or Relate to emails (including all
attachments)You have created, used, maintained or received since April 2001
on any email account associated with the BBGCOM.COM domain name.

2.   All Documents which constitute, Refer, Pertain, or Relate to Communications
You have made or received since April 2001 on any email account associated
with the BBGCOM.COM domain name.

3.   All Documents that Refer, Pertain, or Relate to any expenses incurred by You
in connection with the startup, management, or retention of the
BBGCOM.COM domain name since April 2001.

4. All Documents that Refer, Pertain or Relate to any information contained on all computers in Your Possession, Custody, or Control including servers, laptop and desktop and tower computers as well as any personal digital assistant devices such as Palm Pilots, etc. which Refer, Pertain, or Relate to the registration, creation or maintenance of any Communication via an email account using any BBG's personnel's names associated with the BBGCOM.COM domain name.

# Exhibit
# C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHAL DIVISION

| | | |
|---|---|---|
| (1) BBG COMMUNICATIONS, INC. | § | |
| | § | |
| VS. | § | Civil case No. 2:03-CV-227 |
| | § | (WARD) |
| (1) NETWORK COMMUNICATIONS | § | |
| INTERNATIONAL, INC.; (2) WILLIAM POPE; | § | |
| (3) JAY WALTERS; and | § | |
| (4) JEFFERY WALTERS | § | |

## <u>WAIVER OF SERVICE</u>

COUNTRY OF _____

BEFORE ME, the undersigned Notary Public, on this day personally appeared **Michel Alexiev** me duly sworn on oath deposed and said:

My name is Michel Alexiev and I am a witness in the above-entitled and numbered cause. I have received a copy of the Subpoena in a Civil Case dated July 21, 2003, the receipt of which is expressly acknowledged. By this document, I waive the issuance, service and return of said subpoena on me.

_____
Michel Alexiev

SUBSCRIBED AND SWORN TO BEFORE ME on the ____ day of July, 2003, to certify which witness my hand and official seal.

_____
Notary Public

# Exhibit
# D

**James Bond**

| | |
|---|---|
| **From:** | Goran Alexiev [ga@vp-communications.com] |
| **Sent:** | Monday, March 08, 2004 2:16 PM |
| **To:** | tawnya@sheppardmullin.com |
| **Subject:** | Fw: Business plan, Frankfurt, Nummers, en andere zaken |


FYI

----- Original Message -----
From: "Michael Stomps" <stomps@candw.ky>
To: "Filip Kriz" <filip.kriz@nciceurope.com>; "Goran Alexiev"
<goran.alexiev@nciceurope.com>
Cc: <Michel.alexiev@nciceurope.com>; "Katerina (NCIC) Radostova"
<katerina@nciceurope.com>
Sent: Tuesday, March 18, 2003 9:10 AM
Subject: Re: Business plan, Frankfurt, Nummers, en andere zaken


> I just received the contract from the Operator Center. I am looking
through
> this now and try to get a slightly better delal before i sign it.
>
> ----- Original Message -----
> From: "Filip Kriz" <filip.kriz@nciceurope.com>
> To: "Goran Alexiev" <goran.alexiev@nciceurope.com>; "Michael Stomps"
> <stomps@candw.ky>
> Cc: <Michel.alexiev@nciceurope.com>; "Katerina (NCIC) Radostova"
> <katerina@nciceurope.com>
> Sent: Monday, March 17, 2003 8:41 AM
> Subject: RE: Business plan, Frankfurt, Nummers, en andere zaken
>
>
> Our guy in Budapest is ready to start stickering the public phones in the
> city, in the Budapest Airport, in the train stations, in some hostels and
> student campuses, etc. Do you know, how long will it takes to get new
> numbers? If we have to wait 4 weeks and more, I rather start working with
> NCIC numbers now (we already have few) and later switch to any other
> operator service provider.
>
> Please let me know.
>
> Thanks,
>
> Filip
>
> -----Original Message-----
> From: Goran Alexiev [mailto:goran.alexiev@nciceurope.com]
> Sent: Monday, March 17, 2003 2:06 PM
> To: Michael Stomps
> Cc: Michel.alexiev@nciceurope.com; Katerina (NCIC) Radostova
> Subject: Re: Business plan, Frankfurt, Nummers, en andere zaken
> Importance: High
>
>
> Michael,
>
> 1. Any progress with the Business Plan? Iwould really appreciate it, so we
> can make a next step forward.Could you also include Patrick's activities
 in
> Asia? we need to co-ordiante things there, it is too far for you as well

BBG 04450
CONFIDENTIAL

> us.
>

> 2. Any news with any Operator Service Providers? Strange that NOS does not
> want it, as they do all of BBG's traffic... We are all waitng to go on,
> everybody in France, Turkey, Germany, Hungary etc. is ready to go! I know
it
> is not easy, but there is a lot of money at stake, and the season is
coming.
> Please advise about any progress.
>
> 3. I am seeing our German airport man again on Friday, together with
Michel
> and Ton. I'll keep you posted, things are developing OK.
>
> I look forward to hearing from you.
>
> Regards,
>
> Goran
>
> ----- Original Message -----
> From: Goran Alexiev
> To: Filip (NCIC) Kriz
> Sent: Monday, March 17, 2003 12:30 PM
> Subject: Fw: Business plan, Frankfurt, Nummers, en andere zaken
>
>
> ----- Original Message -----
> From: Michael Stomps
> To: Goran Alexiev
> Cc: Michel.alexiev@nciceurope.com
> Sent: Wednesday, March 12, 2003 10:49 PM
> Subject: RE: Business plan, Frankfurt, Nummers, en andere zaken
>
> Heren,
>
> Sorry dat het even duurt met mijn gedeelte van het business plan, maar er
is
> op moment zoveel gaande dat ik dit continue uitstel. Ik zal vanavond echt
> even tijd vrij maken en er echt even wat uurtjes voor gan zitten.
>
> Frankfurt....ja wat kan ik zeggen. Een onwijze opportunity Van zoiets kan
je
> alleen maar dromen. Houd me in de loop en laat me aub weten of ik iets kan
> doen. De wire van Zellmer is deze week weg gegaan en hij zal nu netjes
> iedere maand betaald worden.
>
> Voor de webphone..ik gebruik vaak www.bestnetcall.com dit is een calback
> service die perfecte kwaliteit heeft. Weet echter niet of deze rates voor
> jullie aantrekkelijk zijn. Als je goedkoper wil kan je ook met VOIP
bellen.
> Er is veel te koop, net2phone heeft heel mooi spul, erg goeie kwaliteit
met
> goed spul. http://store.net2phone.com/products.asp?page=corporate_products
>
> Nummers..........
> Ben hier erg druk mee geweest en heb ook een boell succes geboekt. Ik heb
> een aantal providers gevonden die me ITF's kunnen aanbieden op korte
termijn
> ca. 24-48 uur. De kosten zijn wel een stuk hoger..$0.20-$0.80 per minuut,
> maar daar staat tegenover dat we ze snel hebben en we hoeven $0,0 deposit
> neer te leggen. Andere providers vragen vaak $150-$200 deposit per nummer.
> Verder ben ik er ook achter wie die rare toll free nummers in Italie
> verstrekt en die kan ik ook binnen 48 operational hebben.
>
> Hier is mijn probleem...ik heb NOS gebeld voor een master sales agreement
> die waren absoluut niet geinteresseerd in sticker business. Ik zit nu met
> Triton te praten en die weten het nog niet of ze die business in willen.

