IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | |
|---|---|
| BBG COMMUNICATIONS, INC., | § |
| | § |
| | § |
| V. | § |
| | § |
| | § |
| NETWORK COMMUNICATIONS | § |
| INTERNATIONAL CORP.; | § |
| WILLIAM POPE; | § |
| JAY WALTERS; and | § |
| JEFFERY WALTERS | § |
| | § |
| V. | §CIVIL ACTION NO. 2:03-CV-227-TJW |
| | § |
| RONALD PEREZ | § |
| RICARDO SINGER | §           JURY DEMANDED |
| GREGORIO L. GALICOT | § |
| RAFAEL GALICOT | § |
| MICHAEL STOMPS | § |
| AWI FANG | § |
| a/k/a SURIYANTO SURIYANTO | § |
| GORAN ALEXIEV | § |
| MICHAEL ALEXIEV | § |
| PATRICK MAUCHANT | § |
| KEVEN WATT | § |
| BBG HOLDINGS BERMUDA d/b/a | § |
| BBG COMMUNICATIONS | § |
| (BERMUDA) LTD. | § |

**MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIMS 3
AND 4 FOR TRADEMARK INFRINGEMENT UNDER
TEXAS STATE LAW AND FEDERAL LAW**

BBG Communications, Inc., BBG Holdings Limited, Rafael Galicot, Gregorio

Galicot, Ronald Perez, Michael Stomps and Keven Watt, counterclaim and third-party

defendants, file this Motion for Summary Judgment as to the third and fourth

counterclaims asserted by Network Communications International Corp. ("NCIC") in

NCIC's and Fourth Amended Counterclaim and Third-Party Complaint ("Fourth

1

Amended Counterclaim") for state trademark infringement, federal trademark infringement, federal trademark dilution, and cybersquatting. BBG and Third-Party Defendants bring this motion on the grounds that the use of the term "International Calling Services" does not infringe NCIC's trademark because (a) NCIC does not have a valid trademark for this term; (b) the use of the term constitutes "fair use;" and (c) NCIC has not provided any evidence of confusion caused by BBG's use of the term.

BBG and Third-Party Defendants will demonstrate that there exists no genuine issue regarding whether NCIC can show that BBG or Third-Party Defendants committed trademark infringement under either Texas law or federal law, or that BBG or Third-Party Defendants committed trademark dilution or cybersquatting, and therefore NCIC's claims against BBG in the third and fourth counterclaims must fail.

## FACTUAL BACKGROUND

BBG is a communications company that provides international calling services to third parties throughout the world, including foreign telephone companies, hotels, airports, and seaports. BBG sells millions of dollars of telecommunications services annually. One aspect of its business focuses on the tourist trade in non-U.S. countries. BBG contracts with resorts to provide long distance calling services and collect calling services from outside the U.S. into the U.S. BBG's client is the resort, and the guests of the resort benefit from the calling services. These services are billed to the resort guests directly, typically on a credit card. In order to assist the resort guest in identifying what the credit card charge was for, BBG uses a credit card descriptor, such as "international

calling services." *See* Exhibit A at 68:7-12.[1]  Thus, instead of seeing "BBG" on its bill, which the resort guest may or may not know is a company that provides international calling services, the bill simply describes the services provided. *See id.* at 23:7-15.  In 1999, BBG registered the fictitious business name "International Calling Services" with the San Diego County Recorder's Office. *See id.* at 76:3-7.  Since that time, it has used this term to describe BBG's services to recipients, such as hotel guests.

Counterclaimant NCIC is a competitor of BBG that also provides international calling services to third parties in various countries.  Since August 1997, NCIC or its shareholders have owned a controlling interest in a Texas corporation called "International Calling Services, Inc." or "ICS," which is engaged in network operating services.  Fourth Amended Counterclaim, at ¶ 24(d).

On March 21, 2003, NCIC filed an application with the United States Patent and Trademark Office ("the PTO") to obtain a trademark for the term "International Calling Services." *See* Exhibit B.  The PTO made a determination that the term was purely descriptive and did not have secondary meaning; accordingly, it could not be granted trademark protection. *See* Exhibit C.  NCIC's trademark application has been abandoned, and NCIC does not currently have and will not be able to obtain a trademark for the term "International Calling Services." *See* Exhibit D.

## ANALYSIS

**A.    Legal Standard on a Motion for Summary Judgment**

A motion for summary judgment will be successful "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

[1] The number before the colon is the page and the number after the colon is the relevant line(s).

