IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

| | | |
|---|---|---|
| **BBG COMMUNICATIONS, INC.,** | § | |
| | § | |
| | § | |
| **V.** | § | |
| | § | |
| | § | |
| **NETWORK COMMUNICATIONS** | § | |
| **INTERNATIONAL CORP.;** | § | |
| **WILLIAM POPE;** | § | |
| **JAY WALTERS; and** | § | |
| **JEFFERY WALTERS** | § | |
| | § | |
| **V.** | §**CIVIL ACTION NO. 2:03-CV-227-TJW** | |
| | § | |
| **RONALD PEREZ** | § | |
| **RICARDO SINGER** | § | **JURY DEMANDED** |
| **GREGORIO L. GALICOT** | § | |
| **RAFAEL GALICOT** | § | |
| **MICHAEL STOMPS** | § | |
| **AWI FANG** | § | |
| **a/k/a SURIYANTO SURIYANTO** | § | |
| **GORAN ALEXIEV** | § | |
| **MICHAEL ALEXIEV** | § | |
| **PATRICK MAUCHANT** | § | |
| **KEVEN WATT** | § | |
| **BBG HOLDINGS BERMUDA d/b/a** | § | |
| **BBG COMMUNICATIONS** | § | |
| **(BERMUDA) LTD.** | § | |

## MOTION TO EXCLUDE AND/OR LIMIT THE TESTIMONY OF JASON BOLT

BBG Communications, Inc., BBG Holdings Limited, Rafael Galicot, Gregorio

Galicot, Ronald Perez, Michael Stomps and Keven Watt, counterclaim and third-party

defendants, move to exclude or limit the testimony of Jason Bolt, a purported expert

identified by Network Communications International Corporation ("NCIC") and Blue

Phones Limited ("BPL").  In support, counterclaim and third-party defendants will show

the following.

1

## BACKGROUND

On October 22, 2004, NCIC and BPL provided counsel for the counterclaim and third-party defendants a one and one-half page document entitled "Report of Jason Bolt Relating To Violations of the Computer Fraud and Abuse Act 18 U.S.C. 1030 *et seq.* (Hacking)."  Exhibit 1 ("Bolt Initial Report").  Mr. Bolt's deposition was noticed by the counterclaim and third-party defendants for Wednesday, November 17, 2004.  On Sunday, November 14, 2004, Eric M. Albritton, counsel for Stomps, Perez and Watt requested counsel for NCIC and BPL to provide all material reviewed by Bolt and "a supplemental report if he intend[ed] to offer opinions and testimony not specifically discussed" in the Bolt Initial Report.  Exhibit 2.  On Tuesday, November 16, 2004, at approximately 12:00 pm, counsel for Stomps, Perez and Watt received a box of material from NCIC and BPL's counsel related to Bolt.  Exhibit 3.  This box of material, however, did not include a supplemental report.  *Id.*  Thus, counsel for Stomps, Perez and Watt wrote counsel for NCIC and BPL and stated that since a supplemental report was not provided, he assumed "Bolt [would] only offer testimony covered by his report."  *Id.*  In response, counsel for NCIC and BPL advised that "there is no supplemental report" and that in his report "Bolt specifically [stated] that his investigation is ongoing" and, therefore, his testimony would not be limited to the contours of the report.  *Id.*

Counsel for Stomps, Perez and Watt appeared at the deposition on November 17, 2004, and noted for the record that he objected to Bolt offering any testimony and opinions outside his report.  Exhibit 4 (excerpts of Jason Bolt's deposition) at 5-6.  During the deposition, counsel inquired as to the circumstances surrounding the production of the Bolt Initial Report and whether Bolt had been requested to produce a supplemental report.  *Id.* at 121-122.  Remarkably, Bolt testified that he had never been

advised as to what information should be included in his initial report, the deadline for production of such report, the deadline to complete his work related to his engagement or that he should produce a supplemental report. *Id.* at 121-122, 94. Further, he testified that counsel for NCIC and BPL assisted in drafting the initial report. *Id.* at 123-24.

The discovery deadline in this civil action was November 24, 2004. On that same date, NCIC and BPL filed a notice with the Court that a supplemental expert report of Jason Bolt was served on counsel for the counterclaim and third-party defendants. *See, e.g.*, Exhibit 5 ("Bolt Supplemental Report"). Instead of serving this supplemental report by fax or email, as has been the agreement of the parties, NCIC and BPL placed the supplemental report in the U.S. Mail. Counsel for the counterclaim and third-party defendants received it on Tuesday, November 30, 2004.