BBG 04451
CONFIDENTIAL

Als
> ze het doen zijn de payouts laag. Ik kan aankloppen bij Cantalk, maar die
> kunnen me nu ook wel schieten. Qwest telt niet meer mee, NCIC wil niet
meer,
> blijft er OptiCom over, een OPS in Ohio. Ik heb die gasten een email
> gestuurd maar nog geen response. Het lijkt echt alsogf niemand
geinteresseerd
> is in die business.
>
> De enige andere moglijkheid zou nu zijn dat Filip misschien NOS belt en
een
> master agreement aanvraagt. Moeten we alles DID doen en nix zeggen over
> stickers, gewoon zeggen dat het eerlijke hotel business is. Hij zal wel
> vragen krijgen over waar we nu zitten, omvang van huidige traffic en wie
we
> nu gebruiken en waarom we onze traffic over willen zetten. Hij zal dus wel
> goeie antwoorden moeten hebben. Als je wil kan ik je een email adres geven
> van NOS waar je terecht kan.
>
> BTW, jammer dat David er ff niet bij kan zijn. Hij was zeker de sterke man
> tussen JC en hem.
>
> Ik blijf mijn best doen van mijn kant.
>
> Groet,
>
> Michael
>
> ----Original Message-----
> From: Goran Alexiev [mailto:goran.alexiev@nciceurope.com]
> Sent: Wednesday, March 12, 2003 4:27 AM
> To: Michael Stomps
> Cc: Michel.alexiev@nciceurope.com
> Subject: Business plan, Frankfurt, Nummers, en andere zaken
> Importance: High
>
>
> Michael,
>
> Graag even je aandacht voor het volgende.
>
> We beginnen hier aardig vorderingen te maken met het business plan, maar
ik
> heb ook jou input nodig. Ik begrijp dat je veel op reis bent geweest, maar
> wellicht kun je nu even wat tijd vrij maken ten einde het een en ander te
> 'inventariseren' zoals ik dat ook gedaan heb. Zodra ik de benodigde
> informatie van je ontvangen heb zal ik dat weer intergreren in het BP, en
je
> de 2e versie toesturen voor je comentaar en input.
>
> Wat Frankfurt betreft, ik heb je per fax de meeting summary toegestuurd,
en
> ik zie hem weer a.s. vrijdag. Denk eraan dat alle informatie in deze
> uitermate vertrouwelijk is! Indien deze in verkeerde handen komt kan dit
ons
> allen zeer schaden!
>
> En ja, wat is de status voor de nummers voor Frankrijk en Duitsland? Zoals
> je weet heb ik de 23ste reeds in Parijs afgesproken met JC. En onze Katka
is
> bezig met 20-30 potentiele agenten in Duitsland, dus het is echt de hogste
> tijd dat we de betreffende numers krijgen.
>
> Tot slot, Michel vertelde me dat je voor een paar honderd USD een aantal
> webphones hebt aangeschaft. Kun je ons hier wat meer over vertellen, want
> onze telefoonkosten rijzen de pan uit!
>

3

CONFIDENTIAL

BBC 04454

> Ik zie uit naar je spoedige antwoord.
>
> Groet,
>
> Goran
>
>
>

BBG 04453
CONFIDENTIAL

# James Bond

| | |
|---|---|
| **From:** | Goran Alexiev [goran@caramba.cz] |
| **Sent:** | Monday, March 08, 2004 2:08 PM |
| **To:** | tawnya@sheppardmullin.com |
| **Subject:** | Fw: BBG |

FYI
----- Original Message -----
From: <jeffrey@3comcr.com>
To: "Bill Pope" <Bill.Pope@ncic.com>
Cc: "Michel Alexiev" <michel.alexiev@nciceurope.com>; "Goran Alexiev NCIC"
<goran.alexiev@nciceurope.com>; "Jay Walters" <Jay.Walters@ncic.com>
Sent: Friday, February 28, 2003 8:44 AM
Subject: RE: BBG


> Quoting Bill Pope <Bill.Pope@ncic.com>:
>
> You can not trust these guys, we have more to gain by not working with
them.
>
>
>
> I haven't thought about it anymore, so go take Telcom Italia away from
> them.
> >
> > -----Original Message-----
> > From: Michel Alexiev [mailto:michel.alexiev@nciceurope.com]
> > Sent: Thursday, February 27, 2003 11:33 AM
> > To: Bill Pope
> > Cc: Goran Alexiev NCIC
> > Subject: BBG
> >
> >
> > Bill,
> >
> > Will you still meet with BBG to talk about you avoiding each other a bit
> > more in specific market?
> >
> > Let us know please.
> >
> > Thanks,
> >
> > Michel
> >
> >
>

**BBG 04454**
**CONFIDENTIAL**

1

## James Bond

| | |
|---|---|
| **From:** | Goran Alexiev [goran.alexiev@bbgcomm.com] |
| **Sent:** | Monday, March 08, 2004 2:05 PM |
| **To:** | tawnya@sheppardmullin.com |
| **Subject:** | Fw: Good news |

----- Original Message -----
From: <jeffrey@3comcr.com>
To: "Bill Pope" <Bill.Pope@ncic.com>
Cc: "Forward - Michel Alexiev" <michel@caramba.cz>; "Forward - Tony Hoogstraaten" <tony.from.holland@worldonline.nl>; "Jeff Walters" <jeffrey@3comcr.com>; "Goran" <goran@caramba.cz>
Sent: Friday, October 04, 2002 6:51 AM
Subject: RE: Good news

> Quoting Bill Pope <Bill.Pope@ncic.com>:
>
> We need test calls with a LAWYER ON THE BBG numbers...
>
>
>
> Great news!!!!!!!!!!!!!!!!!!!!!!!11
> >
> > -----Original Message-----
> > From: Michel Alexiev [mailto:michel@caramba.cz]
> > Sent: Friday, October 04, 2002 2:07 AM
> > To: Ton Hoogstraten; Jeff Walters; Goran
> > Cc: bpope@ncic.com
> > Subject: Good news
> >
> >
> > Guys,
> >
> > I have some good news. I got a meeting with Telecom Italia. I talked to
> > the guy in charge and he seemed like a nice guy. He said that they were
> > evaluating what to do with these services in the coming period. He was
> > quite happy to meet with us.
> >
> > I have a meeting set with him in Rome on Thursday November 14th at 11
> > o'clock.
> >
> > Regards,
> >
> > Michel
> >
> > NCIC Regional Office
> > Strossmayerovo nam. 11
> > CZ - 170 00 Prague 7
> > Tel: +420 2 6671 2870
> > Fax: +420 2 6671 2871
> > GSM 1: +420 603 412 582
> > GSM 2:  +31 655 777 486
> > Email: michel.alexiev@ncic.com <mailto:michel.alexiev@ncic.com>
> > Internet: www.ncic.com <http://www.ncic.com>
> >
> >
> >

**BBG 04455**
**CONFIDENTIAL**

## James Bond

**From:** Goran Alexiev [goran@caramba.cz]
**Sent:** Monday, March 08, 2004 2:03 PM
**To:** tawnya@sheppardmullin.com
**Subject:** Fw: Important - Draft reply to Telecom Italia!

----- Original Message -----
**From:** Jeffrey Walters
**To:** Bill Pope ; Goran Alexiev ; Michel Alexiev ; Forward - Tony Hoogstraaten
**Cc:** thomas.azavedo@nciceurope.com
**Sent:** Monday, March 31, 2003 7:29 AM
**Subject:** Re: Important - Draft reply to Telecom Italia!

Ths stickers do say BBG Inc... I have see this on the stickers....

> ----- Original Message -----
> **From:** Bill Pope
> **To:** Jeffrey Walters ; Goran Alexiev ; Michel Alexiev ; Forward - Tony Hoogstraaten
> **Cc:** thomas.azavedo@nciceurope.com
> **Sent:** Monday, March 31, 2003 9:41 AM
> **Subject:** RE: Important - Draft reply to Telecom Italia!
>
> No, probably bbg holdings bermuda....that's their standard scheme...especially if someone gets paid off.  If that person gets caught on the payoff or confesses to their boss, bbg doesn't have much to lose....only $12K and the contract.
>
> > -----Original Message-----
> > **From:** Jeffrey Walters [mailto:jeffrey@3comcr.com]
> > **Sent:** Monday, March 31, 2003 8:55 AM
> > **To:** Bill Pope; Goran Alexiev; Michel Alexiev; Forward - Tony Hoogstraaten
> > **Cc:** thomas.azavedo@nciceurope.com
> > **Subject:** Re: Important - Draft reply to Telecom Italia!
> >
> > Believe this contract is with BBG Inc, it says this on the stickers...
> >
> > > ----- Original Message -----
> > > **From:** Bill Pope
> > > **To:** Goran Alexiev ; Michel Alexiev ; Jeffrey Walters ; Forward - Tony Hoogstraaten
> > > **Cc:** thomas.azavedo@nciceurope.com
> > > **Sent:** Monday, March 31, 2003 8:55 AM
> > > **Subject:** RE: Important - Draft reply to Telecom Italia!
> > >
> > > Well said.  Yes, we forgot to mention that BBG Holdings Bermuda has a limitation of liability of US$12,000.  Is there anything in the contract that says BBG Communications USA assumes responsibilities for any liability?  If not, then Telecom Italia is already in a tight situation with bbg.
> > >
> > > > -----Original Message-----
> > > > **From:** Goran Alexiev [mailto:goran.alexiev@nciceurope.com]
> > > > **Sent:** Monday, March 31, 2003 8:48 AM
> > > > **To:** Michel Alexiev; Jeffrey Walters; Bill Pope; Forward - Tony Hoogstraaten
> > > > **Cc:** thomas.azavedo@nciceurope.com

RRG 04436
CONFIDENTIAL

**Subject:** Re: Important – Draft reply to Telecom Italia!

----- Original Message -----
**From:** Michel Alexiev
**To:** Jeffrey Walters ; Bill Pope ; Ton
**Cc:** NCIC Goran Alexiev ; thomas.azavedo@nciceurope.com
**Sent:** Monday, March 31, 2003 4:06 PM
**Subject:** Important – Draft reply to Telecom Italia

Dear All,

I have some problems with Telecom Italia. They would like to cooperate with us but they have some legal issues with BBG. I have prepared a telephone conversation summary of my conversation today for Telecom Italia. Please read it and comment as much as you can so that we can close the deal now somehow.