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Federal Rule of Civil Procedure 56(c). "An adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Federal Rule of Civil Procedure 56(e). Where, as here, the nonmoving party will have the burden of proof at trial on its counterclaims, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**B.      NCIC's Claim that BBG Infringed its Trademark for "International Calling Services," or Engaged in Trademark Dilution or Cybersquatting Must Fail as a Matter of Law**

Count three of the Counterclaim alleges that BBG engaged in trademark infringement under Texas law, and count four alleges that BBG engaged in trademark infringement under federal law.[2] The allegations under federal law also include violations of the Lanham Act, specifically, trademark infringement, trademark dilution, and cybersquatting.

   1.      The Legal Standard for Trademark Infringement Under Federal and Texas State Law

Section 32 of the Lanham Act states that any person, who shall, without the consent of the registrant:

> use in commerce any reproduction, counterfeit, copy, or colorful imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of

---

[2] The Third-Party Defendants join this motion because count three and four of the counterclaim broadly alleges trademark infringement against the Third-Party Defendants as well as BBG, even though the specific allegations only reference BBG.

4

> goods or services on or in connection with which such use
> is likely to cause confusion, or to cause mistake, or to
> deceive
>
> or;
>
> reproduce, counterfeit, copy or colorable imitation of a
> registered mark and apply such reproduction, counterfeit,
> copy, or colorable imitation to labels, signs, prints,
> packages, wrappers, receptables, or advertisements
> intended to be used in connection with the sale, offering for
> sale, distribution, or advertising or goods or services or in
> connection with which such use is likely to cause
> confusion, or to cause mistake, or to deceive,

is liable for federal trademark infringement. 15 U.S.C. § 1114(1). Thus, a complaint must allege ownership of a federal trademark registration, and the complaint must also allege that the defendant's infringing mark is being used in interstate commerce or has a substantial effect on interstate commerce.

In *Sport Supply Group, Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 460-61 (5th Cir. 2003), the Fifth Circuit reviewed of the essential underpinnings of trademark law.

> A trademark is a word, name, or symbol that is intended to distinguish one producer's goods from those of other producers. *See* 15 U.S.C. § 1127 (defining a "trademark" as "any word, name, symbol, or device, or any combination thereof" that is used by a person "to identify and distinguish his or her goods . . . and to indicate the source of the goods"). Trademark law helps ensure that a trademark can serve this function of distinguishing a producer's goods, because it prohibits other producers from using a similar mark in a way that is "likely to cause confusion" among consumers (*i.e.*, by making consumers wonder which producers created which products). *See* 15 U.S.C. § 1125(a)(1)(A); *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003) ("[Trademark] law broadly prohibits uses of trademarks, trade names, and trade dress that are likely to cause confusion about the source of a product or service."); *see also Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 663 (5th Cir. 2000) (observing that "to prevail on its trademark infringement claim," the trademark owner must show that the other party's use of the mark "creates a likelihood of confusion in the minds of potential consumers as to the 'source, affiliation, or sponsorship'" of the parties' products).
>
> Trademark law thereby serves two essential functions. First, it aids consumers by assuring them that products with the same trademark come from the same source.

*See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163-64 (1995) (observing that trademark law, "by preventing others from copying a source-identifying mark, reduces the customer's costs of shopping and making purchasing decisions, for it quickly and easily assures a potential customer that *this* item--the item with this mark--is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past") (internal citation and quotation marks omitted) (emphasis in original). Second, trademark law protects the economic investments of the trademark owner. The law assures a producer "that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product." *Id.* at 164.

A trademark can serve these two purposes, however, only to the extent that it distinguishes a producer's goods. *See id.* at 164 (observing that "the source-distinguishing ability of a mark . . . permits it to serve these basic purposes" of trademark law).[3]

---

[3] Perhaps for that reason, a particular "mark" qualifies for trademark protection only to the extent that it distinguishes a product. The law classifies marks into five different categories: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 120 L. Ed. 2d 615, 112 S. Ct. 2753 (1992) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)); *Enrique Bernat F., S.A. v. Guadalajara, Inc.*, 210 F.3d 439, 442 n.2 (5th Cir. 2000). A "generic mark," which refers to an entire class of products (such as "airplane" or "computer"), does not distinguish a product at all, and therefore receives no protection under trademark law. *See Two Pesos*, 505 U.S. at 768; William M. Landes & Richard A. Posner, *Trademark Law: An Economic Perspective*, 30 J. LAW & ECON. 265, 291 (1987). A "descriptive mark, " which describes some features or characteristics of a product (*i.e.*, "All Bran" or "Holiday Inn"), *see Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999); Landes & Posner, *supra*, at 290, is "not inherently distinctive." *Two Pesos*, 505 U.S. at 769. As a result, a descriptive mark is not protected unless the mark has acquired "secondary meaning" (*i.e.*, the public associates the description ("all bran") almost exclusively with the particular product ("All Bran")). *See Two Pesos*, 505 U.S. at 769.