The Bolt Supplemental Report differs in several material respects from the Bolt Initial Report. For instance, the Bolt Initial Report states that he was "hired as an expert witness by [NCIC] to give an opinion on Hacking into their customer databases." Exhibit 1. In contrast, the Bolt Supplemental Report states that Bolt was "hired as an expert witness by [NCIC] to: 1) Verify the ownership of IP Addresses [he has] received from NCIC, 2) Collect information regarding those IP Addresses, and their use, 3) Provide documentation acquired during the investigation of those IP Addresses, and 4) Verify NCIC's log file generation practices." Exhibit 5. The Supplemental Bolt Report also contains a discussion of documents produced by Centris and states that based on "a comparison of NCIC's and Centris's server logs, it can be concluded that BBG did access NCIC's servers from the aforementioned IP Addresses." *Id.* Finally, the Supplemental Bolt Report references his compensation arrangement and previous testimony and

publications, which were not addressed in the Bolt Initial Report despite the requirements of Rule 26(a)(2)(B) and Paragraph 1(j) of the Court's Amended Discovery Order. *Compare* Exhibit 1 *with* Exhibit 5.

In both reports, Bolt states that "hacking" refers to "individuals who gain unauthorized access to computer systems for the purpose of stealing and/or corrupting data." Exhibit 1, 5. Further, both reports state that, in Bolt's opinion, that the attempts "to access privileged data on NCIC's servers were perpetrated by BBG employees, or someone associated with BBG." Exhibit 1, 5.

## ARGUMENT

### I.      Failure to Timely Produce a Supplemental Report

Paragraph 1(j) of the Amended Discovery Order provides, in relevant part, that by the date set forth in the Docket Control Order the parties are obligated to disclose "the subject matter on which the expert will testify" and comply with Rule 26(a)(2)(B), which similarly provides, in part, that the report an a retained expert "shall contain a *complete* statement of all opinions to be expressed and the basis and reasons therefor."

In contrast to the Bolt Supplemental Report, the Bolt Initial Report made no mention of Bolt offering opinions concerning verification of "NCIC's log file generation practices." Although the Bolt Supplemental Report states that Bolt was retained to verify "NCIC's log file generation practices," it offers not opinions concerning this issue. Bolt should not be permitted to offer opinions concerning "NCIC's log file generation practices" because this responsibility was not disclosed in the Bolt Initial Report (or at Bolt's deposition) and because no opinions are offered in the Bolt Supplemental Report.

Additionally, Bolt Supplemental Report relies on the fact that one of the IP Addresses (63.110.190.254) "appears on a forum page [of a web site] wherein Ricardo Singer . . . posted a message" to support the conclusion that the IP Address is associated with BBG.  Exhibit 5.  There was no discussion of this fact in the Bolt Initial Report or at Bolt's deposition. Also, the Bolt Supplemental Report attaches documents bates numbered NCIC-BOLT000050 to NCIC-BOLT 000054.  Exhibit 5.  These documents were not produced in advance of Bolt's deposition or at his deposition.  Bolt must be precluded from offering testimony about this newly disclosed evidence and basis for his opinions.  Otherwise, the conduct of NCIC and BPL—that is, identifying new evidence and opinions after the close of discovery—would be sanctioned.

Similarly, the Bolt Initial Report does not discuss Centris documents or any conclusion which purportedly can be drawn from review of same.  The day before Bolt's deposition, NCIC and BPL produced to counsel for Stomps, Perez and Watt documents produced by Centris and represented that those documents had been reviewed by Bolt. Bolt was questioned about these documents during his deposition the following day. However, he should not be permitted to testify at trial about the opinion contained in the Bolt Supplemental Report or expressed by him during his deposition because counsel did not have an adequate opportunity to prepare for the deposition because no report concerning those opinions and testimony had been produced.  This is equitable because counsel for Stomps, Perez and Watt specifically requested a supplemental report in advance of the depositions, NCIC and BPL never requested Bolt to complete his work in a timely fashion and Bolt had the Centris documents in advance of the deposition.

Bolt also should not be permitted to offer any opinions about specific instances of alleged "hacking" because neither the Bolt Initial Report nor the Bolt Supplemental Report identifies which instances of alleged access were purportedly unauthorized. Similarly, Bolt should not be permitted to offer any opinions about whether the alleged access was unauthorized because he does not offer an opinion as to authorization in either report.

Finally, Bolt's testimony (if allowed at all) should be limited to the four IP Addresses in the Bolt Initial Report and Bolt Supplemental Report. The counterclaim and third-party defendants are entitled to a report containing Bolt's opinions. His testimony, if any, should likewise be limited to the four IP Addresses in his reports because he testified at his deposition that he could only offer an opinion about those four IP Addresses. Exhibit 4 at 120-121 ("Q. Can you tell me all of [the IP Addresses] that you believe to be associated with BBG Communications? A. Those four that are in my report. Q. And those are the only four? A. At this time. Q. Just so that we're clear for the jury, as we sit here today, the only four IP addresses that you say in your opinion are associated with BBG are these four in your report? A. At this point in time, yes.").