Michel

Dear Mr. Guira Longo,

For good order I have summarised our discussion of this afternoon concerning the possible implementation of our services.

Facts presented by Telecom Italia:

1. BBG gives Telecom Italia a guarantee of USD 400,000 of yearly revenue up to a call volume ff 120,000 calls per year;
2. Above 120,000 calls a higher guaranteed fee is provided to Telecom Italia;
3. No per call payment is directly agreed upon;
4. The current yearly volume amounts to 100,000 calls per day;
5. BBG has agreed to guarantee this minimum fee of 400,000 to Telecom Italia under the condition that no direct competitor of BBG will be allowed to offer its services through Telecom Italia; The following should be checked: Letting in competitors would free BBG of the contractual guaranteed payments, but not from the payment as such. So, BBG would not guarantee the payment anymore, but still would be required to make the payment. The amount of the payment could be on a pro-rata basis, but it is hard to argue that letting in competitors would free BBG of any payment at all (as the contract says that it is non-exclusive). Also, Telecom Italia should evaluate what exactly means guarantee of payment by BBG. How enforceable is this guarantee, are there securities? A guarantee of a company with limited liability of USD couple thousand is worthless.
6. The contract with BBG and Telecom Italia contains a clause that the contract with BBG is non-exclusive. Problems or concerns by Telecom Italia relating a cooperation between NCIC and Telecom Italia.

1. Telecom Italia fears that it will not receive any payments from BBG if it will allow NCIC or any other provider to offer its services. We should find out when these payments have taken place (if any at all), or when they will take place.

Questions and comments related to the above presented facts.

1. What does the contract state about payments by BBG to Telecom Italia if the market is

**BBG 04457**
**CONFIDENTIAL**

opened by Telecom Italia to other providers? If it only links it to the guarantee rather than the payment itself, we should be fine.

2. Surely it can not imply that if the market is opened to other providers that BBG is relieved of its obligation to pay Telecom Italia. As the contract is non exclusive and BBG would have no obligation to pay, then this would mean two things. A) BBG will pay out commissions only when they have the market to themselves, or B) BBG has no obligation to pay anything if other providers are allowed to the market and thus they can offer their services for free. This is legally not enforceable and will not stand up in court at all and we would be willing to pay for the legal fees that may arise from this issue.

3. Clearly, there must be some legal way to enforce payment on a per-call basis, based on historical calling data and past payments.

4. Does Telecom Italia have the obligation to continue to cooperate with BBG if BBG doesn't pay any commissions?

5. We would like to cooperate with your legal council in order to find a solution for the problem above and possibly guarantee you the difference in revenue that you may miss from BBG.

6. We could ask them to sign an agreement with us for the implementation of the speed dial, and become operational only after they have re-negotiated the deal with BBG.

7. Is there any way how to make clear to Telecom Italia that BBG has been stealing money from them for al these years?

I shall give you a call tomorrow in order to discuss the above issues with you in more detail.

Best regards,

Michel Alexiev

BBG 04452
CONFIDENTIAL

# James Bond

**From:** Goran Alexiev [goran@caramba.cz]
**Sent:** Monday, March 08, 2004 1:13 PM
**To:** tawnya@sheppardmullin.com
**Subject:** Fw: BT payphone division

----- Original Message -----
**From:** Bill Pope
**To:** Jeffrey Walters ; Goran Alexiev ; michel.alexiev@nciceurope.com
**Cc:** Jay Walters
**Sent:** Monday, March 24, 2003 5:36 PM
**Subject:** RE: BT payphone division

Can't hurt to try. I think they want to use 2 providers, so we can at least get Faircall tossed out....they lost their biggest customer at the end of last year, so they are hurting.

-----Original Message-----
**From:** Jeffrey Walters [mailto:jeffrey@3comcr.com]
**Sent:** Monday, March 24, 2003 7:07 PM
**To:** Bill Pope; Goran Alexiev; michel.alexiev@nciceurope.com
**Cc:** Jay Walters
**Subject:** Re: BT payphone division

Most likely BBG has an inside person that they been woring; this is how they operate..

----- Original Message -----
**From:** Bill Pope
**To:** Jeffrey Walters ; Goran Alexiev ; michel.alexiev@nciceurope.com
**Cc:** Jay Walters
**Sent:** Monday, March 24, 2003 7:20 PM
**Subject:** RE: BT payphone division

We're competing with bbg and faircall. We know bbg will offer some sort of advance, so we should throw something in on the third month...that basically means they finance their own advance. They have 116,000 phones....muy grande!!!

-----Original Message-----
**From:** Jeffrey Walters [mailto:jeffrey@3comcr.com]
**Sent:** Monday, March 24, 2003 6:51 PM
**To:** Bill Pope; Goran Alexiev; michel.alexiev@nciceurope.com
**Subject:** Re: BT payphone division

??

----- Original Message -----
**From:** Bill Pope
**To:** Goran Alexiev ; Jeffrey Walters ; michel.alexiev@nciceurope.com
**Sent:** Monday, March 24, 2003 2:56 PM
**Subject:** RE: BT payphone division

Any updates on BT payphones? Maybe we need to offer an exclusivity advance on the 3rd

BBG 04487
CONFIDENTIAL

month?

-----Original Message-----
**From:** Bill Pope
**Sent:** Tuesday, February 04, 2003 8:49 AM
**To:** 'Goran Alexiev'; Jeffrey Walters; michel.alexiev@nciceurope.com
**Subject:** RE: BT payphone division

Oh. I imagine bbg is going automated.

-----Original Message-----
**From:** Goran Alexiev [mailto:goran@nciceurope.com]
**Sent:** Monday, February 03, 2003 10:52 PM
**To:** Bill Pope; Jeffrey Walters; michel.alexiev@nciceurope.com
**Subject:** Re: BT payphone division

The faircall number went straight to the operator at Stansted.

Michel

----- Original Message -----
From: "Bill Pope" <Bill.Pope@ncic.com>
To: "Jeffrey Walters" <jeffrey@3comcr.com>; "Goran Alexiev"
<goran@nciceurope.com>; <michel.alexiev@nciceurope.com>
Sent: Tuesday, February 04, 2003 4:04 AM
Subject: RE: BT payphone division

Yes. Goran, I forgot something significant. When you tested the
phones at Stansted....did you happen to notice if they were automating
the calls or did they go straight to live operator? I think we need to
push the fact that we prefer to offer live operator, but can pay higher
for automated calls. The live operators tend to complete quite a few
more calls. When people hear an automated prompt not in their main
language, they tend to hang up. If they hear a live person and they
speak some english, then they will try to have the operator complete
the call. We just found this out in the Hong Kong airport and need to
mention this in the BT proposal

-----Original Message-----
From: Jeffrey Walters [mailto:jeffrey@3comcr.com]
Sent: Monday, February 03, 2003 8:16 PM
To: Goran Alexiev; michel.alexiev@nciceurope.com
Cc: Bill Pope
Subject: Re: BT payphone division

Bill, were you able to have a look at this???