Suggestive, arbitrary, and fanciful marks, by contrast, better distinguish their products and are therefore accorded more protection under trademark law. *See id.* at 768 ("The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection."). A "suggestive mark" "merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods." *Lane Capital*, 192 F.3d at 344. An example might be "Business Week." Landes & Posner, *supra*, at 289. An "arbitrary mark" uses "a common word in an unfamiliar way." *Lane Capital*, 192 F.3d at 344. A good example might be "Apple Computer." Landes & Posner, *supra*, at 289. Finally, a "fanciful mark" is "not a real word at all," but is invented solely for the purpose of identifying a particular product. *Lane Capital*, 192 F.3d at 344. Examples could include "Kodak" or "Exxon." Landes &

>It thus seems clear that the primary function of a trademark is to serve as a label-- a mark that identifies and distinguishes a particular product.
>
>. . .

Texas law appears to have adopted this understanding of a trademark. Under Texas law, a trademark is a device intended primarily to identify and distinguish a particular producer's goods. *See* TEX. BUS. & COM. CODE ANN. § 16.01(a)(5) (defining a "trademark" as "a word, name, symbol, device, slogan or any combination thereof . . . used by a person *to identify his goods and distinguish them* from the goods manufactured or sold by others") (emphasis added); *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 806 (Tex. App.--Austin 2001, pet. denied) (commenting, in analyzing a claim for infringement of a common law mark, that "marks are . . . eligible for protection only if they can identify and distinguish the plaintiff's goods or services from those of others"); *see also* TEX. BUS. & COM. CODE ANN. § 16.08(a)(6) (noting that a mark can be registered as a trademark "*unless it . . . is likely to cause confusion. . .* because . . . it resembles another persons's unabandoned mark registered in this state") (emphasis added); *All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc.*, 991 S.W.2d 484, 488  (Tex. App.--Fort Worth 1999, no pet. h.) (noting that "to succeed on a common law claim for trade name infringement," a party must show in part that "there is a likelihood of confusion between its mark and that of its competitor"); *see also id.* ("The issues in a common law trademark infringement action under Texas law are no different than those under federal trademark law.").

---

Posner, *supra*, at 289.

7

2. <u>NCIC Does Not Have a Trademark for "International Calling Services"</u>

On March 21, 2003, NCIC filed an application with the PTO to obtain a trademark for "International Calling Services." *See* Exhibit B. The PTO rejected this application because the proposed mark involves purely descriptive terms. *See* Exhibit C. A trademark will not be registered if it is merely descriptive or generic, and has no secondary meaning. See 15 U.S.C. § 1052(e). At this point, the application has been abandoned. See Exhibit D. Accordingly, NCIC does not currently have and never will have a registered trademark for the term "International Calling Services."

3. <u>There is no Genuine Issue Regarding Whether the Term "International Calling Services" is a Distinctive Term</u>

If the Counterclaimants name is not covered by a registered trademark, then the Counterclaimants bears the burden of proving that the name is distinctive and therefore protectable. See *Nat'l Conf. of Bar Examiners v. Multistate Legal Studies, Inc*., 692 F.2d 478, 488 (7th Cir. 1982). The term "International Calling Services" simply describes a kind of telecommunications product that is sold by hundreds of different companies across the world. If NCIC was able to prevent other companies from using these words to describe their business, then NCIC would unfairly remove these descriptive terms from public use. "No one can claim protection for the exclusive use of a trade-mark or trade-name which would practically give him a monopoly in the sale of any goods other than those produced or made by himself." *Del. & Hudson Canal Co. v. Clark*, 80 U.S. (13 Wall) 311, 323 (1872).

BBG's use of the term "International Calling Services" as a credit card descriptor was done in good faith and was simply to describe the type of function that was

performed by BBG for a customer.[4]  Rafael Galicot testified: "We have a small space we can put in a bill, and what we do is we put something that relates to what the product we're selling is so the customer knows what they did, what charges is being applied to, and how they can pay."  Exhibit A at 23:11-15.  And, although NCIC alleges that BBG used the term "International Calling Services" in an effort to confuse customers, NCIC has shown no evidence, and there is no evidence, that BBG's use of the term actually caused confusion.

    4.    <u>NCIC's Claim for Trademark Dilution Fails as a Matter of Law</u>

The law on trademark dilution under U.S.C. § 1125(c) is set forth in the statute:

(c) Remedies for dilution of famous marks.