## II.     Rule 702, *Daubert* and *Kumho Tire Co.*

Rule 702 of the Federal Rules of Evidence provides that

[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592-

93 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999), this Court must

determine whether the proffered expert testimony based on scientific, technical or

specialized knowledge is relevant and reliable.  In conducting a *Daubert* analysis, courts

typically examine the following factors to determine the reliability of the proposed expert

testimony:  (1) whether the theory or technique has been or can be reliably tested; (2)

whether it has been subjected to peer review or publication; (3) the known or potential

rate of error of the technique; and (4) the general acceptance of the methodology.  *Black*

*v. Food Lion, Inc.*, 171 F.3d 308, 311 (5th Cir. 1999) (citing *Daubert*, 509 U.S. at 592-

94).  The test of reliability, however, is flexible; "*Daubert*'s list of specific factors neither

necessarily nor exclusively applies to all experts or in every case."  *Kumho Tire Co.*, 526

U.S. at 141.

        The reliability analysis applies to all aspects of an expert's testimony, including

the methodology, the facts used by the expert to form a conclusion, and the link between

the facts and the conclusion.  *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir.

1999).  "[A]ny step that renders the analysis unreliable under the *Daubert* factors renders

the expert's testimony inadmissible."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745

(3d Cir. 1994).

        Bolt should not be permitted to offer any testimony under Rule 702 of the Federal

Rules of Evidence for several, independent reasons.  First, Bolt testified, in effect, that his

purported testimony is not expert testimony.

        Q.   (By Mr. Albritton)  Mr. Bolt, in light of your  testimony about your
        experience in alleged hacking incidents and the training or the lack of training in
        response to or relation to these specific issues that are involved in this case, I
        gather that anybody with a pretty good working knowledge of computers who

could go to the ARIN website and who could get out a dictionary and look up
Network, Internet Protocol Access, they could give the substance of what you've
told us here today, correct?

A.   Yes.

Q.   You don't need any specialized, you know, training or experience to be able
to offer the opinions about the matters which you've offered opinions?

A.   That's true.

Q.   So, anybody that had some rudimentary, more understanding than me and
access to a definition, or to a dictionary and the Internet could have offered the
same opinions and conclusions that you've offered?

A.   That's correct.

Q.   There's nothing special about it at all?

A.   No.

Q.   So, I'm correct?

A.   You are correct, yes.

Exhibit 4 at 156-57.  In fact, Bolt testified that he did not even represent to NCIC that he

was an expert in tracing IP Addresses, or anything for that matter.  Exhibit 4 at 118-119.

As such, Bolt cannot offer "scientific, technical or other specialized knowledge" which

"will assist the trier of fact to understand the evidence or to determine a fact in issue" in

this case.  Fed. R. Evid. 702.

Second, the real opinion being offered by Bolt—that the attempts to access data

on NCIC's serves were perpetrated by BBG employees or someone associated with

BBG—is not reliable.  Bolt admitted in his deposition that he cannot offer any reliable

testimony about the person or persons who accessed NCIC's database, if in fact it was

accessed.

Q.   You cannot testify who purportedly got access via this IP address?

A.   That's correct.

 Q.   You can't even testify about the actual location of where this access was
obtained, if it was, in fact?

A.   No.

Q.   You cannot offer an opinion, can you, Mr. Bolt, about where the person who
purportedly had this access was sitting when he did it?

 A.   Oh, no.

 Q.   You can't even tell anything further than the city in which it allegedly
happened, correct?

A.   Based solely on this log?
Q.   Right.
A.   No.
Q.   Okay.  Well, and based on everything you know in this case, you can't offer any opinion about where a person was located, the -- the actual location where they purportedly gained access to these servers, correct?
A.   Yeah.
Q.   You can?
A.   Sure.
Q.   Okay.  Well, tell -- tell us how you could do that, Mr. Bolt.
A.   The deposition of Elsa Laura, she mentioned, answered the question that these IP addresses were routers located at their location at BBG Enterprises.
Q.   She said that each one of those were located at BBG's physical address?
A.   Yeah.
Q.   Okay.
A.   I mean, she said they're their routers.
Q.   Okay.  So, other than your reliance on her testimony, is there anything -- any other way you would know that?
A.   No.

Exhibit 4 at 133-135.  A similar exchange punctuates the unreliability of his opinion that someone associated with BBG is responsible for the access, if any.