----- Original Message -----
From: "Goran Alexiev" <goran@nciceurope.com>
To: "Jeffrey Walters" <jeffrey@3comcr.com>;

BBG 04488
CONFIDENTIAL

<michel.alexiev@nciceurope.com>
Cc: "Bill Pope" <bpope@ncic.com>
Sent: Monday, February 03, 2003 4:30 AM
Subject: Re; BT payphone division


> I have the p[roposal ready and I have sent it to Bill for his comments and
> then it canm go out. I have all contact details.
>
> So bill, please have a good look at it and I cvan send it out.
>
> Michel
>
> ----- Original Message -----
> From: "Jeffrey Walters" <jeffrey@3comcr.com>
> To: <michel.alexiev@nciceurope.com>
> Cc: "Bill Pope" <bpope@ncic.com>
> Sent: Friday, January 31, 2003 12:26 AM
> Subject: BT payphone division
>
>
> > Michel, you need to go after BT payphone division that want an offer
from
> > us; they are testing with BBG & Faircall.
> >
> > Do you have the contact info....
> >
> >
> >
> >
> >
> >
> >

BBG 04489
CONFIDENTIAL

# Exhibit
# E



**1-800-SERVE-EM**
a Corbodex Company

Tel: 800.737.8336    process@1-800-serve-em.com
Fax: 888.737.8336    http://www.1-800-serve-em.com

**Case Notification**
**Case:** 2:03-CV-227
**Your Ref. No:** 2:03-CV-227
Sent: 7/1/2004

---

*From:* Patricia Barron
*To:* Mona DuBroc
Jerald R. Harper, P.L.C. A Professional Law Corporation

*Street:*    504 Texas Street, Suite 405
Shreveport, LA 71101
*Voice:*    318.221.1004
*Fax:*    318.221.0008
mona@mmw-law.com
harper@mmw-law.com

*Court:* United States District Court for the Eastern District of Texas  **CLIENT COPY**
*Case:* 2:03-CV-227
*Style:* BBG Communications, Inc.

Plaintiff

-vs-

Network Communications International Corp., William Pope, Jay Walters, Jeffrey Walters

Defendant

-vs-

Network Communications International Corp., William Pope, Jay Walters, Jeffrey Walters

Third Party Plaintiff

-vs-

Ronald Perez, et al.

Third Party Defendant

**7/1/2004 2:04 PM:**
**Mona, I've sent out an inquiry for status on Goran Alexiev, Michel Alexiev and Awi Fang a/k/a Suriyanto Suriyanto. I'll let you if I get a response, however it is likely that we will not. The Czech Republic is a signatory to the Hague, and the Hague treatly specifically states that a signatory country is under no obligation to provide status and does not have an obligatory time frame in which to effect service. Australia (Letters Rogatory) does not have a history of answering any request for status as well. I realize that this is frustrating, and I'll pass along any information to you immediately if I hear something. Also, please let me know if we are to go ahead with the translation into Mandarin Chinese on Patrick Mauchant. Thanks.**

*Accountable Inter-Jurisdictional Process Service*

United States District Court for the Eastern District of Texas

**BBG Communications, Inc.**
**Plaintiff**
**-vs-**
**Network Communications International Corp., William Pope, Jay Walters, Jeffrey**
**Walters**
**Defendant**
**-vs-**
**Network Communications International Corp., William Pope, Jay Walters, Jeffrey**
**Walters**
**Third Party Plaintiff**
**-vs-**
**Ronald Perez, et al.**
**Third Party Defendant**

**Case No.: 2:03-CV-227**

**AFFIDAVIT OF PATRICIA BARRON**

I, Patricia Barron, am Director – International Services of 1-800-SERVE-EM, an Inter-Jurisdictional Process Service Clearing Firm. I am over the age of twenty-one, not a party nor an attorney for any party in this action, and state the following:

1.    We specialize in the service of civil process in foreign countries; and

2.    The United States and The Czech Republic are signatories to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, done at the Hague, November 15, 1965, (Hague Service Convention); and

3.    The Czech Republic has declared that all documents to be served must be translated into Czech in their entirety; and

4.    On May 10, 2004 we forwarded to the Central Authority in The Czech Republic the Third Party Summons in a Civil Action, NCIC's First Amended Counterclaim and Claim Against Third-Party Defendants, NCIC's Counterclaim and Claim Against Third-Party Defendants, Counterclaimant NCIC's Motion for Preliminary Injunction, Docket Control Order, Amended Discovery Order, Notice of Scheduling Conference, Proposed Deadlines for Docket Control Order and Discovery Order, Original Complaint and Jury Demand and Exhibits A through K, translation thereof and the USM 94 form in accordance with the Hague Service Convention for service upon **Goran Alexiev, Zvonarova 3, 1300 Prague 3, Czech Republic;** and

5.    No signatory nation is obligated under the Hague Service Convention to provide status with respect to service of documents in its possession; and

6.    As of September 21, 2004 there is no status available; and

7.    The Hague Service Convention does not impose an obligatory time frame; and

8.    It has been my continuous experience that the turn around time for effected service in The Czech Republic under the Hague Service Convention is approximately three months but has occasionally exceeded five months.

Patricia Barron
Director – International Services
1-800-SERVE-EM
800.737.8336
Job Serial No. 2004023370

SUBSCRIBED AND SWORN TO before me this 21st day of September, 2004

Paul Lee Vedder, Jr.
Notary
State of Florida
County of Palm Beach

PAUL LEE VEDDER, JR.
COMMISSION # DD336740
EXPIRES JUL 11, 2008
BONDED THROUGH
RLI INSURANCE COMPANY

**United States District Court for the Eastern District of Texas**

**BBG Communications, Inc.**
**Plaintiff**
**-vs-**
**Network Communications International Corp., William Pope, Jay Walters, Jeffrey Walters**
**Defendant**
**-vs-**
**Network Communications International Corp., William Pope, Jay Walters, Jeffrey Walters**
**Third Party Plaintiff**
**-vs-**
**Ronald Perez, et al.**
**Third Party Defendant**

**Case No.: 2:03-CV-227**

**AFFIDAVIT OF PATRICIA BARRON**

I, Patricia Barron, am Director – International Services of 1-800-SERVE-EM, an Inter-Jurisdictional Process Service Clearing Firm. I am over the age of twenty-one, not a party nor an attorney for any party in this action, and state the following:

1.  We specialize in the service of civil process in foreign countries; and

2.  The United States and The Czech Republic are signatories to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, done at the Hague, November 15, 1965, (Hague Service Convention); and

3.  The Czech Republic has declared that all documents to be served must be translated into Czech in their entirety; and

4.  On May 10, 2004 we forwarded to the Central Authority in The Czech Republic the Third Party Summons in a Civil Action, NCIC's First Amended Counterclaim and Claim Against Third-Party Defendants, NCIC's Counterclaim and Claim Against Third-Party Defendants, Counterclaimant NCIC's Motion for Preliminary Injunction, Docket Control Order, Amended Discovery Order, Notice of Scheduling Conference, Proposed Deadlines for Docket Control Order and Discovery Order, Original Complaint and Jury Demand and Exhibits A through K, translation thereof and the USM 94 form in accordance with the Hague Service Convention for service upon **Michel Alexiev, Zvonarova 3, 1300 Prague 3, Czech Republic;** and

5.  No signatory nation is obligated under the Hague Service Convention to provide status with respect to service of documents in its possession; and

6.  As of September 21, 2004 there is no status available; and

7.  The Hague Service Convention does not impose an obligatory time frame; and

8.  It has been my continuous experience that the turn around time for effected service in The Czech Republic under the Hague Service Convention is approximately three months but has occasionally exceeded five months.

Patricia Barron
Director – International Services
1-800-SERVE-EM
800.737.8336
Job Serial No. 2004023349


SUBSCRIBED AND SWORN TO before me this 21st day of September, 2004


Paul Lee Vedder, Jr.
Notary
State of Florida
County of Palm Beach

PAUL LEE VEDDER, JR.
COMMISSION # DD336740
EXPIRES JUL 11, 2008
BONDED THROUGH
RLI INSURANCE COMPANY
NOTARY PUBLIC STATE OF FLORIDA



Tel: 800.737.8336   process@1-800-serve-em.com
Fax: 888.737.8336   http://www.1-800-serve-em.com

**Case Notification**
**Case:** 2:03-CV-227
**Your Ref. No:** 2:03-CV-227
**Sent:** 9/21/2004

*From:* Patricia Barron

*To:* Mona DuBroc
  Jerald R. Harper, P.L.C. A Professional Law
  Corporation

  *Street:*   504 Texas Street, Suite 405
       Shreveport, LA 71101

  *Voice:*   318.221.1004

  *Fax:*    318.221.0008

  mona@mmw-law.com
  harper@mmw-law.com

*Court:* United States District Court for the Eastern
     District of Texas

*Case:* 2:03-CV-227

*Style:* BBG Communications, Inc.
                    Plaintiff

              -vs-
     Network Communications International
     Corp., William Pope, Jay Walters, Jeffrey
     Walters
                    Defendant

              -vs-
     Network Communications International
     Corp., William Pope, Jay Walters, Jeffrey
     Walters
                  Third Party Plaintiff