  (1) The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection. In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to--

    (A) the degree of inherent or acquired distinctiveness of the mark;
    (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
    (C) the duration and extent of advertising and publicity of the mark;
    (D) the geographical extent of the trading area in which the mark is used;
    (E) the channels of trade for the goods or services with which the mark is used;
    (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;
    (G) the nature and extent of use of the same or similar marks by third parties;

---

[4] Even if the Court were to find that the term "International Calling Services" is entitled to any protection under the trademark law, which the PTO has already conclusively decided it is not, BBG's use of the term is subject to the fair use defense.  Section 33(b)(4) of the Lanham Act states that the defense has three basic requirements: (1) the use is other than as a mark; (2) the use is fair and in good faith; and (3) the use is only to describe goods or services.  *See* 15 U.S.C. § 1115(b)(4).

9

and
(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

(2) In an action brought under this subsection, the owner of the famous mark shall be entitled only to injunctive relief as set forth in 15 USC § 1116 unless the person against whom the injunction is sought willfully intended to trade on the owner's reputation or to cause dilution of the famous mark. If such willful intent is proven, the owner of the famous mark shall also be entitled to the remedies set forth in 15 USC §§ 1117(a), 1118, subject to the discretion of the court and the principles of equity.

As described above, NCIC does not have a trademark for the term "International Calling Services." Furthermore, the USPTO has conclusively determined that it has only descriptive meaning, and therefore is not "famous" for purposes of the legal requirement under trademark dilution. NCIC's claim that BBG engaged in trademark dilution must fail as a matter of law.

5.  <u>NCIC's Claim for Cybersquatting Fails as a Matter of Law</u>

A claim of cybersquatting requires proof of the following under 15 U.S.C. § 1125(d):

(d) Cyberpiracy prevention.

(1) (A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person--
(i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
(ii) registers, traffics in, or uses a domain name that--
(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
(II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
(III) is a trademark, word, or name protected by reason of section 706 of title 18, United States Code, or section 220506 of title 36, United States Code.

NCIC cannot show that any elements of a claim for cybersquatting have been met: they are not the owner of the "International Calling Services" mark, and they cannot show that BBG uses the term "International Calling Services" as a credit card descriptor

10

in bad faith.  BBG's use of the term, simply to reference the type of product a customer is billed for, was done in good faith and for reasonable business purposes.  *See* Exhibit E (deposition excerpts of Gregorio Galicot) at 148:15-18, 149:8-13.

## CONCLUSION

A motion for summary judgment as to a cause of action should be granted if the undisputed facts show that the claim has no merit and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

NCIC's claims for trademark infringement, trademark dilution, and cybersquatting against BBG fails as a matter of law because NCIC cannot show that the term International Calling Services is distinctive or has secondary meaning.  Therefore, it has no protectable right in the term.  BBG's use of the term, simply to reference the type of product a customer is billed for, was done in good faith, and NCIC cannot produce any credible evidence that it has caused actual confusion.  Accordingly, the Court should grant BBG's Motion for Summary Judgment on the third and fourth counterclaims, as they related to BBG.

Respectfully submitted,

/s/_____
Gregory P. Love
Attorney-in-Charge
State Bar No. 24013060
WELLBORN   HOUSTON, LLP
300 W. Main Street
P.O. Box 1109
Henderson, Texas 75653-1109
Telephone: (903) 657-8544
Facsimile:  (903) 657-6108

James J. Mittermiller
California Bar No. 85177

Sheppard, Mullin, Richter & Hampton, LLP
501 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 338-6500
Facsimile: (619) 234-3815

ATTORNEYS FOR BBG COMMUNICATIONS, INC., BBG HOLDINGS LIMITED, GREGORIO GALICOT AND RAFAEL GALICOT

*/s/ Eric M. Albritton*

_____
Eric M. Albritton
Attorney-in-Charge
Texas State Bar No. 00790215
Albritton Law Firm
P.O. Box 2649
Longview, Texas 75606
(903) 757-8449 (office)
(903) 758-7397 (fax)
eric@albrittonlawfirm.com

Scott E. Stevens
Texas State Bar No. 00792024
Stevens Law Firm
P.O. Box 807
Longview, Texas 75606
(903) 753-6760 (office)
(903) 753-6761 (fax)
scott@seslawfirm.com

ATTORNEYS FOR RONALD PEREZ, MICHAEL STOMPS AND KEVEN WATT

## CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this motion was served on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(A).  Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by certified mail, return receipt requested, on this the 2nd day of December, 2004.

*/s/ Eric M. Albritton*

_____
Eric M. Albritton