Q.   Okay.  So, you're just assuming that it was somebody associated with BBG, correct?
A.   That's correct.
Q.   There is no objective verifiable and reproducible data that supports your conclusion or your assumption that it was BBG personnel, correct?
A.   Not without being able to log in to those routers.
Q.   Okay.  So, the answer is, I'm correct?
. . .
A.   That's correct.  Sorry.

Exhibit 4 at 116.

Bolt further testified that just because an IP Address is associated with a router at BBG does not necessarily mean that the access occurred from BBG's location.  He explained that a customer of BBG could gain access to the internet from the IP Address associated with BBG's router from a remote location.  *See* Exhibit 4 at 167; *see also* Exhibit 4 at 68-69, 115.

Third, Bolt has insufficient training and experience to offer any opinions about a person attempting to gain unauthorized access to a database, such as is alleged in this case.  During his deposition, he testified that he has no personal experience with unauthorized access to a database.  Exhibit 4 at 151.  Furthermore, he has neither certifications nor training dealing with unauthorized access to a database.  *Id.* at 147-148. Thus, he is not qualified as an "expert" and his testimony about this issue would be unreliable.

Similarly, Bolt is not qualified to offer any opinions concerning "NCIC's log file generation practices" (even if NCIC and BPL had complied with their obligation to provide an expert report that sets out the subject matter on which the expert will testify) because he is not an expert regarding the SQL database NCIC uses.

> Q.   You're not proclaiming to be an expert on SEQUEL, are you?
> A.   No.
> Q.   So, you can't offer -- since you said you're not an expert on SEQUEL and you're not purporting to be, you can't offer any opinions about that SEQUEL database at NCIC, correct?
> A.   That's correct.
> Q.   You can't offer any opinions as to whether or not the data on that SEQUEL database has been manipulated, correct?
> A.   That's correct.
> Q.   You couldn't, you know, even if you had looked at it, since you are not certified in that, you couldn't tell if it had been manipulated or not, correct?
>  A.   No.  Nobody could.
>  Q.   Okay.  So, no -- nobody in the world, regardless of their level of training, could go through and tell whether or not things have been inserted, deleted, or updated in that SEQUEL table, correct?
>  A.   That's correct.  You -- it's -- it would have to be corroborated somewhere else.

Exhibit 4 at 43-44, 51-52.  Any Bolt testimony about SQL, therefore, would be unreliable.  Likewise, Bolt is not qualified to offer any opinions concerning whether the alleged access was authorized (even if NCIC and BPL had complied with their obligation

to provide an expert report that sets out the subject matter on which the expert will

testify).  He testified in his deposition that he could not offer an opinion as to whether any

access was unauthorized or beyond the scope of authorization given.  Exhibit 4 at 133.

> Q.   Okay.  So, whether or not the access was unauthorized is for somebody other
> than you to testify about?
> A.   That's correct.
> Q.   So, really, your conclusion that this was hacking is unfounded because, under
> your definition of hacking, it's got to be unauthorized, and you have no way to
> know whether it was authorized or not authorized?
> A.   That is correct.
> Q.   So, you really aren't offering any opinion that the persons associated with
> these IP addresses hacked into NCIC's database?
> A.   That's correct.

Exhibit 4 at 117.  Therefore, any opinion on this matter would be unreliable.

## CONCLUSION

For these reasons, Jason Bolt's testimony should be excluded in its entirety or

limited as set forth above.

Respectfully submitted,

_____
Eric M. Albritton
Attorney-in-Charge
Texas State Bar No. 00790215
Albritton Law Firm
P.O. Box 2649
Longview, Texas 75606
(903) 757-8449 (office)
(903) 758-7397 (fax)
eric@albrittonlawfirm.com

Scott E. Stevens
Texas State Bar No. 00792024
Stevens Law Firm
P.O. Box 807
Longview, Texas 75606
(903) 753-6760 (office)
(903) 753-6761 (fax)
 scott@seslawfirm.com

ATTORNEYS FOR RONALD PEREZ,
MICHAEL STOMPS AND KEVEN WATT


/s/_____
Gregory P. Love
Attorney-in-Charge
State Bar No. 24013060
WELLBORN   HOUSTON, LLP
300 W. Main Street
P.O. Box 1109
Henderson, Texas 75653-1109
Telephone: (903) 657-8544
Facsimile:  (903) 657-6108

James J. Mittermiller
California Bar No. 85177
Sheppard, Mullin, Richter & Hampton, LLP
501 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 338-6500
Facsimile: (619) 234-3815

ATTORNEYS FOR BBG
COMMUNICATIONS, INC., BBG
HOLDINGS LIMITED, GREGORIO
GALICOT AND RAFAEL GALICOT

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this motion was served on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(A). Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by certified mail, return receipt requested, on this the 2nd day of December, 2004.

_____
Eric M. Albritton