              -vs-
     Ronald Perez, et al.
                  Third Party Defendant

**9/21/2004 5:15 PM:**
**Mr. Harper, I have requested status, however have not had a response. I'll be in touch with you**
**immediately if I hear something, however the Hague treaty does not require that a signatory**
**country provid status and has no obligatory time frame in which to effect service. It is also**
**possible that Gorian and Michel Alexiev have been served and the Central Authority in The**
**Czech Republic has not yet sent the certificates of service to us. This is not uncommon. At any**
**rate, attached are affidavits of compliance to effectively support a motion to extend. I'll overnight**
**the originals to you for delivery tomorrow. If we may be of any other assitance pending receipt of**
**the certificates of service, please don't hesitate to contact us.**

*Accountable Inter-Jurisdictional Process Service*



**1-800-SERVE-EM**
a Carbadex Company

Tel: 800.737.8336
Fax: 888.737.8336

process@1-800-serve-em.com
http://www.1-800-serve-em.com

### Case Notification
**Case:** 2:03-CV-227
**Your Ref. No:** 2:03-CV-227
Sent: 9/21/2004

*From:* Patricia Barron

*To:* Mona DuBroc
Jerald R. Harper, P.L.C. A Professional Law
Corporation

    *Street:* 504 Texas Street, Suite 405
Shreveport, LA 71101

    *Voice:* 318.221.1004

    *Fax:* 318.221.0008

mona@mmw-law.com
harper@mmw-law.com

*Court:* United States District Court for the Eastern
District of Texas

*Case:* 2:03-CV-227

*Style:* BBG Communications, Inc.
                                 Plaintiff
         -vs-
Network Communications International
Corp., William Pope, Jay Walters, Jeffrey
Walters
                              Defendant
         -vs-
Network Communications International
Corp., William Pope, Jay Walters, Jeffrey
Walters
                Third Party Plaintiff
         -vs-
Ronald Perez, et al.
               Third Party Defendant

**9/21/2004 5:15 PM:**
**Mr. Harper, I have requested status, however have not had a response. I'll be in touch with you immediately if I hear something, however the Hague treaty does not require that a signatory country provid status and has no obligatory time frame in which to effect service. It is also possible that Gorian and Michel Alexiev have been served and the Central Authority in The Czech Republic has not yet sent the certificates of service to us. This is not uncommon. At any rate, attached are affidavits of compliance to effectively support a motion to extend. I'll overnight the originals to you for delivery tomorrow. If we may be of any other assitance pending receipt of the certificates of service, please don't hesitate to contact us.**

*Accountable Inter-Jurisdictional Process Service*

United States District Court for the Eastern District of Texas

**BBG Communications, Inc.**
**Plaintiff**
-vs-
**Network Communications International Corp., William Pope, Jay Walters, Jeffrey**
**Walters**
**Defendant**
-vs-
**Network Communications International Corp., William Pope, Jay Walters, Jeffrey**
**Walters**
**Third Party Plaintiff**
-vs-
**Ronald Perez, et al.**
**Third Party Defendant**

**Case No.: 2:03-CV-227**

**AFFIDAVIT OF PATRICIA BARRON**

I, Patricia Barron, am Director – International Services of 1-800-SERVE-EM, an Inter-Jurisdictional Process Service Clearing Firm. I am over the age of twenty-one, not a party nor an attorney for any party in this action, and state the following:

1.    We specialize in the service of civil process in foreign countries; and

2.    The United States and The Czech Republic are signatories to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, done at the Hague, November 15, 1965, (Hague Service Convention); and

3.    The Czech Republic has declared that all documents to be served must be translated into Czech in their entirety; and

4.  On May 10, 2004 we forwarded to the Central Authority in The Czech Republic the Third Party Summons in a Civil Action, NCIC's First Amended Counterclaim and Claim Against Third-Party Defendants, NCIC's Counterclaim and Claim Against Third-Party Defendants, Counterclaimant NCIC's Motion for Preliminary Injunction, Docket Control Order, Amended Discovery Order, Notice of Scheduling Conference, Proposed Deadlines for Docket Control Order and Discovery Order, Original Complaint and Jury Demand and Exhibits A through K, translation thereof and the USM 94 form in accordance with the Hague Service Convention for service upon **Goran Alexiev, Zvonarova 3, 1300 Prague 3, Czech Republic;** and

5.  No signatory nation is obligated under the Hague Service Convention to provide status with respect to service of documents in its possession; and

6.  As of September 21, 2004 there is no status available; and

7.  The Hague Service Convention does not impose an obligatory time frame; and

8.  It has been my continuous experience that the turn around time for effected service in The Czech Republic under the Hague Service Convention is approximately three months but has occasionally exceeded five months.

Patricia Barron
Director – International Services
1-800-SERVE-EM
800.737.8336
Job Serial No. 2004023370

SUBSCRIBED AND SWORN TO before me this 21st day of September, 2004

Paul Lee Vedder, Jr.
Notary
State of Florida
County of Palm Beach

PAUL LEE VEDDER, JR.
COMMISSION # DD336740
EXPIRES JUL 11, 2008
BONDED THROUGH
RLI INSURANCE COMPANY

United States District Court for the Eastern District of Texas

BBG Communications, Inc.
**Plaintiff**
-vs-
Network Communications International Corp., William Pope, Jay Walters, Jeffrey
**Walters**
**Defendant**
-vs-
Network Communications International Corp., William Pope, Jay Walters, Jeffrey
**Walters**
**Third Party Plaintiff**
-vs-
Ronald Perez, et al.
**Third Party Defendant**

Case No.: 2:03-CV-227

AFFIDAVIT OF PATRICIA BARRON

I, Patricia Barron, am Director – International Services of 1-800-SERVE-EM, an Inter-Jurisdictional Process Service Clearing Firm. I am over the age of twenty-one, not a party nor an attorney for any party in this action, and state the following:

1.    We specialize in the service of civil process in foreign countries; and

2.    The United States and The Czech Republic are signatories to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, done at the Hague, November 15, 1965, (Hague Service Convention); and

3.    The Czech Republic has declared that all documents to be served must be translated into Czech in their entirety; and

4.   On May 10, 2004 we forwarded to the Central Authority in The Czech Republic the Third Party Summons in a Civil Action, NCIC's First Amended Counterclaim and Claim Against Third-Party Defendants, NCIC's Counterclaim and Claim Against Third-Party Defendants, Counterclaimant NCIC's Motion for Preliminary Injunction, Docket Control Order, Amended Discovery Order, Notice of Scheduling Conference, Proposed Deadlines for Docket Control Order and Discovery Order, Original Complaint and Jury Demand and Exhibits A through K, translation thereof and the USM 94 form in accordance with the Hague Service Convention for service upon **Michel Alexiev, Zvonarova 3, 1300 Prague 3, Czech Republic;** and

5.   No signatory nation is obligated under the Hague Service Convention to provide status with respect to service of documents in its possession; and

6.   As of September 21, 2004 there is no status available; and

7.   The Hague Service Convention does not impose an obligatory time frame; and

8.   It has been my continuous experience that the turn around time for effected service in The Czech Republic under the Hague Service Convention is approximately three months but has occasionally exceeded five months.

Patricia Barron
Director – International Services
1-800-SERVE-EM
800.737.8336
Job Serial No. 2004023349

SUBSCRIBED AND SWORN TO before me this 21st day of September, 2004

Paul Lee Vedder, Jr.
Notary
State of Florida
County of Palm Beach

PAUL LEE VEDDER, JR.
COMMISSION # DD336740
EXPIRES JUL 11, 2008
BONDED THROUGH
RLI INSURANCE COMPANY
NOTARY PUBLIC STATE OF FLORIDA

# Exhibit
# F

Writer's Direct Line: 714-424-2828
tawnya@sheppardmullin.com

September 8, 2004

Our File Number: 082X-105444

*VIA E-MAIL AND FAX*

Benchmark Communications
Attention: Goran and Michel Alexiev
Barendrecht, Netherlands
Fax (31) 180618210

Re:   <u>BBG v NCIC – Request for Attendence at Deposition</u>

Dear Mssrs. Alexiev:

As you may know, our law firm is representing BBG Communications in an ongoing lawsuit in the Eastern District of the State of Texas in the United States between BBG Communications and NCIC, and other third parties. You have been named as third party defendants in this lawsuit by NCIC, but we do not know if service of the complaint has been effected on you as of this time.

NCIC has requested that we attempt to arrange for your voluntary deposition (a legal procedure used in the United States which is a recorded statement made by each of you as a witness under penalty of perjury as to the truth of your statements). We have agreed with NCIC to send you this letter making this request. We do not know if there is a similar procedure in the Czech Republic, and request that you to seek independent legal counsel for their review of this information and request under Czech law.

In return for your voluntary appearance, NCIC has agreed that it would not attempt to serve you with any papers relating to this lawsuit, and that your appearance would not waive any challenges you may have in connection with any legal proceeding with NCIC. NCIC has also offered to take such deposition either in Eastern Texas, or in your home country in the city of Prague, at your election.

Michel and Goran Alexiev
Benchmark Communications
September 8, 2004
Page 2

        Please let us know, no later than September 10, 2004, whether you would agree to make such a voluntary appearance.

                              Very truly yours,

                              Tawnya Wojciechowski

                    for SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

W02-OC:NTW41366774.1

cc:    Greg Love, Esq.
        James Mittermiller, Esq.
        Betty Santohigashi, Esq.

# Exhibit G

Sep 08 04 01:41p     0000                                    p.2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

BBG COMMUNICATIONS, INC.,
BBG HOLDINGS LIMITED,

                    Plaintiffs,

                                        Case No. CV2:03-CV-227

          v.

1. NETWORK COMMUNICATIONS
   INTERNATIONAL CORP.,
2. BLUEPHONE,
3. WILLIAM POPE,
4. JAY WALTERS,
5. JEFFERY WALTERS
                    Defendants.

**DECLARATION OF GREGORIO GALICOT SUPPORTING
OPPOSITION TO NCIC'S MOTION TO COMPEL**

I, Gregorio Galicot, declare that:

        1.      I am President of BBG Communications, Inc. ("BBG"). I have
personal knowledge of the facts set forth in this declaration and would testify as to the
accuracy of any matters stated herein.

        2.      I have personally made several verbal requests to the Alexievs to
voluntarily appear for a deposition requested by NCIC, starting approximately during the
week of August 15, then during a personal visit to meet them in Germany the week of the
23rd of August, to voluntarily appear for a deposition requested by NCIC. I told them that
NCIC had agreed not to serve them with the lawsuit. In each instance, the Alexiev
brothers declined.

        3.      I was advised by BBG's Italian affiliate's personnel, on or about June
28, 2004, that they first found counterfeit stickers traced via test calls that terminated at

W02-OC:NTW\41369336.1                          -1-

1  NCIC from Telcom Italia payphones. I advised Mr. Pope directly of this information, on

2  June 29, 2004.

3          4.      On or about August 8, 2004, I was asked to travel to Texas from San

4  Diego for a deposition August 16, 2004 concerning these counterfeit stickers. I went to

   Texas and had my deposition taken on August 16, 2004. Without waiving any attorney-

5  client privilege I was advised that Mr. Aldo Albino produced some documents relating to

6  the allegations of illegal stickering by NCIC. However, at no time prior to Mr. Albino's

7  visit to the United States to appear for a deposition in this matter was I aware of the

8  existence of the documents produced by its Italian affiliate's personnel at the depositions

   on August 17, 2004.

9          5.      On Saturday, August 28, 2004, I approved of the cost of obtaining

10 expedited translations of documents written entirely in Italian that BBG's counsel had

11 received from Italy that same day.

12         6.      I reviewed the document requests made by NCIC to BBG regarding

13 any complaints made by PTTs to BBG concerning any illegal stickering since April 1,

14 2001. I was asked questions and testified in my deposition on August 16, 2004 that I was

   unaware of any specific complaints by PTTs to BBG relating to any "illegal stickering."

15 After my deposition on August 16, 2004, I diligently searched BBG's existing records and

16 correspondence, and located a couple of documents that discussed "stickers," but were not

17 necessarily complaints from PTTs nor complaints about BBG's activities. However, in a

   good faith effort to provide a response for records potentially responsive to this request,

18 attached collectively hereto as Exhibit A.

19         7.      I do not believe that any information relating to BBG's use of any (1) USA

20 Direct numbers; (2) prepaid telephone calling card services; (3) or any call-back services

21 has any relationship with any claim or defense in this action. BBG does not utilize any

   call-back services, so I respond to NCIC's request and state that BBG has no documents

22 responsive to NCIC's requests labeled J, K and L. Moreover, BBG will produce

23 information concerning any use of USA Direct numbers if the Court finds such

24 information relevant in any way to this litigation.

25         8.      BBG is very sensitive to the use to which NCIC would put information

26 relating to BBG's worldwide agent identification. I consider the collective identity of all of

   these agents who are unknown to NCIC to be BBG's trade secret and proprietary

27 information. I have reviewed emails produced in this litigation that evidence NCIC's

28

W02-OC:NTW\41369336.1                                       -2-

1  continued efforts (including 2004) to solicit BBG's agents, specifically Papa Paco in Italy.
2  Since I am aware that NCIC intercepted BBG's personnel emails for a two year period
3  immediately prior to the initiation of this litigation, NCIC actually has in its possession a
4  significant amount of BBG's personnel having email addresses. I do not understand how
5  the identification of email addresses assigned to BBG's agents located in Asia, South
6  America or other areas of the world having no connection to this lawsuit would be
7  reasonably calculated to lead to admissible evidence in the prosecution of any claim or
8  defense by any party to this litigation. However, to avoid the Court's consideration of the
9  merits of this argument, I will produce a list of persons having BBGCOMM.COM and
10  BBGCOM.COM email addresses (subject to a confidential designation under the
   protective order). However, I request that this information be maintained "confidential"
   under the protective order entered in this lawsuit, and not be used outside of the context of
   this litigation.

11        9.     BBG has assisted in making available for deposition various third parties
12  who are not employees of BBG. However, the Alexiev brothers in the Czech Republic do
13  business with BBG as independent, exclusive agents. I have personally requested their
14  voluntary appearance, as it would be to BBG's benefit that they appear for deposition. I
15  asked them several times throughout the month of August 2004 to voluntarily appear for
16  NCIC's deposition, which they declined. I did not attempt in any way to dissuade them
17  from appearing for any deposition. After our counsel sent a letter to them on September 6,
18  2004, the Alexives they told me that they would not appear unless NCIC (1) agreed to drop
19  all allegations regarding the Alexievs in NCIC's lawsuit; (2) paid the Alexievs all past-due
20  commissions they claim they were owed by Bluephone for business they sent to NCIC
   during Benchmark Communication's relationship with NCIC; (3) agreed not to sue them;
   and (4) signed a non-compete agreement with Benchmark Communications such that
   NCIC would not solicit its contracts with its customers.

21        10.    During 2001, I conducted an investigation into the stealing of hotel property
22  telephone calls by individual hotel operators who were being paid to divert the calls from
23  BBG contracted properties. My investigation revealed that operators were using USA
24  Direct numbers, local numbers, 800 numbers, and other methods to route the call through
25  the hotel PBX equipment in an manner which would be undetected by the hotel
26  management. This investigation dealt with a woman named Zuki, and for a period of time,
27  I worked with her to determine how she was able to organize stealing such calls. After my
   investigation about her activities, I ceased any contact with her.

28

W02-OC:NTW\41369336.1                          -3-

11.    At my deposition, Mr. Harper asked me if I had made any reports concerning this investigation, and I told him that I believed I had. Although we did obtain very important information which was shared with some hotel customer and agents, I have searched our records and have not been able to find any specific reports concerning the investigation that BBG conducted to understand how call traffic was being diverted from BBG's exclusively contracted properties.

I declare under penalty of perjury under the laws of California, Texas, and the United States of America that the foregoing is true and correct and that I executed this declaration on September 8th, 2004 at San Diego, California.

By: _____

GREGORIO GALICOT

W02-OC:NTW\41369336.1                                    -4-

# Exhibit
# H

NCIC's request for voluntary attendence at deposition

## Tawnya Wojciechowski

**From:** Michel Alexiev [michel.alexiev@bbgcomm.com]
**Sent:** Wednesday, September 08, 2004 9:52 AM
**To:** Tawnya Wojciechowski
**Subject:** Re: NCIC's request for voluntary attendence at deposition

Dear Tawnya,

Following our communication with Mr. Galicot during the past months, as well as on the basis of the request by NCIC, please be advised as follows:

We do not really feel the necessity to appear in defense of NCIC as requested, but as a courtesy to Mr. Galicot we are willing to consider this. Our appearance would be contingent of the following precedent:

- NCIC to pledge unconditionally and irrevocably not to sue Messrs. Alexiev under any circumstance;
- NCIC to reimburse Messrs. Alexiev for all travel and lodging expenses;
- NCIC to pay Messrs. Alexiev overdue commissions from May 2003 in the amount of US$ 16,000;
- NCIC unconditionally not to compete or try to compete, directly or indirectly, signed up by Messrs. Alexiev or Benchmark Project Management s.r.o. till date.

Kind regards,

Michel and Goran Alexiev

----- Original Message -----
**From:** Tawnya Wojciechowski
**To:** goran@caramba.cz
**Sent:** Tuesday, September 07, 2004 12:04 AM
**Subject:** NCIC's request for voluntary attendence at deposition

Dear Mssrs. Alexiev:

Please see the attached letter and give me your response at your earliest convenience.

Tawnya R. Wojciechowski, Esquire
Sheppard, Mullin, Richter & Hampton LLP
650 Town Center Drive, Fourth Floor
Costa Mesa, California 92626
phone (714) 424-2828
cell: (949) 295-3996
fax (714) 513-5130
email: tawnya@sheppardmullin.com

<<41366774_1.DOC>>

This message is sent by a law firm and may contain information that is privileged

NCIC's request for voluntary attendence at deposition

or confidential. If you received this transmission in error, please notify the
sender by reply e-mail and delete the message and any attachments.
**Sheppard, Mullin, Richter & Hampton LLP**
Please visit our website at www.sheppardmullin.com

# Exhibit
# I

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

FILED-CLERK
S. DISTRICT COURT

04 OCT 22 PM 3: 40

TX EASTERN-MARSHALL

BY_____

| | |
|---|---|
| BBG COMMUNICATIONS, INC., <br> BBG HOLDINGS LIMITED <br><br> V. <br><br> NETWORK COMMUNICATIONS <br> INTERNATIONAL CORP., <br> BLUE PHONES LIMITED; <br> WILLIAM POPE, JAY WALTERS, <br> AND JEFFREY WALTERS <br><br> V. <br><br> RONALD PEREZ; <br> GREGORIO L. GALICOT; RAFAEL <br> GALICOT; MICHAEL STOMPS; AWI <br> FANG A/K/A SURIYANTO SURIYANTO; <br> GORAN ALEXIEV; MICHEL ALEXIEV; <br> PATRICK MAUCHANT; KEVEN WATT; <br> AND BBG HOLDINGS BERMUDA <br> D/B/A BBG COMMUNICATIONS <br> (BERMUDA), LTD. | § § § § § § § § § § § § § § § § § § § § § § § § CIVIL ACTION NO. 2:03-CV-227 <br><br> JUDGE WARD |

### Affidavit of Service

"I certify under penalty of perjury that a copy of a document titled Summons and Fourth Amended Counterclaim and Third-Party Complaint was served on Michel Alexiev and Goran Alexiev, whose address is 17000 Prague 7, Strossmayerovo NAM.11 Czech Republic by Federal Express (tracking number 790778141121) on October 5, 2004."

Further Affiant Sayeth Not.

IN WITNESS HEREOF, the undersigned has executed this Affidavit of Service on October 19, 2004.

_Leah Twedt_
LEAH TWEDT

Sworn and subscribed to before me this 19th day of October, 2004 to certify which witness my hand and official seal.

_Terri L. Harvey_
Notary Public in and for the State of Texas

TERRI L. HARVEY <br> Notary Public <br> STATE OF TEXAS <br> My Comm. Exp. 12-5-2007

## Certificate of Service

I certify that on the ___19 day of October, 2004 the above Affidavit of Service is being sent to the following counsel of record via facsimile:

Gregory P. Love
WELLBORN, HOUSTON, ADKISON, MANN,
 SADLER & HILL, L.L.P.
P.O. Box 1109
Henderson, TX 75653-1109

Tawnya R. Wojciechowski
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
650 Town Center Dr., 4th Floor
Costa Mesa, CA 92626-1925

James J. Mittermiller
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
501 W. Broadway, 19th Floor
San Diego, CA 92101

Betty J. Santohigashi
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
12544 High Bluff Dr., Ste. 300
San Diego, CA 92130-3051

Eric M. Albritton
ALBRITTON LAW FIRM
109 W. Tyler St.
Longview, TX 75601

Scott E. Stevens
BUNT, WRIGHT & STEVENS, PLLC
P.O. Box 3969
Longview, TX 75606-3969

SHARON SMALL

#174136



FedEx Express
Customer Support Trace
3875 Airways Boulevard
Module H, 4th Floor
Memphis, TN 38116

U.S. Mail: PO Box 727
Memphis, TN 38194-4643

Telephone: 901-369-3600

10/07/2004

Dear Customer:

Here is the proof of delivery for the shipment with tracking number **790778141121**. Our records reflect the following information.

## Delivery Information:

**Signed for by:** A.LEXIOV
**Delivery Location:** 17000 PRAQUE
**Delivery Date:** Oct 5, 2004 11:10

## Shipping Information:

Tracking number: 790778141121

Ship Date: Sep 27, 2004
Weight: 1.0 lbs.

**Recipient:**
MICHEL ALEXIEV
17000 PRAQUE
STROSSMAYEROVO NAM.11
CZ

**Shipper:**
LEAH TWEDT
RAMEY & FLOCK, P.C
100 EAST FERGUSON
TYLER , TX 75702
US

**Reference:**

5204-1 SOS

Thank you for choosing FedEx Express. We look forward to working with you in the future.

FedEx Worldwide Customer Service
1-800-Go-FedEx®

S:.3 441 (Rev. 8/01) Third Party Summons in a C:" Action

# UNITED STATES DISTRICT COURT

EASTERN    District of    TEXAS

PLAINTIFF
BBG COMMUNICATIONS, INC.
BBG HOLDINGS LIMITED

**THIRD PARTY SUMMONS IN A CIVIL ACTION**

V. DEFENDANT AND THIRD PARTY PLAINTIFF
1)   NETWORK COMMUNICATIONS
     INTERNATIONAL CORP.,
2)   BLUE PHONES LIMITED,
3)   WILLIAM POPE,
4)   JAY WALTERS, AND
5)   JEFFERY WALTERS

Case Number: 2:03-CV-227

JUDGE WARD

V. THIRD PARTY DEFENDANT
RONALD PEREZ, ET AL

To: Name and address of Third Party Defendant
MICHEL ALEXIEV
Strossmayerovo NAM.11
17000 Prague
Czech Republic

May be served pursuant to the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil or Commercial Matters, 20 U.S.T. 361, 658 U.N.T.S. 163, reprinted in 28 U.S.C.A. and in accordance with international law.

**YOU ARE HEREBY SUMMONED** and required to serve on

PLAINTIFF'S ATTORNEY (name and address)
Gregory P. Love
Welborn, Houston, Adkison,
Mann, Sadler & Hill, LLP
300 West Main St.,
Henderson, Texas 75653

DEFENDANT AND THIRD-PARTY PLAINTIFF'S ATTORNEY
(name and address)
Sharon Small
Jerry Harper
Ramey & Flock, P.C.
100 East Ferguson, Suite 500
Tyler, Texas 75702

an answer to the third-party complaint which is served on you with this summons, within <u>20</u> days after the service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default may be taken against you for the relief demanded in the third-party complaint. There is also served on you with this summons a copy of the complaint of the plaintiff. You have the option of answering or not answering the plaintiff's complaint, *unless* (1) this is a case within Rule 9(h) Federal Rules of Civil Procedure, *and (2)* the third-party plaintiff is demanding judgment against you in favor of the original plaintiff under the circumstances described in Rule 14(c) Federal Rules of Civil Procedure, in which situation you are required to make your defenses, if any, to the claim of plaintiff as well as to the claim of the third-party plaintiff. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

DAVID J. MALAND

CLERK

(By) DEPUTY CLERK

9/27/04

DATE

O 441 (Rev. 8/01) Third Party Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[w] | |
| NAME OF SERVER | TITLE |

Check one box below to indicate appropriate method of service

☐   Served personally upon the third-party defendant. Place where served:

☐   Left copies thereof at the third-party defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

     Name of person with whom the summons and complaint were left:

☐   Returned unexecuted:

☒   Other (specify):   By Federal Express . 790778141121

### STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

### DECLARATION OF SERVER

     I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on   9/27/04     _Kevin Sweatt_
Date                    _Signature of Server_

     100 E. Ferguson Ste. 500 , Tyler, TX 75702
                       _Address of Server_

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

SAO 44? (Rev. 8/01) Third Party Summons in a Ci    tion

# UNITED STATES DISTRICT COURT

__EASTERN__   District of   __TEXAS__

PLAINTIFF
BBG COMMUNICATIONS, INC.
BBG HOLDINGS LIMITED

**THIRD PARTY SUMMONS IN A
CIVIL ACTION**

V. DEFENDANT AND THIRD PARTY PLAINTIFF
  1) NETWORK COMMUNICATIONS
     INTERNATIONAL CORP.,
  2) BLUE PHONES LIMITED
  3) WILLIAM POPE,
  4) JAY WALTERS, AND
  5) JEFFERY WALTERS.

Case Number: 2:03-CV-227

JUDGE WARD

V. THIRD PARTY DEFENDANT

RONALD PEREZ, ET AL

To: Name and address of Third Party Defendant
GORAN ALEXIEV
Strossmayerovo NAM.11
17000 Prague
Czech Republic

May be served pursuant to the Hague Convention on the
Service Abroad of Judicial and Extra-Judicial Documents
in Civil or Commercial Matters, 20 U.S.T. 361, 658 U.N.T.S.
163, reprinted in 28 U.S.C.A. and in accordance with
international law.

**YOU ARE HEREBY SUMMONED** and required to serve on

PLAINTIFF'S ATTORNEY (name and address)

Gregory P. Love
Welborn, Houston, Adkison,
Mann, Sadler & Hill, LLP
300 West Main St.,
Henderson, Texas  75653

DEFENDANT AND THIRD-PARTY PLAINTIFF'S ATTORNEY
(name and address)

Sharon Small
Jerry Harper
Ramey & Flock, P.C.
100 East Ferguson, Suite 500
Tyler, Texas 75702

an answer to the third-party complaint which is served on you with this summons, within 20 days after the service of this
summons on you, exclusive of the day of service. If you fail to do so, judgment by default may be taken against you for the
relief demanded in the third-party complaint. There is also served on you with this summons a copy of the complaint of
the plaintiff. You have the option of answering or not answering the plaintiff's complaint, *unless* (1) this is a case within
Rule 9(h) Federal Rules of Civil Procedure, *and (2)* the third-party plaintiff is demanding judgment against you in favor
of the original plaintiff under the circumstances described in Rule 14(c) Federal Rules of Civil Procedure, in which
situation you are required to make your defenses, if any, to the claim of plaintiff as well as to the claim of the third-party
plaintiff. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a
reasonable period of time after service.

DAVID J. MALAND

9/27/04

CLERK

DATE

(By) DEPUTY CLERK

%AO 441 (Rev. 8/01) Third Party Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me▼ | |
| NAME OF SERVER | TITLE |

*Check one box below to indicate appropriate method of service*

☐   Served personally upon the third-party defendant. Place where served:

☐   Left copies thereof at the third-party defendant's dwelling house or usual place of abode with a person of suitable age and
discretion then residing therein.

Name of person with whom the summons and complaint were left:

☐   Returned unexecuted:

☒   Other (specify):   By Federal Express 790778141121

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information
contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on   9/27/04          *Leandwedt*
Date                                   *Signature of Server*

100 E. Ferguson Ste 500   Tyler, TX 75702
                    *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

# Exhibit
# J



# RAMEY &FLOCK

A PROFESSIONAL CORPORATION

Sharon Small

ATTORNEYS AND COUNSELORS AT LAW

Direct dial: 903-510-5273
Email: sharons@rameyflock.com

October 27, 2004

**Via Fax No. 903-934-9257**

Melissa R. Smith
GILLAM & SMITH, L.L.P.
110 S. Bolivar St., Ste. 204
Marshall, TX 75670

RE:   No. 2:03-CV-227; *BBG Communications, Inc. v. Network Communications International Corp., et al;* In the U.S. District Court for the Eastern District of Texas, Marshall Division.

Dear Ms. Smith:

As you are aware, we have had discussions regarding the possibility of our clients granting an extension for you to file responsive pleadings on behalf of your clients, Michel and Goran Alexiev. After conferring with our clients, we are amenable to not seeking an entry of default and granting you an extension to November 1, 2004 to file your responsive pleadings.

We respectfully request that you provide us with disclosures and relevant documents as soon as practicable after you have filed your answer. As you are aware, pursuant to Local Rule CV-26, absent a court order to the contrary, a party is not excused from responding to discovery because there are pending motions to dismiss, to remand or to change venue.

Thank you for your cooperation.

Sincerely,

SHARON SMALL

SS/tlh
# 174892.1

M. Smith
October 27, 2004
Page 2

cc:   **All Via Facsimile**

Gregory P. Love
WELLBORN, HOUSTON FIRM
300 W. Main St.
Henderson, TX 75653-1109

Tawnya R. Wojciechowski
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
650 Town Center Dr., 4th Floor
Costa Mesa, CA 92626-1925

James J. Mittermiller
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
501 W. Broadway, 19th Floor
San Diego, CA 92101

Betty J. Santohigashi
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
12544 High Bluff Dr., Ste. 300
San Diego, CA 92130-3051

Eric M. Albritton
ALBRITTON LAW FIRM
109 W. Tyler St.
Longview, TX 75601

Scott E. Stevens
BUNT, WRIGHT & STEVENS, PLLC
P.O. Box 3969
Longview, TX 75606-3969

# Exhibit
# K

## Excerpts from Stomps Deposition

Michael Stomps

1  were at the BBG offices, at least from mid-morning until early
2  evening on the first day at the meetings in San Diego?
3      A.  No, sir.
4      Q.  And the second day of the meetings, you were at
5  Sheppard Mullin from all morning until the early afternoon?
6      A.  Yes, sir.
7      Q.  And the Alexievs were there, too?
8      A.  Yes, sir.
9      Q.  And during those hours, you did not access the NCIC
10 site from the BBG offices, correct?
11     A.  That is correct.
12     Q.  And during those same hours, you don't believe it was
13 possible for the Alexievs to be accessing the NCIC site from
14 BBG's offices, correct?
15     A.  That is correct.
16     Q.  And you think you were -- you did access the NCIC site
17 from Sheppard Mullin the second day?
18     A.  I cannot remember the specific location, but it could
19 very well have been.
20     Q.  All right.  Did you access the NCIC site from BBG the
21 second day?
22     A.  I -- I believe I did, yes.
23     Q.  Okay.  And do you know how long you were on the NCIC
24 site the second day?
25     A.  I don't know.

Michael Stomps

1        Q.   Did anyone else know you were accessing the NCIC site

2   on either the first or the second day?

3        A.   Michel and Goran know.

4        Q.   Okay.   Were the three of you together looking at the

5   numbers?

6        A.   No.

7        Q.   How did they know?

8             MR. ALBRITTON:   Objection, form.

9        A.   I don't know.   I don't know how they knew.   I would

10  assume they -- they knew, because I -- I was going in a

11  boardroom and I was going to do my -- my evaluation, and that

12  was one of the things that I was going to look at, so.

13       Q.   (BY MR. HARPER)   Why -- what was the purpose of a

14  password for this account, this site?

15       A.   What -- what -- what particular site?

16       Q.   This NCIC site.

17       A.   I -- to -- to restrict the users, amount of users.

18       Q.   And based on that understanding, do you believe that --

19  or did you understand that there were legitimate and

20  illegitimate purposes for accessing the site?

21       A.   Could you repeat that question?

22       Q.   Yes, sir.   Did you believe that there were certain

23  legitimate purposes for which you were to access the site and no

24  others?

25       A.   Yes, sir.

Michael Stomps

1      Q.    Okay.  So, access -- you will agree with me, that

2   access to this site was not supposed to be abused by someone?

3      A.    Correct.

4      Q.    And would you agree with me that accessing the site to

5   advance the interest of a competitor of Blue Phone or NCIC would

6   have been an abusive use of that site?

7      A.    It -- I believe the -- the person that would own that

8   information would -- would make a decision on what to do with

9   that information.

10     Q.    Okay.  Would -- would advancing the interest of BBG --

11  excuse me -- of NCIC or Blue Phone be an illegitimate use of

12  that site?

13     A.    Would you rephrase that question?

14     Q.    Yes, sir.  Would accessing the NCIC site for purposes

15  other than advancing the business of NCIC or Blue Phone be an

16  illegitimate use of that site?

17     A.    I -- just the last part.  I'm sorry.  Just the last

18  part.

19     Q.    You want me rephrase it again?  Sure.

20     A.    Yes, please.  I understand the question, but I just

21  want to have the last part.

22     Q.    Let me -- let me -- let me change it just a little bit.

23  Okay.  I'm going to change the question on you.

24               Did you understand that using the NCIC site to

25  advance the interest of a competitor --